## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, <br><br> Plaintiff <br><br> v. <br><br> PHASE 2 INVESTMENTS INC. f/k/a MARITIME AUTOWASH, INC. AND MARITIME AUTOWASH, II, <br><br> and <br><br> CWP WEST CORP. T/A MISTER CAR WASH, <br><br> Defendants | Civil Action No. JKB-17-2463 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CWP WEST CORP. T/A MISTER CAR WASH'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT OR, ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

PAGE

I.     INTRODUCTION ...................................................................................... 1

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS ........................... 2

       A.    Negotiation of the Purchase of the Assets of Maritime Autowash and the
             Due Diligence Process ...................................................................... 2

       B.    The Terms of the Asset Purchase Agreement ..................................... 4

       C.    Mister Car Wash Begins Conversion on January 22, 2015 ................... 7

       D.    Any Information about the Claimants Is Based Solely on Information
             Provided by Maritime Autowash ..................................................... 10

III.   LEGAL STANDARDS ............................................................................. 13

       A.    Standard for Motion to Dismiss ...................................................... 13

             1.    Rule 12(b)(1) Standard ......................................................... 13

             2.    Rule 12(b)(6) Standard ......................................................... 14

       B.    Standard for Summary Judgement ................................................... 15

IV.    ARGUMENTS ......................................................................................... 16

       A.    The court lacks jurisdiction over EEOC's claims as to Mister Car Wash
             because the EEOC does not (nor could it) allege the Claimants were
             employed by Mister Car Wash ........................................................ 16

       B.    The court lacks jurisdiction over EEOC's claims as to Mister Car Wash
             because the Claimants did not exhaust their administrative remedies ............... 18

       C.    The Complaint does not state a claim upon which the court may grant
             relief, or, alternatively, Mister Car Wash is entitled to summary judgment
             that it is not subject to successor liability .......................................... 20

             1.    The Complaint fails to state a claims upon which relief may be
                   granted as to all untimely alleged bad acts .............................. 20

             2.    Courts recognize successor liability in limited circumstances to
                   prevent responsible parties from avoiding liability for employment
                   discrimination through corporate chicanery ............................ 21

TABLE OF CONTENTS
(CONTINUED)

3.   Mister Car Wash is not a successor to Maritime Autowash because it had no adequate notice of the pendency of the Charges before it purchased Maritime Autowash's assets and it is a completely separate and distinct entity that purchased only Maritime Autowash's assets ................................................................... 26

a.   There is no evidence showing that Mister Car Wash had adequate notice of the pendency of the Charges at the time of the asset sale because Maritime Autowash represented that no charges were pending....................................................... 26

b.   The EEOC has not shown that Maritime Autowash cannot provide relief.................................................................... 29

c.   Mister Car Wash is not the continuation of business by Maritime Autowash under a different name .............................. 31

V.   CONCLUSION.................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anchor Ross v. Fed. Bureau of Alcohol, Tobacco, & Firearms*,
    807 F. Supp. 2d 362 (D. Md. 2011) ....................................................................17

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986) .........................................................................................15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................14, 26, 30, 31

*Balas v. Huntington Ingalls Indus., Inc.*,
    711 F.3d 401 (4th Cir. 2013) ...........................................................................18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .........................................................................14, 15, 26, 30

*Bouchat v. Baltimore Ravens Football Club, Inc.*,
    346 F.3d 514 (4th Cir. 2003) ...........................................................................15

*Braswell v. Great Expectations of Washington, Inc.*,
    Civ. No. 5:97-41-BRL, 1997 WL 1134125 (E.D.N.C. Aug. 5, 1997) ...................31

*Brooks v. City of Winston-Salem*,
    85 F.3d 178 (4th Cir. 1996) .............................................................................20

*Brown v. McKesson Bioservices Corp.*
    2006 U.S. Dist. LEXIS 9774 (D. Md. Mar. 10, 2006) .......................................13

*Bryant v. Bell Atl. Md., Inc.*,
    288 F.3d 124 (4th Cir. 2002) ...........................................................................18

*C.f. Roman v. Guapos III, Inc.*,
    970 F. Supp. 2d 407 (D. Md. 2013) ..................................................................18

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .....................................................................................15, 16

*Chacko v. Patuxent Inst.*,
    429 F.3d 505 (4th Cir. 2005) ...........................................................................18

*Clackamas Gastroenterology Assocs. v. Wells*,
    538 U.S. 440 (2003) .........................................................................................17

*Coleman v. Keebler Co.*,
    997 F. Supp. 1094 (N.D. Ind. 1998) ......................................................................1, 29

*Conley v. Gibson*,
    355 U.S. 41 (1957).................................................................................................14

*Dennis v. County of Fairfax*,
    55 F.3d 151 (4th Cir. 1995) ..................................................................................18

*EEOC v. 786 South LLC*,
    2010 WL 4628101 (W.D. Tenn. Nov. 8, 2010)......................................................25

*EEOC v. Alford*,
    1993 WL 389433 (E.D. Va. July 15, 1993) .............................................23, 24, 31

*EEOC v. Anchor Sign Corp.*,
    Civ. No. 88-68-N, 1988 WL 141031 (E.D. Va. July 22, 1988)................17, 24, 25

*EEOC v. Dillard's, Inc.*,
    Civ. No. 08-1780-PCL, 2011 WL 2784516 (S.D. Cal. July 14, 2011)...................19

*EEOC v. Journal Disposition Corp.*,
    2011 WL 5118721 (W.D. Mich. Oct. 27, 2011).............................................28, 34

*EEOC v. MacMillan Bloedel Containers, Inc.*,
    503 F.2d 1086 (6th Cir. 1974) ........................................................................22, 23

*EEOC v. Maritime Autowash*,
    820 F.3d 662 (4th Cir. 2016) ...........................................................................11, 30

*EEOC v. Nichols Gas & Oil, Inc.*,
    688 F. Supp. 2d 193 (W.D.N.Y. 2010)..................................................................30

*EEOC v. Sunbelt Rentals, Inc.*,
    521 F.3d 306 (4th Cir. 2008) .................................................................................19

*Evans v. B.F. Perkins Co.*,
    166 F.3d 642 (4th Cir. 1999) .................................................................................16

*Evans v. Techs. Applications & Serv. Co.*,
    80 F.3d 954 (4th Cir. 1996) .............................................................................18, 19

*Felty v. Graves-Humphreys Co.*,
    818 F.2d 1126 (4th Cir. 1987) ...............................................................................15

*Giarratano v. Johnson*,
    521 F.3d 298 (4th Cir. 2008) .................................................................................15

*Gulino v. N.Y. State Educ. Dep't*,
  460 F.3d 361 (2d Cir. 2006) ................................................................. 16

*Hartsell v. Duplex Prods.*,
  123 F.3d 766 (4th Cir. 1997) ............................................................... 19

*Hoffman Plastic Compounds, Inc. v. NLRB*,
  535 U.S. 137 (2002) ............................................................................. 30

*Jones v. Am. Postal Workers Union*,
  192 F.3d 417 (4th Cir. 1999) ............................................................... 13

*Jones v. Calvert Group, Ltd.*,
  551 F.3d 297 (4th Cir. 2009) ............................................................... 18

*Jordan v. Alternative Resources Corp.*,
  458 F.3d 332 (4th Cir. 2006) ............................................................... 16

*Labram v. Havel*,
  43 F.3d 918 (4th Cir. 1995) ................................................................. 14

*Lipscomb v. Technologies, Services & Information, Inc.*,
  2011 WL 691605 (D. Md.) .................................................................. 29

*McBurney v. Cuccinelli*,
  616 F.3d 393 (4th Cir. 2010) ............................................................... 16

*Musikiwamba v. ESSI, Inc.*,
  760 F.2d 740 (7th Cir. 1985) ...................................................... *passim*

*Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*,
  25 Fed. Appx. 116 (4th Cir. 2001) ................................................. 21, 22

*National R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002) ....................................................................... 20, 21

*Phillips v. CSX Transport, Inc.*,
  190 F.3d 285 (4th Cir. 1999), *cert. denied*, 529 U.S. 1004 (2000) .......... 15

*Prince v. Kids Ark Learning Center, LLC*,
  622 F.3d 992 (8th Cir. 2010) .......................................................... 23, 34

*Reynolds & Reynolds Co. v. Hardee*,
  932 F. Supp. 149 (E.D. Va. 1996), *aff'd*, 133 F.3d 916 (4th Cir. 1997) .......... 15

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States*,
  945 F.2d 765 (4th Cir. 1991) ............................................................... 13

*Rowe Entertainment, Inc. v. William Morris Agency, Inc.*,
2005 WL 22833 (S.D.N.Y. Jan. 5, 2005), *aff'd* 167 Fed. Appx. 227 (2d Cir.
2005) ...................................................................................................................22, 23

*Steinbach v. Hubbard*,
51 F.3d 843 (9th Cir. 1995) ...........................................................................29

*United Black Firefighters v. Hirst*,
604 F.2d 844 (4th Cir. 1979) .........................................................................14

*Wheeler v. Snyder Buick, Inc.*,
794 F.2d 1228 (7th Cir. 1986) ...........................................................25, 31, 35

*Williams v. Giant Food Inc.*,
370 F.3d 423 (4th Cir. 2004) .........................................................................21

*Young v. City of Mount Ranier*,
238 F.3d 567 (4th Cir. 2001) .........................................................................14

**Statutes**

42 U.S.C. § 2000e-2(a) ...........................................................................................16

42 U.S.C. § 2000e(b) ...............................................................................................17

42 U.S.C. Section 2000e(f) ......................................................................................17

Civil Rights Act of 1964 Title VII....................................................................*passim*

Civil Rights Act of 1991 Title VII and Title I ........................................................13

Fla. Stat. Ann. § 607.1106(1)(c) (West 2017)...................................................2, 30

**Other Authorities**

2 EEOC Compliance Manual § 2-III A.1.,
https://www.eeoc.gov/policy/docs/threshold.html................................................17

Fed. R. Civ. P. 12(b)(6)......................................................................................14, 19

Fed. R. Civ. P. 12(d) ................................................................................................15

Fed. R. Civ. P. 56 .....................................................................................................15

Fed. R. Civ. P. 56(a) ................................................................................................15

Pursuant to Rules 12(b)(1) and 12(b)(6) or, alternatively, 56(a) of the Federal Rules of Civil Procedure and Local Civil Rule 105, Defendant CWP West Corp. T/A Mister Car Wash ("Mister Car Wash") respectfully submits this memorandum of law in support of its motion to dismiss or, alternatively, motion for summary judgment on Plaintiff U.S. Equal Employment Opportunity Commission's ("EEOC" or "Commission") claims against it.

## I.   INTRODUCTION

The EEOC cannot maintain its claims against Mister Car Wash because it lacks standing to sue Mister Car Wash and because the individuals on whose behalf the EEOC sues failed to exhaust their administrative remedies.   If the court determines it has jurisdiction over the EEOC's claims, the claims should be dismissed because they fail to state a claim on which relief may be granted, or alternatively, summary judgment should be granted in Mister Car Wash's favor because there is no basis for imposing successor liability upon Mister Car Wash.

It would be "grossly unfair . . . to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief."  *Coleman v. Keebler Co.*, 997 F. Supp. 1094, 1099 (N.D. Ind. 1998) (quoting *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 752 (7th Cir. 1985)), as is the case here with Mister Car Wash.  During its administrative investigation, the EEOC sought and obtained from Mister Car Wash information showing—unequivocally—that Mister Car Wash is not a successor under the applicable principles of law and is therefore not subject to successor liability.  Nevertheless, the EEOC has sued naming Mister Car Wash as a defendant and asserting, without adequate factual support, that it is a successor corporation. Because the facts show that Mister Car Wash is not a successor corporation, and because the only allegations against Mister Car Wash in support of the successor liability theory are recitals of the elements of that theory, all of the EEOC's claims should be dismissed for failure to state a

claim or, alternatively, summary judgment should be granted in Mister Car Wash's favor because there is no basis for imposing successor liability upon Mister Car Wash.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

The EEOC filed its First Amended Complaint ("Am. Compl.") on September 27, 2017, on behalf of nine individuals whom the EEOC alleges were employed by Maritime Autowash, Inc. and/or Maritime Autowash, II (collectively, "Maritime Autowash"): Elmer Escalante, Godofredo Esquivel Platero, Luis Serrano, Jose Luis Dominguez[1] Gabriela Espinoza, Saul Herrera, Santos Villacorta, Eddy Cervantes, and Merced Espinosa Diaz[2] (collectively, "Claimants") and an alleged class of aggrieved Hispanic employees.

### A.    Negotiation of the Purchase of the Assets of Maritime Autowash and the Due Diligence Process

1.    On or about October 8, 2014, Mister Car Wash and Maritime Autowash[3] entered into a letter of intent for Mister Car Wash to purchase the assets of Maritime Autowash. Decl. of Casey Lindsay ("Lindsay Decl."), attached hereto as Ex. 1. The purchase price specified in the letter of intent was in excess of $15 million. Lindsay Decl. Ex. A ¶ 1. After signing the letter of intent, the parties commenced the due diligence process and began negotiating the terms of an asset purchase agreement.

---

[1] According to the EEOC's Form 5, the correct spelling of this individual's surname is Dominquez. *See infra* Statement of Undisputed Material Facts ¶ 22.

[2] According to the EEOC's Form 5, the correct spelling of this individual's name is Merceo Espinosa-Diaz. *See id.*

[3] On or around April 8, 2015, Phase 2 Investments, Inc. ("Phase 2") was created from the merger of Maritime Autowash, Inc. and Maritime Autowash, II. Am. Compl. ¶ 8, ECF No. 5. The surviving entity, Phase 2, is responsible and liable for all the liabilities and obligations of each corporation party to the merger—Maritime Autowash, Inc. and Maritime Autowash, II. FLA. STAT. ANN. § 607.1106(1)(c) (West 2017).

2.      Prior to the execution of the letter of intent and the fixing of the $15-plus million purchase price, Maritime Autowash had not disclosed to Mister Car Wash the existence of any pending lawsuits or claims by employees.  Lindsay Decl. ¶ 6.  The letter of intent specifies that the purchase price was subject to reduction if Mister Car Wash assumed any liabilities of Maritime Autowash.  *Id.* Ex. A ¶ 1.

4.      The purchase was intentionally structured as an asset acquisition to avoid assuming any existing liabilities of Maritime Autowash, except those specifically agreed to as part of the (to be negotiated) asset purchase agreement.  Lindsay Decl. ¶ 7.

5.      As part of the due diligence process, Mister Car Wash asked Maritime Autowash to disclose any and all pending lawsuits or claims by employees.  Decl. of Sarah Ross ("Ross Decl.") ¶ 3, attached hereto as Ex. 2.

6.      In response, on or about October 23, 2014, Maritime Autowash forwarded position statements earlier prepared by its counsel responding to the EEOC charges filed by the Claimants following their termination of employment by Maritime Autowash during 2013. Ross Decl. ¶ 4, Ex. A; Decl. of Lawrence J. Minich ("Minich Decl.") ¶ 3, attached hereto as Ex. 3. Accompanying the position statements was a letter dated October 20, 2014 from Maritime Autowash's counsel stating Maritime Autowash had an Employment Practices Liability Insurance policy with $1,000,000 in coverage and that such counsel would be "surprised" if the Claimants' damages would exceed $1,000,000.  Ross Decl. Ex. B. This was the first Mister Car Wash knew of the Claimants' charges.  Ross Decl. ¶ 4.  Mister Car Wash did not receive the actual charges of discrimination from Maritime Autowash at any time, including during the due diligence process, and therefore did not know the specific allegations raised in the charges of discrimination.  *Id.* ¶ 5.

3

7.     At Mister Car Wash's request, Maritime Autowash provided Mister Car Wash with considerable due diligence documentation, including various census of Maritime Autowash's then current employees. *Id.* ¶ 6.  None of the due diligence documents provided by Maritime Autowash indicated that any of the Claimants were then current employees of Maritime Autowash. *Id.*  At no time during the due diligence process did Maritime Autowash disclose to Mister Car Wash that the EEOC had already filed an Order to Show Cause against Maritime Autowash for its failure to disclose certain information during the EEOC's investigation, a fact that was discovered by Mister Car Wash only after closing on the asset acquisition. *Id.* ¶ 7.  Instead, Maritime Autowash assured Mister Car Wash that Maritime Autowash would remain responsible and liable for any defense and damages related to the EEOC matters.  Minich Decl. ¶ 4.

8.     Based on Maritime Autowash's continued assurances, records reflecting that all of the charging parties (including the Claimants) had long since left employment with Maritime Autowash, and Maritime Autowash's failure to disclose its ongoing battles with the EEOC, Mister Car Wash did not negotiate for a lower purchase price.  Lindsay Decl. ¶ 8; Minich Decl. ¶ 5.  Instead, on January 21, 2015, Mister Car Wash executed an Asset Purchase Agreement ("APA") with Maritime Autowash, Podrog Maritime Investments, LLC, a Florida limited liability company, and Podrog Maritime Investments II, LLC.  Minich Decl. Ex. A.  Maritime Autowash, together with Podrog Maritime Investments, LLC and Podrog Maritime Investments II, LLC are collectively referred to as the "Seller" in the APA and herein).

### B.     The Terms of the Asset Purchase Agreement

9.     Pursuant to the APA, Mister Car Wash purchased the real property and substantially all of operating assets of two car washes ("stores")—one in Millersville and another in Edgewater, Maryland.  Minich Decl. Ex. A.  Mister Car Wash did not purchase the "mermaid"

trademark and/or logo used in signage by Maritime Autowash; this was licensed by Mister Car Wash for a transition period only. *Id*. Ex. A § 1.2.  The APA clearly and unambiguously provides that "[e]xcept for (i) liabilities and obligations arising out of the operation of the Business *after the Closing Date* . . . , (ii) obligations for Coupons . . . , and (iii) liabilities and obligations *specifically assumed* by Buyer pursuant to the terms of this Agreement, it is expressly understood and agreed that Buyer *is not assuming or becoming liable for any liabilities of Seller* (including, without limitation, any indebtedness of Seller) of any kind or nature at any time existing or asserted, whether known or unknown, fixed, contingent or otherwise."  *Id.* Ex. A § 1.3 (emphasis added).  Any liabilities to be assumed by Mister Car Wash were to be listed on Schedule 1.3 to the APA; this schedule lists only two truck leases and a camera security system lease.  No mention is made of any employee complaints or litigation.  *Id.* Ex. A Schedule 1.3. Furthermore, the Seller, Maritime Autowash, expressly acknowledged and agreed that it remained exclusively liable for all of the excluded liabilities that Mister Car Wash did not specifically assume.  *Id.* Ex. A § 1.3.

10. Notwithstanding its earlier disclosure of the position statements, Maritime Autowash expressly represented and warranted to Mister Car Wash in the APA that "[t]here is no litigation or governmental or administrative proceeding or investigation pending or, to Sellers' Knowledge, threatened against Seller, or any affiliate of Seller, which may have an adverse effect on the Business or the [purchased] Assets, or which would prevent or hinder the consummation of the transactions contemplated by [the APA]."  *Id.* Ex. A § 2.8(a).

11. Regarding Maritime Autowash's employees, Maritime Autowash further represented and warranted to Mister Car Wash as follows:

> Seller employs over fifty (50) employees and generally enjoys good employer-employee relationships.  Seller is responsible for and has paid, or will have paid,

> in accordance with all applicable laws and current policies of Seller all amounts due to Sellers' employees for any salary, bonus, wages, severance, vacation, sick leave, benefits or other accrued obligations due to Sellers' employees for service through the Closing Date.  Seller agrees to terminate all of Sellers' employees effective as of the close of business on the Closing Date.  Pursuant to the Management Agreements between Maritime, Maritime II, and PMI and PMI II, respectively, the employees shall remain employees of Maritime and Maritime II through the Closing Date.

*Id.* Ex. A § 2.12(b).  Mister Car Wash was not required to hire any of Maritime Autowash's employees (*id.* Ex. A § 2.12(c)), and, after Maritime Autowash's employees were terminated, Mister Car Wash was not liable to those individuals for "severance pay" or any other payments (*id.*).  Maritime Autowash, as Seller, further agreed that Mister Car Wash, as Buyer, "shall not have any responsibility or liability of any kind whatsoever which relates in any way . . . to any person's status as an employee of Seller on or prior to the Closing Date".  *Id.* Ex. A § 5.7.

12.     Maritime Autowash, as Seller, and its owner, David Podrog, agreed to indemnify and hold harmless Mister Car Wash from and against any damages, liabilities, losses, taxes, fines, penalties, costs, and expenses of any kind or nature whatsoever arising out of any liability of Maritime Autowash and Mr. Podrog in connection with acts for which Mister Car Wash became liable.  *Id.* Ex. A § 8.2.  This indemnification obligation was to "remain in full force and effect regardless of any assignment by Buyer, investigation made by or on behalf of Buyer Indemnified Parties, or any knowledge of Buyer Indemnified Parties or such individuals of any facts or circumstances contributing to such indemnification.  *Id.* Ex. A § 8.2(d).

13.     On or about January 21, 2015, at the closing of the acquisition ("Closing"), Mister Car Wash paid the Seller, including Maritime Autowash, the full purchase price—in excess of $15 million—the largest amount Mister Car Wash had ever paid for two stores in the history of the company.  *Id.*

### C.     Mister Car Wash Begins Conversion on January 22, 2015

14.    After the Closing, Mister Car Wash began converting the two acquired stores into Mister Car Wash-branded car washes.   Ross Decl. ¶ 8. As contemplated by the licensing provisions of the APA, Mister Car Wash continued to use for a limited time the outdoor monument and building signage, public-facing marketing materials, and social media pages previously used by Maritime Autowash, as is customary in Mister Car Wash's standard acquisition integration process until Mister Car Wash-branded signage, marketing materials and social media could be put into place, typically within 6 to 7 months.  *Id.* ¶ 9.  By mid-August, 2015, Mister Car Wash was no longer using public-facing marketing materials.  *Id.* ¶ 10.  By October 2015, Mister Car Wash was no longer using the Maritime Autowash website or social media.  *Id.* ¶ 11.  Mister Car Wash's usage of outdoor monument and building signage showing the tradename "Maritime Autowash" continued solely as a result of an unrelated trademark infringement claim over the name "Mister Car Wash."  *Id.* ¶ 12.  The outdoor monument and building signage has now been converted to "Mister Car Wash".  *Id.*  Ex. C.

15.    Following the Closing, the customer receipts at the stores were changed to the Mister Car Wash name and information, and the Maritime Autowash name and information were deleted.  *Id.* ¶ 13.  Mister Car Wash quickly began to make changes to the stores' internal processes and structure.  On the day of the Closing, Mister Car Wash management identified that the towels and tunnel chemistry (the chemicals used to clean the car) needed to be adjusted in order to provide a higher quality of customer service.  *Id.* ¶ 14.  Mister Car Wash management also promptly began to fine-tune the vacuuming processes in order to facilitate a faster experience for customers who purchased a "full service" (exterior and interior) car wash.  *Id.* And Mister Car Wash implemented significant changes to the physical layout of the car wash operations to increase efficiency and maximize customer service, consistent with the Mister Car

Wash brand. *Id.* During the first eight months of operation, Mister Car Wash spent more than $300,000 on equipment and capital improvements at the two stores. *Id.* ¶ 15. To date, Mister Car Wash has spent a total of approximately $600,000 on equipment and capital improvements, including new outdoor monument signage. *Id.*

16.     Consistent with Mister Car Wash's acquisition integration process, Mister Car Wash offered employment to all individuals who were current Maritime Autowash employees as of the Closing. *Id.* ¶ 16. In doing this, Mister Car Wash relied upon the detailed census of Maritime Autowash employees provided by Maritime Autowash throughout the due diligence process, none of which include any of the Claimants' names. *Id.* In fact, Mister Car Wash is without any documentation to reflect that any of these individuals ever applied for employment with Mister Car Wash or were hired by Mister Car Wash. *Id.*

17.     The employees saw many changes after the Closing, beginning with the hiring processes. *Id.* ¶ 17. Each applicant for employment with Mister Car Wash (including, but not limited to, the former Maritime Autowash employees) was asked to complete Mister Car Wash hiring paperwork, was provided a Mister Car Wash employee handbook, and otherwise followed the Mister Car Wash hiring processes. *Id.* Each individual hired by Mister Car Wash to work at the two stores was required, in compliance with applicable employment laws, to produce specified documentation of authorization to work lawfully in the United States. *Id.*

18.     To Mister Car Wash's disappointment, many of the former Maritime Autowash employees were unable to produce valid documentation of eligibility to work lawfully in the United States. Ross Decl. ¶ 18. 137 employees appeared on the Maritime Autowash census delivered several weeks prior to the Closing; immediately following the Closing, only 75 of these individuals applied to work for Mister Car Wash. *Id.* During the E-Verify process

conducted by Mister Car Wash when hiring employees immediately following the Closing, 33 individuals received Department of Homeland Security Tentative or Final Nonconfirmations and accordingly, in compliance with applicable laws, they were not employed by Mister Car Wash beyond the statutory eight-day period. *Id.* Mister Car Wash was able to maintain employment of only 42 (or 31%) of these experienced Maritime Autowash employees. *Id.* The vast majority of Maritime Autowash employees who did not continue as Mister Car Wash employees were production-level employees—what Mister Car Wash calls the employees who physically vacuum, dry, and otherwise directly service customer vehicles. *Id.* ¶ 19. The other employees that Mister Car Wash hired immediately following the Closing had only been recently hired by Maritime Autowash once it became known that Mister Car Wash intended to E-Verify all new hires. These newly hired employees had little-to-no car wash experience as of the Closing. *Id.*

19.    As a result, Mister Car Wash had to make the difficult business decision to suspend its high-revenue detailing services at both stores, resulting in a significant decrease in the profits of each store. Ross Decl. ¶ 20. Without experienced production employees, Mister Car Wash had no choice: it simply could not provide the customers a quality experience. *Id.* This was a direct result of the differences between Maritime Autowash's hiring processes and Mister Car Wash's hiring processes put into place at the stores *on the first day after the acquisition*. *Id.*

20.    As further evidence of the change of ownership to Mister Car Wash, the Maritime Autowash uniforms and work attire were phased out and the newly-hired employees were expected to adhere to Mister Car Wash's higher expectations with respect to uniforms and/or work attire. Ross Decl. ¶ 21. By September 2015, Mister Car Wash had spent over $10,000 on new uniforms for the employees at the two stores. *Id.* Changes were made to the employees'

compensation and benefits to bring the new stores in line with other Mister Car Wash stores. *Id.* ¶ 22. The employees were also quickly trained on Mister Car Wash-developed practices and processes and immediately the time required to wash a car decreased significantly. *Id.* ¶ 23. During due diligence, Maritime Autowash had reported that its average time to wash a car was approximately 45 minutes. *Id.* Within the first few weeks of Mister Car Wash's operations, as a result of the changes that Mister Car Wash made to the vacuum process, tunnel chemistry, machinery, towels, and other matters, the car wash time was much closer to Mister Car Wash's standard of approximately 12-15 minutes. *Id.*

21.     With respect to management, Mister Car Wash quickly recognized that the managers acquired in the acquisition were not capable of performing at the levels expected by Mister Car Wash. Ross Decl. ¶ 24. Within approximately 100 days, Mister Car Wash had terminated the employment of the district manager, the general managers (one of whom resigned), and assistant managers of both stores. *Id.* The replacement managers for these two stores were relocated from other Mister Car Wash locations outside of Maryland. *Id.*

### D.     Any Information about the Claimants Is Based Solely on Information Provided by Maritime Autowash

22.     Beginning March 25, 2014 and continuing through April 14, 2014, the Claimants and other Charging Parties[4] filed charges against Maritime Autowash alleging national origin discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII")  (collectively, the "Charges"). Minich Decl. Ex. C. "Escalante held no

---

[4] Cervantes, Eddy (EEOC Charge No. 531-2014-00417); Dominquez, Jose (531-2014-00412); Escalante, Elmer (531-2013-02215); Espinosa, Gabriela (531-2014-00413); Espinosa, Juan (531-2014-00420); Espinosa-Diaz, Merceo (531-2014-00419); Franco, Jose (531-2014-00404); Franco, Juan (531-2014-00760); Herrera, Saul (531-2014-00414); Jeronimo, Carmelina (531-2014-00415); Platero, Godofredo (531-2014-00407); Serrano-Guillen, Luis (531-2014-00408); Villacorta, Santos (531-2014-00406).

valid work authorization when he was hired by Maritime [Autowash]." *EEOC v. Maritime Autowash*, 820 F.3d 662, 665 (4th Cir. 2016).

23.     Based on Maritime Autowash's assurances that the Charges were meritless, the fact that none of the Claimants' or other Charging Parties' names appeared on the employee census provided during due diligence, the assertion that Maritime Autowash had a $1,000,000 insurance policy available to cover any liability for the Charges, and the express provisions of the APA, including representations, warranties, and indemnifications by Maritime Autowash confirming that Mister Car Wash had no liability for any Charges (collectively or individually), Mister Car Wash was, understandably, not aware of or involved in the EEOC's continued investigation into employment actions prior to the Closing by Maritime Autowash.  Minich Decl. ¶ 8.

24.     It was not until *several months after* the Closing that Mister Car Wash became aware of the ongoing status of the Charges when it began to receive direct communications from the EEOC.  Minich Decl. ¶ 9.  By letter dated March 4, 2015, the EEOC informed Mister Car Wash of potential successor liability for alleged discrimination committed by Maritime Autowash".  *Id.* ¶ 11 Ex. C.  This is the first Mister Car Wash was made aware of its potential liability.  *Id.*  The EEOC issued Mister Car Wash a written request for information dated March 23, 2015 ("RFI"), which letter Mister Car Wash did not receive until on or about May 19, 2015. *Id.* ¶ 12 Ex. D.

25.     On May 11, 2015, without having received any information from Mister Car Wash, the EEOC amended the Charges for some, but not all, of the Charging Parties, naming

Mister Car Wash as a respondent ("Amended Charges").[5]  *Id.* ¶ 13.   None of the Amended Charges alleges that any of the complained of discrimination occurred after the Closing Date.  *Id.* Ex. E.   Indeed, the latest date of discrimination alleged in any of the Amended Charges is July 27, 2013 – more than a year and half before Mister Car Wash purchased the assets of Maritime Autowash. *Id.* Mister Car Wash received the Amended Charges in approximately June 2015. *Id.* ¶ 14.  This was the first time Mister Car Wash was made aware of the specific allegations in the Charges.  *Id.* ¶¶ 10, 14.   Notwithstanding, Mister Car Wash cooperated with the EEOC, providing full responses to each of the Requests for Information.  *Id.* ¶ 15.

26.     In accordance with the indemnification provisions of the APA, legal counsel for Maritime Autowash filed, on behalf of Mister Car Wash (but without Mister Car Wash's prior review), position statements in response to the Amended Charges.  Minich Decl. ¶ 16.  The facts asserted by Maritime Autowash's legal counsel in defense of the alleged discrimination were based solely on information provided by Maritime Autowash, essentially a restatement of the position statements the same legal counsel had filed in 2014 on behalf of Maritime Autowash in response to the original Charges.  *Id.*  Maritime Autowash's legal counsel properly asserted that "[s]ince Mister Car Wash only purchased Maritime[ Autowash]'s assets, it is not liable for any of Maritime[ Autowash]'s alleged liabilities."  *Id.*

27.     Mister Car Wash continued to rely on Maritime Autowash to resolve the Charges and provide it with a defense, and was not party to the ongoing subpoena-enforcement action during 2015-2016 brought by EEOC against Maritime Autowash.  *Id.* ¶ 17.  Any responses filed

---

[5] The Amended Charges were filed by: Abel I. Sosa Canas, Eddy N. Cervantes, Jose Luis Dominquez, Elmer Escalante, Gabriela Espinosa, Merced Espinosa-Diaz, Juan Franco, Saul Herrera, Carmelina Jeronimo, Godofredo Platero, Luis Serrano-Guillen, and Santos Villacorta. Minich Decl. Ex. E.

on behalf of Mister Car Wash by Maritime Autowash's legal counsel were not provided to Mister Car Wash prior to their filing. *Id.*

28.     On March 17, 2017, EEOC issued to Maritime Autowash and Mister Car Wash a Letter of Determination finding reasonable cause to believe that Maritime Autowash violated Title VII based on national origin (Am. Compl. ¶ 28) and that Mister Car Wash is a successor in interest for Title VII national origin purposes.  Minich Decl. ¶ 18.

29.     On September 27, 2017, EEOC filed the Complaint under Title VII and Title I of the Civil Rights Act of 1991, on behalf of the Claimants and an alleged class of aggrieved Hispanic employees.  Am. Compl. ¶¶ 34-84.

## III.    LEGAL STANDARDS

### A.    Standard for Motion to Dismiss

#### 1.    Rule 12(b)(1) Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a claim should be dismissed when the court lacks subject matter jurisdiction.  The existence of subject matter jurisdiction is a threshold issue that the court must address before considering the merits of the case. *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 422 (4th Cir. 1999).  The plaintiff bears the burden of establishing that subject matter jurisdiction exists. *Id.*  The court should grant a motion to dismiss under Rule 12(b)(1) if "the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).  The court has previously treated motions to dismiss for failure to exhaust administrative remedies as governed by Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. *Brown v. McKesson Bioservices Corp.* 2006 U.S. Dist. LEXIS 9774, at *8 (D. Md. Mar. 10, 2006) (plaintiff's failure to exhaust

administrative remedies was fatal to her claims) (citing *Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003), *aff'd* 85 Fed. Appx. 960, 960 (4th Cir. 2004)).

## 2. Rule 12(b)(6) Standard

Rule 12(b)(6) provides for dismissal of a pleading that does not state a claim upon which the court may grant relief.  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a pleading that merely offers "labels and conclusions," or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).  Likewise, "[c]onclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995).  Indeed, "[t]he presence . . . of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support" the legal conclusion.  *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001).  A complaint also is insufficient if it relies upon "naked assertions devoid of further factual enhancement."  *Iqbal*, 556 U.S. at 678 (internal citation omitted).  Because the central purpose of the complaint is to provide the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests," the plaintiff's legal allegations must be supported by some factual basis sufficient to allow the defendant to prepare a fair response.  *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  Accordingly, to survive dismissal, the EEOC must put forth claims that cross "the line from conceivable to plausible."  *Twombly*, 550

14

U.S. at 570.  The Fourth Circuit has concluded that the Supreme Court's decision in *Twombly* establishes a standard that is "more favorable to dismissal of a complaint" at the earliest stages of a case than previous standards. *See Giarratano v. Johnson*, 521 F.3d 298, 304 n.3 (4th Cir. 2008).  Additionally, Rule 12(d) permits a court to consider matters outside the pleadings in connection with a motion to dismiss, and to treat the motion as one for summary judgment pursuant to Rule 56. Fed. R. Civ. P. 12(d); *Reynolds & Reynolds Co. v. Hardee*, 932 F. Supp. 149, 152 (E.D. Va. 1996), *aff'd*, 133 F.3d 916 (4th Cir. 1997).

### B.   Standard for Summary Judgement

Summary judgment "shall [be] grant[ed] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any which it believes will demonstrate the absence of any genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In considering the motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).  To withstand a motion for summary judgment, the nonmoving party must do more than present a mere scintilla of evidence. *Phillips v. CSX Transport, Inc.*, 190 F.3d 285, 287 (4th Cir. 1999), *cert. denied,* 529 U.S. 1004 (2000).  Instead, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.  The court has an affirmative duty to prevent factually unsupported claims and defenses from proceeding to trial.  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003); *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).  Summary judgment is "regarded not as a disfavored

procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (internal citations omitted).

## IV.    ARGUMENTS

### A.    The court lacks jurisdiction over EEOC's claims as to Mister Car Wash because the EEOC does not (nor could it) allege the Claimants were employed by Mister Car Wash

The EEOC has failed to establish subject matter jurisdiction because the Complaint fails sufficiently to allege that Mister Car Wash was Claimants' "employer" for purposes of Title VII. As the party invoking federal jurisdiction, the EEOC bears the burden of establishing standing under Article III of the Constitution.  *McBurney v. Cuccinelli*, 616 F.3d 393, 410 (4th Cir. 2010). As the United States Court of Appeals for the Fourth Circuit explained in *McBurney*:

> The irreducible constitutional minimum of standing requires (1) an injury in fact—a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical; (2) causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant; and (3) redressability—a likelihood that the requested relief will redress the alleged injury.

616 F.3d at 402 (*quoting Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998) (quotation marks omitted); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

Title VII claims may be brought only against a plaintiff's employer.  *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 338 (4th Cir. 2006) (citing *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006)).  Title VII makes it an unlawful employment practice for an employer to discriminate against an individual on the basis of race, color, religion, or national origin, 42 U.S.C. § 2000e-2(a), and, consequently, "the existence of an employer-employee relationship is a primary element of Title VII claims."  *Gulino*, 460 F.3d at 370.  A plaintiff must plead and prove the existence of an employment relationship with the defendant in

order to state a claim under Title VII.  *EEOC v. Anchor Sign Corp.*, Civ. No. 88-68-N, 1988 WL

141031, at *4 (E.D. Va. July 22, 1988), attached as Ex. 4.

Pursuant to 42 U.S.C. Section 2000e(f), an "employee" is an "individual employed by an

employer."  And an "employer" is defined to mean a "person engaged in an industry affecting

commerce who has fifteen or more employees for each working day in each of twenty or more

calendar weeks in the current or preceding year."  42 U.S.C. § 2000e(b).  The Commission's

Policy Guidance on Threshold Issues also provides an unambiguous statement about who is

protected by Title VII:

> The question of whether an employer-employee relationship exists is fact-specific
> and depends on whether the employer controls the means and manner of the
> worker's work performance.  This determination requires consideration of all
> aspects of the worker's relationship with the employer.

2 EEOC COMPLIANCE MANUAL § 2-III A.1., https://www.eeoc.gov/policy/docs/threshold.html

(last visited Nov. 22, 2017).[6]

Here, nowhere in the Complaint does the EEOC allege (nor could it) that Mister Car

Wash employed the Claimants.[7]  Instead, the EEOC recounts various alleged instances of

discrimination during Claimants' employment with Maritime Autowash and states that Mister

Car Wash purchased and obtained Maritime Autowash's *real property and tangible assets* on

January 21, 2015.  Am. Compl. ¶ 11.  Thus, there is no fairly traceable connection between the

Claimants' alleged injuries and Mister Car Wash.  *Anchor Ross v. Fed. Bureau of Alcohol,*

*Tobacco, & Firearms*, 807 F. Supp. 2d 362, 368 (D. Md. 2011).  To be sure, the Claimants'

---

[6] Although the EEOC Compliance Manual is not controlling, it may constitute a "body of
experience and informed judgment" to which the court may resort for guidance.  *Clackamas*
*Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 449 n.9 (2003).

[7] Nor does the EEOC allege Mister Car Wash is an employer under the alternative joint employer
or integrated enterprise theories.

"injuries are only traceable to, and redressable by, those who employed them."  *C.f. Roman v. Guapos III, Inc.*, 970 F. Supp. 2d 407, 412 (D. Md. 2013) (no standing to sue restaurants that were not employer of named plaintiffs in collective FLSA action).  Therefore, the court should dismiss the Complaint in its entirety as to Mister Car Wash under Rule 12(b)(1).

**B.      The court lacks jurisdiction over EEOC's claims as to Mister Car Wash because the Claimants did not exhaust their administrative remedies**

The EEOC's Complaint should be dismissed for failure to exhaust administrative remedies.  Before one has standing to file suit under Title VII, a plaintiff must exhaust administrative remedies by filing a charge of discrimination with the EEOC.  *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002).  If a plaintiff fails to exhaust administrative remedies, the failure deprives the court of subject matter jurisdiction over that claim.  *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 406 (4th Cir. 2013); *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009).

Here, the EEOC does not allege (nor could it) that the Claimants filed a charge of discrimination with the EEOC alleging race discrimination.  The EEOC does not allege in the Complaint that the Claimants alleged race discrimination in the Charges or Amended Charges because the Claimants never made race-based claims before the EEOC.  Thus, the EEOC cannot expand the Claimants' claims in this action to include alleged race discrimination, and the EEOC's race claims are procedurally barred.  *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005); *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996).

Nor does the EEOC allege that the Claimants ever raised the following alleged issues in connection with their national origin claims of discrimination in the Charges or Amended Charges:  wages; payments; tips; compensable work; eating on a hill; drinking unfiltered water;

18

access to filtered water and ice, air conditioning, a refrigerator, a microwave, and food; better-quality uniforms; appearing in a photo; attending a party; throwing away food, drinks, and a backpack; and video surveillance. Thus, these claims are also procedurally barred. *Id.* In addition, eating on a hill; access to filtered water and ice, air conditioning, a refrigerator, a microwave, and food; better-quality uniforms; appearing in a photo; attending a party; throwing away food, drinks, and a backpack; and video surveillance do not state a claim upon which relief may be granted and should be dismissed under Rule 12(b)(6) because they are not sufficiently severe or pervasive so as to be actionable. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008); *Hartsell v. Duplex Prods.*, 123 F.3d 766, 773 (4th Cir. 1997).

As for the alleged class of employees, although "[t]he EEOC may seek relief on behalf of individuals beyond the charging parties . . . , the EEOC must discover such individuals and wrongdoing *during the course of its investigation*." *EEOC v. Dillard's, Inc.*, Civ. No. 08-1780-PCL, 2011 WL 2784516, at *6 (S.D. Cal. July 14, 2011) (emphasis in original), attached as Ex. 5. The EEOC started with 14 charging parties, and it now sues on behalf of the Claimants—who are limited to nine individuals. Thus, any alleged class member not already identified among the Claimants has not exhausted administrative remedies. *Id.* Because the EEOC has not alleged that the Claimants and unidentified "class" members have exhausted the requisite administrative remedies, the Complaint must be dismissed. In the alternative, the Complaint should be dismissed pursuant to Rule 12(b)(6).

**C.** **The Complaint does not state a claim upon which the court may grant relief, or, alternatively, Mister Car Wash is entitled to summary judgment that it is not subject to successor liability**

      **1.** **The Complaint fails to state a claims upon which relief may be granted as to all untimely alleged bad acts**

Dismissal is also appropriate when the complaint clearly reveals the existence of a meritorious affirmative defense, including a statute of limitations defense. *Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996) (citing 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357, at 352 (1990) ("'A complaint showing that the statute of limitations has run on the claim is the most common situation in which the affirmative defense appears on the face of the pleading,' rendering dismissal appropriate.")). This is such a case.

The EEOC is limited here to seeking relief solely for individuals who experienced discrimination within the 300-day limitations period.   Except for claims of harassment, employment actions that occurred prior to the commencement of Title VII's limitation period are not actionable.   *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).   This is true even where the plaintiff makes a timely challenge to one or more employment actions within the limitations period and also challenges earlier actions from outside that period on the theory that the employer is engaged in a "continuing violation."   In *Morgan*, the plaintiff challenged as racially discriminatory a series of discrete employment actions—including discipline, denial of training, and termination—which he alleged constituted a continuing violation.   The Supreme Court held that only those adverse actions that occurred 300 days or less before he filed his charge were actionable.   *Id*. at 114.   It reasoned that each failure to hire, failure to promote, or discharge occurs on the day that it happens, and that a series of these discrete acts cannot be

converted into a single "practice" for statute of limitations purposes merely because they may be related. *Id*. at 110-11.[8]

All allegations in the Complaint, including, by way of example only, those regarding disparate duties, pay, and promotion (Am. Compl. ¶¶ 35-40, 66-72); denial of overtime and tips (*id*. ¶¶ 41-45, 72-76); and compensable work (*id*. ¶¶ 46-49, 77-84) that occurred 300 days before the dates on which the Claimants filed the Charges with the EEOC are time-barred and must be dismissed.[9]

### 2. Courts recognize successor liability in limited circumstances to prevent responsible parties from avoiding liability for employment discrimination through corporate chicanery

"It is well settled that, 'where one company sells or otherwise transfers all of its assets to another company, the latter is not liable for the debts and liabilities of the transferor.'" *Nat'l Am.*

---

[8] *Morgan* did not decide whether the rule barring challenges to discrete employment decisions that fall outside the limitations period applies to "pattern or practice" cases. *Id*. at n.9. However, there is no sound reason why the rule should not apply to these cases, and in *Williams v. Giant Food Inc.*, 370 F.3d 423 (4th Cir. 2004), the Fourth Circuit held that it does. In *Williams*, the plaintiff alleged that the employment decisions she challenged—mainly a series of failures to promote—were part of a 20-year pattern or practice of discrimination. She contended that the limitations period should therefore be extended to encompass all adverse decisions made pursuant to the alleged pattern or practice.

The Fourth Circuit rejected this argument. Citing *Bazemore v. Friday*, 478 U.S. 385 (1986), the court found that even when discriminatory decisions are made pursuant to a discriminatory policy that constitutes a pattern or practice of discrimination, the discrimination still manifests itself in "discrete discriminatory acts." 370 F.3d at 429. Thus, the court concluded that the holding of *Morgan*—that discrete employment decisions made outside the limitations period cannot be rendered actionable on a "continuing violation" theory—applies to cases in which "such discrete acts occurred as part of a policy of discrimination." *Id*. It therefore held that "even if Williams is correct that Giant Food's failures to promote her during the applicable limitations period were part of a broader pattern or practice of discrimination, those failures to promote remain discrete acts of discrimination," each of which must be challenged within its limitations period, or not at all. *Id*.

[9] Cervantes filed his Charge on 3/25/14; Dominquez on 4/3/14; Escalante on 3/25/14; Espinosa on 4/14/14; and Espinosa-Diaz, Herrera, Platero, Serrano-Guillen, and Villacorta on 3/25/14. Minich Decl. Ex. C.

*Ins. Co. v. Ruppert Landscaping Co.*, 25 Fed. Appx. 116, 120 (4th Cir. 2001) (citations omitted) (asset purchaser was not liable for debts, even though it was aware of debts, loaned money, hired 100 employees and advised clients that companies were "combining" their operations and forming an "alliance"). As the *Ruppert* court reasoned, "[i]f we were to craft a rule suggesting that a company would assume the liabilities of a financially-strapped company simply by purchasing its assets, we would eviscerate the general and long-standing rule of non-liability, as well as drastically chill future asset purchases." *Id.* at 121.

Where one of the liabilities of the former company is for alleged employment discrimination, however, some courts have, in limited circumstances, held a "new" company liable under a theory of "successor liability" where it is, essentially, the "old" company with a new name. The basic premise of successor liability in employment discrimination cases is that "[fa]ilure to hold a successor employer liable for the discriminatory practices of its predecessor could emasculate the relief provisions of Title VII by leaving the discriminatee without a remedy or with an incomplete remedy . . . . *Such a result could encourage evasion in the guise of corporate transfers of ownership.*" *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1091-92 (6th Cir. 1974) (emphasis added).

To avoid such a result, courts generally employ a multi-factor test to determine whether a company is the successor of another for the purposes of imposing employment liability. *Id.* at 1094 (listing nine factors). However, "[c]ourts considering the appropriateness of imposing successor liability on a purchaser of assets (as distinguished from a purchaser of stock, who acquires the assets and liabilities of the seller) have focused on only two factors." *Rowe Entertainment, Inc. v. William Morris Agency, Inc.,* 2005 WL 22833, at *79 (S.D.N.Y. Jan. 5, 2005), *aff'd* 167 Fed. Appx. 227 (2d Cir. 2005) (citations omitted). Thus, to establish successor

22

liability in a case involving the purchase of assets, "two conditions must be satisfied: '(1) the successor had notice of the claim before acquisition; [and] (2) there was substantial continuity in the operation of the business before and after the sale.'" *Id.* (citation omitted).

Courts have repeatedly emphasized that "[s]uccessor liability is an equitable determination," *Prince v. Kids Ark Learning Center, LLC*, 622 F.3d 992, 994 (8th Cir. 2010) (citations omitted), and that "[t]he ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy." *Id.* at 995. Courts will generally impose liability where the successor "has benefitted from the discriminatory employment practices of its predecessor." *MacMillan Bloedel*, 503 F.2d at 1092.

Courts have accordingly imposed liability on a successor corporation where the facts show that the two companies are essentially the same. For example, in *EEOC v. Alford*, 1993 WL 389433 (E.D. Va. July 15, 1993), attached as Ex. 6, the employer (Stable Beau Shane) was operated as a sole proprietorship by Walter Alford. After it discriminated against its employee and she filed a charge with the EEOC, Ecurie Alford, a separate corporation that was formed and owned by Mr. Alford and his wife, took over operations of the stable: "Mr. Alford became the president of Ecurie Alford and its sole director. His wife, Bonnie Alford, served as . . . secretary/treasurer of Ecurie Alford. Walter and Bonnie hold all of the stock of Ecurie Alford between them." *Id.* at *1.

On these facts, the *Alford* court held that successor liability was entirely appropriate because, "Beau Shane is still operating as Ecurie Alford, Ltd., a Virginia corporation." *Id.* at *2. It explained that:

> Walter Alford d/b/a Beau Shane and Ecurie Alford, Ltd. are the same company. Only the form is different. One was a sole proprietorship and the other is a corporation. Ecurie Alford succeeded to the assets and the liabilities of Beau Shane.

23

*Id.* at *9.

Conversely, where the facts show that the corporate transaction was entirely arms-length, courts have refused to hold that a new company is liable for the discriminatory acts of a predecessor entity. Thus, in *EEOC v. Anchor Sign Corp.*, 1988 WL 141031 (E.D. Va. 1988), the court granted a motion to dismiss and rejected the EEOC's position that Anchor Sign was the successor to another company (Talley Neon) because it purchased some of its assets and retained some of its employees.  The court noted that the EEOC did not allege "that Anchor was in any way involved in the acts of discrimination which occurred while Beekman was employed by Talley Neon, nor is it alleged that any act of discrimination by Anchor was a continuation of the alleged original acts of discrimination."  *Id.* at *2.  It found that the transfer of asserts was a typical arms-length transaction that was not done for the purpose of avoiding liability for the allegedly discriminatory acts of Talley Neon:

> Talley Neon did not sell its business patents, trademark, license, permits, monies, corporate structure, or its good name, but only a part of its assets at the Norfolk location, and did not transfer any liability for any wrong it may have committed . . . .  There is nothing in the record to suggest that Anchor Sign had any notice or information about the Civil Rights claim Beekman may have had. Nor is there any allegation or suggestion the sale by Talley Neon and the purchase by Anchor Sign was a sham or made for any ulterior motive, or was other than a straight forward, open and armslength sale.  The fact is, Talley Neon was not trying, and did not get rid of or relieve itself from liability for the Beekman claim.

*Id.* at *3.

Because the two companies were competitors, *id.* at *5, and "Talley Sign owns no interest in Anchor; they are not in a parent-subsidiary relationship; there is no interrelation of operations, common management centralized control of labor relations, nor does the sole stockholder of Anchor have any ownership interest in Talley sign, nor is it even suggested

Anchor or Talley Sign is an agent of the other," the court held that "Anchor is not the successor to Talley Neon." *Id.* at *4.

Similarly in *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228 (7th Cir. 1986), the court held that the transaction showed that the two companies were completely separate.  There, the alleged successor company (Double K):  (a) purchased the assets of the former company (Snyder); (b) employed many of Snyder's employees; (c) continued the same business; (d) at the same physical location.  *Id.* at 1231.  Thus, the court held, there was "very considerable continuity, following the sale of assets," between Snyder and Double K. *Id.* at 1230.

Despite these many facts showing a continuation of the prior business, the court held that Double K was not the successor of Snyder because:

- "at the time it purchased Snyder assets, Double K had no knowledge whatever of Wheeler's claims against Snyder";

- "the identity of the ownership is totally different"; and

- Snyder was able to provide relief from the time of the allegedly discriminatory action to the date of the asset sale.

*Id.* at 1230-31. While acknowledging that it should strive to provide relief to a plaintiff, the *Wheeler* court held that these facts required a finding of no successor liability:

> In the present case, in which the absence of any timely actual knowledge on the part of the successor is so clear; in which substantial, while not complete, relief from the predecessor is available to the victim; and in which the ownership of the predecessor and of the successor is totally distinct, we refrain from subjecting the doctrine of successor liability to judicial surgery on the scale which would be necessary to permit Wheeler to obtain relief from Double K.

*Wheeler*, 794 F.2d at 1237.  *See also EEOC v. 786 South LLC*, 2010 WL 4628101, at *4 (W.D. Tenn. Nov. 8, 2010) (holding that company (Tripoli II) that purchased prior company (786 South) was not liable for prior company's employment liability because, *inter alia*, "[t]here is no evidence that Tripoli II benefitted from the alleged discriminatory employment practices of 786

25

South"; "Tripoli II lacked actual notice of the instant suit"; and "[t]here is no evidence that the sale to Tripoli was an 'evasion in the guise of corporate transfers of ownership'" (citations omitted)), attached as Ex. 7.

> **3.    Mister Car Wash is not a successor to Maritime Autowash because it had no adequate notice of the pendency of the Charges before it purchased Maritime Autowash's assets and it is a completely separate and distinct entity that purchased only Maritime Autowash's assets**

The Complaint fails to state a claim against Mister Car Wash and must be dismissed because Mister Car Wash is not a successor corporation to Maritime Autowash.  Instead, the facts, which the EEOC sought and is aware of based on information obtained during its investigation, show that Mister Car Wash purchased Maritime Autowash's assets only and it had no adequate notice of the pendency of the Charges before the Closing.  Specifically, this was an arms-length asset acquisition, there is no common ownership or control between Mister Car Wash and Maritime Autowash, and the asset acquisition was not consummated for the purpose of avoiding liability.  On these facts, Mister Car Wash and Maritime Autowash cannot be said to be the same company.

> **a.    There is no evidence showing that Mister Car Wash had adequate notice of the pendency of the Charges at the time of the asset sale because Maritime Autowash represented that no charges were pending**

The Complaint alleges that "[a]t the time of purchase, Defendant Mister Car Wash had actual notice of the EEOC charges which serve as the jurisdictional basis for this action."  Am. Compl. ¶ 27.  However, the EEOC does not provide any facts explaining how Mister Car Wash "had actual notice" of the Charges.  The complete lack of any facts or details supporting this allegation shows that it is "a formulaic recitation of the elements of a cause of action" that is insufficient under *Twombly*, 550 U.S. at 570, and Rule 8.  *See also Iqbal*, 556 U.S. at 678 ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice" to plead a claim).   Simply stating that Mister Car Wash had knowledge of the Charges, because it is an element of successor liability, is insufficient under the law.

Mister Car Wash lacked adequate notice of the pendency of the Charges at the time it executed the APA with Maritime Autowash, and, in the absence of adequate notice, successor liability cannot be imposed.  The APA provides that "[t]here is no litigation or governmental or administrative proceeding or investigation pending or, to Sellers' Knowledge, threatened against Seller, or any affiliate of Seller, which may have an adverse effect on the Business or the Subject of Assets, or which would prevent or hinder the consummation of the transactions contemplated by the [APA]."  Minich Decl. Ex. A ¶ 2.8(a).  The APA clearly and unambiguously provides that "[e]xcept for (i) liabilities and obligations arising out of the operation of the Business after the Closing Date . . . , (ii) obligations for Coupons . . . , and (iii) liabilities and obligations specifically assumed by Buyer pursuant to the terms of this Agreement, it is expressly understood and agreed that Buyer is not assuming or becoming liable for any liabilities of Seller (including, without limitation, any indebtedness of Seller) of any kind or nature at any time existing or asserted, whether known or unknown, fixed, contingent or otherwise."  Accordingly, the Seller, Maritime Autowash, remained exclusively liable for all of the excluded liabilities that Mister Car Wash did not specifically assume.  Furthermore, Maritime Autowash agreed to an indemnification clause in the APA in which they agree to indemnify and hold Mister Car Wash harmless from and against any damages, liabilities, losses, taxes, fines, penalties, costs, and expenses of any kind or nature whatsoever arising out of any liability of Maritime Autowash in connection with acts for which Mister Car Wash becomes liable, up to $15-plus million. Indemnification—a pivotal issue as to Mister Car Wash—is a matter of contract interpretation,

and there is no genuine issue as to the meaning of the indemnification of Mister Car Wash by Maritime Autowash.

This is not a case where Mister Car Wash could have discovered the Charges through the exercise of due diligence. *See, e.g., EEOC v. Journal Disposition Corp.*, 2011 WL 5118721, at *2 (W.D. Mich. Oct. 27, 2011) (EEOC alleged constructive notice by purchaser of assets because litigation was contained in due diligence schedules and "IPCAC would have at least had constructive notice because this suit was filed before the asset sale"), attached as Ex. 8. Rather, as part of the due diligence process, Mister Car Wash asked Maritime Autowash to disclose any and all pending lawsuits or claims by employees, and Maritime Autowash provided position statements earlier prepared by its counsel responding to EEOC charges filed by some of the Claimants following their termination of employment by Maritime Autowash during 2013, together with the October 20, 2014, letter from Maritime Autowash's counsel stating Maritime Autowash had an Employment Practices Liability Insurance policy with $1,000,000 in coverage and that such counsel would be surprised if the Claimants' damages would exceed $1,000,000. Ross Decl. Ex. A. At no time during the due diligence process did Maritime Autowash disclose to Mister Car Wash that the EEOC had already filed an Order to Show Cause against Maritime Autowash for its failure to disclose certain information during the EEOC investigation process, a fact that was discovered by Mister Car Wash only after closing on the asset acquisition. Ross Decl. ¶ 7. Instead, Maritime Autowash assured Mister Car Wash that Maritime Autowash would remain responsible and liable for any defense and damages related to the Charges. Minich Decl. ¶ 4.

Maritime Autowash deprived Mister Car Wash of any adequate notice of the pendency of the Charges before the Closing, and Maritime later made no disclosure to Mister Car Wash

28

regarding an Order to Show Cause related to the EEOC's investigation. Instead, Maritime Autowash provided Mister Car Wash assurances that, effectively, Maritime Autowash was handling the matter, had sufficient insurance coverage to do so, and would continue to address the matter. As a result, Mister Car Wash had no effective notice of any potential liability from the Charges before its purchase of Maritime Autowash's assets. *Musikiwamba*, 760 F.2d at 750 (inequitable to impose successor liability where successor did not have opportunity to protect itself by negotiating a lower purchase price); *Steinbach v. Hubbard*, 51 F.3d 843, 847 (9th Cir. 1995) ([t]he principle reason for the notice requirement is to ensure fairness by guaranteeing that a successor had an opportunity to protect against liability by negotiating a lower price or indemnity clause). Because there are no factual allegations showing that Mister Car Wash knew of the Charges prior to purchasing Maritime Autowash's assets, the successor liability claim fails as a matter of law.[10]

### b.     The EEOC has not shown that Maritime Autowash cannot provide relief

The next element generally considered by courts is whether the predecessor company has the ability to provide relief for the acts that occurred prior to the asset sale. Here, the Complaint does not allege that Maritime Autowash is unable to provide relief. Instead, it alleges only that

---

[10] This distinguishes this case from *Lipscomb v. Technologies, Services & Information, Inc.,* 2011 WL 691605 (D. Md.), where, because the underlying transaction involved the purchase of a contract, with its attendant liabilities, the court held that the purchaser should have, through the exercise of due diligence, discovered the EEOC charge. *Id.* at *9, attached as Ex. 9. As shown above, a purchaser's due diligence extends only to those "liabilities" that are relevant to the transaction, which is exactly what happened here. Mister Car Wash's lack of knowledge about the Charges at the time of the Closing thus cannot be overcome by an assertion that it "should have" discovered this information. *See, e.g., Coleman v. Keebler Co.*, 997 F. Supp. 1094, 1099 (N.D. Ind. 1998) ("[A] successor who exercises due diligence in its purchase and yet fails upon inquiry to uncover evidence of the plaintiff's lawsuit prior to the purchase will not be found to have notice."). Moreover, in *Lipscomb,* the employee, who worked for the predecessor discriminatory employer, continued working for the successor after it purchased the contract. 2011 WL 691601, *1. That is obviously not the case here, as the Claimants all stopped working for Maritime Autowash in 2013.

"[i]t is not assured that Defendant Phase 2 has had, or currently has, the ability to provide the relief in this matter."[11]   Am. Compl. ¶ 25.   Nor does the Complaint address whether Maritime Autowash or Mr. Podrog can satisfy any judgment in this action.[12]

Like the conclusory allegation about Mister Car Wash's alleged knowledge of the Charges discussed above, this nebulous allegation is insufficient under *Twombly* and *Iqbal*. Indeed, even prior to *Twombly,* it would be inadequate.   *See, e.g., Musikiwamba*, 760 F.2d at 751-54 (a "perfunctory recitation" which alleged only that there were inadequate funds by the predecessor company to satisfy a judgment is "grossly deficient").   In any event, Maritime Autowash and Mr. Podrog are more than capable of satisfying any judgment in this action because:   (1) any potential damages would be small as compared to the purchase price Mister Car Wash paid for Maritime Autowash; and (2) Maritime Autowash has an insurance policy with $1,000,000 in coverage.   What is more, an award of monetary damages, if any (and without conceding that undocumented individuals are entitled to recovery in the first place), would at least be reduced because of the Claimants' undocumented status.   *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 151-52 (2002) (federal immigration policy precludes the award of back pay within the context of NLRA unfair labor practice charges to undocumented workers).[13]

---

[11] Although Defendant Phase 2 was not a party to the APA, it is the successor in interest to the Sellers pursuant to Florida law.   FLA. STAT. ANN. § 607.1106(1)(c).

[12] The Complaint does not allege that Maritime Autowash lacks sufficient assets to satisfy a judgment, and the EEOC's hint that Maritime Autowash may not be able to satisfy some illusory date of judgment at some indeterminate date in the future mandates dismissal.   *EEOC v. Nichols Gas & Oil, Inc.*, 688 F. Supp. 2d 193, 203 (W.D.N.Y. 2010) (citing *Finnerty v. Wireless Retail, Inc.*, 624 F. Supp. 2d 642, 660 (E.D. Mich. 2009)).

[13] "What these cases do throw into relief are the hard questions that arise when illegal immigrants invoke statutory protections against employment discrimination."   *EEOC v. Maritime Autowash, Inc.*, 820 F.3d at 667.

30

The Claimants should find themselves in no better, nor no worse, of a position than without the successor in the picture.  As the Seventh Circuit held in *Musikiwamba*, "[u]nless extraordinary circumstances exist, an injured employee should not be made worse off by a change in the business.  But neither should an injured employee be made better off."  "[I]f the wrongdoer is able to pay, it would be inequitable to force the innocent successor to provide relief."  *Braswell v. Great Expectations of Washington, Inc.*, Civ. No. 5:97-41-BRL, 1997 WL 1134125, at *5 (E.D.N.C. Aug. 5, 1997), attached as Ex. 10; *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1237 (7th Cir. 1986) (declining to impose successor liability when the successor lacked notice of the claim, "substantial, while not complete, relief from the predecessor is available to the victim, and in which the ownership of the predecessor and of the successor is totally distinct").  Maritime Autowash's and Mr. Podrog's ability to satisfy the judgment strongly rebuts the vague allegation in the Complaint.

> **c.    Mister Car Wash is not the continuation of business by Maritime Autowash under a different name**

Finally, the facts show that there was no continuity of business between Maritime Autowash and Mister Car Wash.  Paragraph 26 of the Complaint reads, "Defendant Mister Car Wash is liable in the matter under the principles of successor liability."  But this legal conclusion is not entitled to a presumption of truth (neither are Plaintiff's legal conclusions in paragraph 22 of the Complaint that "there has been a substantial continuity of business operations by Defendant Mister Car Wash.").  *See Iqbal*, 556 U.S. at 678 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  This is not a case like *Alford*, where the employer essentially continued the exact same operation, but in a different corporate format.  1993 WL 389433, at *9 ("Ecurie Alford succeeded to the assets and the liabilities of Beau Shane" because "[o]nly the form is different.  One was a sole

proprietorship and the other is a corporation"). Rather, although physical assets were purchased by Mister Car Wash, there is no substantial continuity of the heart of the car wash operations—the employees.

Under the APA, Mister Car Wash was not required to hire any of Maritime Autowash's employees.  Upon termination from employment with Maritime Autowash, the individuals who were employed by Maritime Autowash were not entitled to "severance" or any other payment from Mister Car Wash.  Furthermore, under the APA, Mister Car Wash has no responsibility or liability of any kind relating in any way to any person's status as a Maritime Autowash employee on or prior to the Closing.  The EEOC does not allege in the Complaint, nor could it, that any of the claimants were ever rehired by Mister Car Wash.  To be sure, Claimants all testify in the Charges and Amended Charges that their employment with Maritime Autowash ceased in 2013, *years before the Closing*.  Minich Decl. Exs. B & E.  Had the Claimants been Maritime Autowash's employees on the Closing, and they were not, they would have been offered employment by Mister Car Wash, and, if they meet Mister Car Wash's hiring standards, including at the outset providing proof of authorization to work lawfully in the United States, they would have likely been hired by Mister Car Wash.  But the Claimants were not employed by Maritime Autowash in January 2015, and so they were not hired by Mister Car Wash.

No continuation of operations may be found here.  Mister Car Wash operates car washes, but that does not equate to a continuation of Maritime Autowash's business.  Immediately on January 22, 2015, Mister Car Wash began the process of converting the assets it purchased into Mister Car Wash entities.  These changes included:

- replacing towels;

- changing tunnel chemistry (in other words, changing the chemical formula used in the car wash tunnel to achieve a Mister Car Wash wash);

- changing the vacuuming process;

- changing the layout of car wash operations to increase efficiency and maximize customer service;

- replacing uniforms;

- recruiting and hiring individuals who may be lawfully employed in the United States and requiring all such individuals to undergo successfully the E-Verify process;

- changing point of sale receipts to include Mister Car Wash's name and logo;

- terminating the employment of the existing management team and replacing them with experienced Mister Car Wash managers;

- replacing internal signage; and

- distributing Mister Car Wash human resources documents, forms, and policies.

Maritime Autowash's signage was initially maintained because of unrelated intellectual property issues, and those have all now been replaced by Mister Car Wash-branded designs.  Minich Decl. Ex. A § 1.2; Ross Decl. ¶¶ 9, 12, Ex. C.

Moreover, where, as here, the EEOC seeks injunctive relief, there needs to be a strong showing of continuity of business operations for a court to conclude that the "new" company is, essentially, the "old" company under a different name.   In *Musikiwamba*, the court held that, although a continuity of business operations was generally required to impose successor liability, this burden was significantly higher, and, perhaps, insurmountable, where the plaintiff sought injunctive relief against a "successor" that did not participate in the allegedly discriminatory conduct:

> The amount of "continuity" required between the predecessor and the successor will vary depending upon the number of employees adversely affected by the predecessor's action and the remedy requested by the injured employee(s).  In the instant case, for example, less continuity is required because the plaintiff is not seeking reinstatement, retroactive seniority, or placement on a preferential hiring

list.  Greater continuity would be required if the plaintiff were seeking more than monetary damages.  *And perhaps no amount of continuity would suffice to impose liability on a successor when a predecessor has discriminated against an entire class of individuals and the remedy is some sort of affirmative action decree or injunctive relief.*

*Musikiwamba*, 760 F.2d at 751 (citations omitted; emphasis added).

Here, the EEOC seeks, among other things, a permanent injunction against Mister Car Wash for the alleged discriminatory employment practices of Maritime Autowash and declaratory relief against Mister Car Wash when Mister Car Wash is not alleged to have done anything wrong.  Am. Compl. Prayer for Relief ¶ A (requesting injunctive relief) & ¶ B (requesting declaratory relief).  But there has been no showing of continuity sufficient to impose any liability on Mister Car Wash, let alone the heightened showing required here.

Finally, as numerous courts have held, an analysis of whether the court should impose successor liability ultimately depends on whether it would be equitable to do so under the particular facts of a case.  *See, e.g., Prince v. Kids Ark Learning Center*, 622 F.3d 992, 994 (8th Cir. 2010) ("[s]uccessor liability is an equitable determination" (citations omitted)); *Journal Disposition Corp.*, 2011 WL 5118721, at *2 (court considers multiple factors and facts to determine if "equities" warrant imposing particular legal obligation on purchaser).  It would be grossly unfair and inequitable here to impose any liability on Mister Car Wash, which is not alleged to have done anything wrong, for the alleged discriminatory acts of Maritime Autowash.  It is undisputed that Mister Car Wash did not engage in national origin discrimination or retaliation, and because the EEOC seeks injunctive relief, such relief against Mister Car Wash would not cure the alleged national origin discrimination and retaliation by Maritime Autowash.  *See Journal Disposition Corp.*, 2011 WL 5118721, at *3 (although alleged successor corporation (IPCAC) allegedly had notice of claim, purchased all asserts, produced the same products, used

the same equipment, engaged the same vendors, serviced the same clients and employed the same workers as predecessor corporation, which was allegedly no longer available to provide relief, court denied EEOC motion to add alleged successor to suit because "IPCAC has an interest in not being required to defend a claim that it had no responsibility for creating.  The federal policy of prohibiting discrimination . . . would not be furthered by imposing successor liability on IPCAC because there is no evidence that IPCAC has actively adopted Defendant's allegedly discriminatory policies . . . .  There is no reason to believe that IPCAC will fail to enact programs and policies that are consistent with the ADA in the absence of injunctive relief."); *Wheeler*, 794 F.2d at 1237 (it would be inequitable to impose successor liability, even where there was "considerable continuity" of business, because new owner was completely different than old owner and had no "timely *actual* knowledge") (emphasis added).

## V.    CONCLUSION

For the foregoing reasons, this motion to dismiss should be granted and the Complaint should be dismissed with prejudice, and/or, alternatively, summary judgment should be granted for Mister Car Wash.

 Dated:  November 27, 2017                              Respectfully submitted,

                                                        */s/ Kevin M. Kraham*
                                                        Kevin M. Kraham (26220)
                                                        LITTLER MENDELSON, P.C.
                                                        815 Connecticut Avenue NW
                                                        Suite 400
                                                        Washington, DC  20006
                                                        (202) 842-3400 Tel
                                                        (202) 842-0011 Fax
                                                        kkraham@littler.com

                                                        *Counsel for Defendant*
                                                        *CWP West Corp. t/a Mister Car Wash*