# EXHIBIT A

ASSET PURCHASE AGREEMENT

BY AND AMONG

CWP WEST CORP.,
A DELAWARE CORPORATION;

MARITIME AUTOWASH, INC.,
A MARYLAND CORPORATION;

PODROG MARITIME INVESTMENTS, LLC,
A FLORIDA LIMITED LIABILITY COMPANY;

MARITIME AUTOWASH II, INC.,
A MARYLAND CORPORATION;

PODROG MARITIME INVESTMENTS II, LLC,
A FLORIDA LIMITED LIABILITY COMPANY;

AND

DAVID PODROG,
SELLING STOCKHOLDER

DATED AS OF January 21 , 2015

681992.v13

**Table of Contents**
**to**
**Asset Purchase Agreement**

**Page**

SECTION 1.   PURCHASE AND SALE OF ASSETS. ............................................... 2
   1.1   Sale of Assets. ......................................................................................... 2
   1.2   Excluded Assets. ...................................................................................... 3
   1.3   Assumption of Liabilities. ....................................................................... 3
   1.4   Purchase Price and Payment. ................................................................... 4
   1.5   Purchase Price Allocation. ....................................................................... 4
   1.6   Time and Place of Closing. ...................................................................... 4
   1.7   Transfer of Subject Assets. ..................................................................... 4
   1.8   Proration and Apportionment. ................................................................. 6
   1.9   Inventory. ................................................................................................. 7
   1.10  Coupons. .................................................................................................. 7
SECTION 2.   REPRESENTATIONS AND WARRANTIES OF SELLER AND PODROG .. 7
   2.1   Organization, Qualification and Capitalization ....................................... 7
   2.2   Authority of Seller. .................................................................................. 8
   2.3   Absence of Restrictions. .......................................................................... 9
   2.4   Title to Assets; Liens; Condition of Assets. ........................................... 9
   2.5   Financial Statements. ............................................................................... 9
   2.6   Intellectual Property. ............................................................................. 10
   2.7   Assumed Contracts. ............................................................................... 11
   2.8   No Litigation; Compliance With Applicable Laws. ............................... 11
   2.9   Payment of Taxes. ................................................................................. 11
   2.10  Insurance. .............................................................................................. 11
   2.11  Warranty or Other Claims. .................................................................... 12
   2.12  Employee Benefit Programs and Employees. ....................................... 12
   2.13  Environmental Matters. ......................................................................... 13
   2.14  Disclosure. ............................................................................................. 14
   2.15  Permits; Consents. ................................................................................. 14
   2.16  Transactions with Interested Persons. ................................................... 14
   2.17  Subsidiaries. .......................................................................................... 15
   2.18  Labor Matters. ....................................................................................... 15
   2.19  Inventory. ............................................................................................... 15
   2.20  Real Property. ........................................................................................ 15
   2.21  Patriot Act Representations ................................................................... 17
   2.22  Maryland Bulk Transfers ...................................................................... 17
SECTION 3.   REPRESENTATIONS AND WARRANTIES OF BUYER. ................. 18
   3.1   Organization of Buyer. .......................................................................... 18
   3.2   Authority of Buyer. ................................................................................ 18
   3.3   Broker's or Finder's Fees ...................................................................... 18

SECTION 4.   COVENANTS. ..................................................................19
    4.1      Prior to Closing. ..............................................................19
    4.2      Non-Competition Agreements. ........................................20
    4.3      Confidentiality. ...............................................................20
SECTION 5.   CONDITIONS TO THE OBLIGATIONS OF BUYER. ...........20
    5.1      Representations and Warranties; Covenants. ....................20
    5.2      Third Party Consents. ......................................................21
    5.3      Release of Liens. .............................................................21
    5.4      Approval of Proceedings; Documentation. ........................21
    5.5      Certificate of Good Standing............................................22
    5.6      Legal Opinion .................................................................22
    5.7      Employee Matters.............................................................22
    5.8      Environmental Inspections. ..............................................22
    5.9      No Adverse Change. .........................................................22
    5.10     No Litigation....................................................................22
    5.11     Financing. ........................................................................22
    5.12     Title Insurance. ................................................................23
    5.13     Surveys. ...........................................................................23
    5.14      Shareholder Approval. .....................................................23
    5.15     Environmental Studies. .....................................................23
    5.16     UCC and Lien Searches. ...................................................23
SECTION 6.   CONDITIONS TO THE OBLIGATIONS OF SELLER..............24
    6.1      Representations and Warranties. .......................................24
    6.2      Delivery of Purchase Price. ..............................................24
SECTION 7.   RIGHTS AND OBLIGATIONS SUBSEQUENT TO CLOSING DATE. ......24
    7.1      Further Assurances. ..........................................................24
    7.2      Collection of Assets. ........................................................24
    7.3      Payment of Obligations. ...................................................24
    7.4      Access to Books and Records. ..........................................24
SECTION 8.   INDEMNIFICATION. .....................................................25
    8.1      Survival of Warranties. .....................................................25
    8.2      Indemnification by Seller and Podrog. ..............................25
    8.3      Indemnification by Buyer..................................................26
    8.4      Notice; Defense of Claims. ...............................................27
    8.5      Escrow. ............................................................................27
SECTION 9.   MISCELLANEOUS. .......................................................28
    9.1      Construction. ...................................................................28
    9.2      Fees and Expenses. ...........................................................28
    9.3      Governing Law; Consent to Jurisdiction............................28
    9.4      Notices. ............................................................................28
    9.6      Entire Agreement; No Third Party Beneficiaries.................30
    9.7      Assignability; Binding Effect. ..........................................30
    9.8      Captions and Gender. .......................................................31
    9.9      Execution in Counterparts. ...............................................31
    9.10     Amendments. ...................................................................31

681992.v13

9.11   Publicity and Disclosures. ................................................................. 31
9.12   Taxes. ............................................................................................... 31
9.13   Cooperation. ...................................................................................... 31
9.14   Severability. ...................................................................................... 31

681992.v13

## SCHEDULES

| | | |
|---|---|---|
| Schedule 1.1(b) | - | Personal Property |
| Schedule 1.1(d) | - | Intellectual Property |
| Schedule 1.1(e) | - | Assumed Contracts |
| Schedule 1.2 | - | Excluded Assets |
| Schedule 1.3 | - | Assumption of Liabilities |
| Schedule 2.1 | - | Organization, Qualification and Capitalization of Seller |
| Schedule 2.2 | - | Authority of Seller |
| Schedule 2.4(a) | - | Liens on Non-Real Estate Assets |
| Schedule 2.4(b) | - | Condition of Non-Real Estate Assets |
| Schedule 2.4(c) | - | Ownership of Non-Real Estate Assets |
| Schedule 2.5 | - | Financial Statements |
| Schedule 2.6(d) | - | Net Names |
| Schedule 2.7 | - | Exceptions to Assumed Contracts |
| Schedule 2.10 | - | Insurance |
| Schedule 2.12 | - | Employee Benefit Programs and Employees |
| Schedule 2.13(d) | - | Environmental Documents |
| Schedule 2.15(a) | - | Permits; Consents (Approvals/Assignment of Approvals) |
| Schedule 2.15(b) | - | Required Consents Under Assumed Contracts |
| Schedule 2.16 | - | Transactions With Interested Parties |
| Schedule 2.17 | - | Subsidiaries |
| Schedule 2.19 | - | Inventory |
| Schedule 2.20 | - | Real Property |
| Schedule 2.20(a) | - | Permitted Encumbrances |
| Schedule 2.20(b) | - | Security Interests |
| Schedule 2.20(c) | - | Condition of Real Property |
| Schedule 2.20(g) | - | Real Property Taxes |
| Schedule 5.2 | - | Third Party Consents |

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Purchase Price Allocation (Section 1.5) |
| Exhibit B-1 | - | Warranty Bill of Sale – Podrog Maritime Investments, LLC (Section 1.7) |
| Exhibit B-2 | - | Warranty Bill of Sale – Podrog Maritime Investments II, LLC (Section 1.7) |
| Exhibit C-1 | - | Form of Special Warranty Deed – Severna Park Property (Section 1.7) |
| Exhibit C-2 | - | Form of Special Warranty Deed – Edgewater Property (Section 1.7) |
| Exhibit D | - | Opinion of Sellers' Counsel (Section 1.7) |
| Exhibit E | - | Occupancy Certificate(s) (Section 2.20(e)) |
| Exhibit F | - | Zoning Letter(s) |
| Exhibit G-1 | - | Form of Non-Competition Agreement – Maritime Autowash, Inc. (Section 4.2) |
| Exhibit G-2 | - | Form of Non-Competition Agreement – Podrog Maritime Investments, LLC (Section 4.2) |

681992.v13

Exhibit G-3   -   Form of Non-Competition Agreement – Maritime Autowash II, Inc. (Section 4.2)

Exhibit G-4   -   Form of Non-Competition Agreement – Podrog Maritime Investments II, LLC (Section 4.2)

Exhibit G-5   -   Form of Non-Competition Agreement – Podrog (Section 4.2)

Exhibit H   -   Assignment and Assumption of Contracts (Section 5.4(i))

Exhibit I   -   Reserved

Exhibit J   -   Survey Certification (Section 5.13)

Exhibit K   -   Escrow Agreement (Section 1.7)

681992.v13

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made as of the 2) day of ＿＿January＿＿, 2015, by and among CWP WEST CORP., a Delaware corporation with its principal place of business at 222 East Fifth Street, Tucson, Arizona 85705 ("Buyer"); MARITIME AUTOWASH, INC. ("Maritime"), a Maryland corporation, with its principal place of business at 2473 Solomons Island Road, Edgewater, Maryland 21037 (sometimes referred to as the "Edgewater Property"), PODROG MARITIME INVESTMENTS, LLC ("PMI"), a Florida limited liability company, MARITIME AUTOWASH II, INC. ("Maritime II"), a Maryland corporation, with its principal place of business at 8562 Veterans Highway, Millersville, Maryland 21108 (sometimes referred to as the "Severna Park Property") PODROG MARITIME INVESTMENTS II, LLC ("PMI II"), a Florida limited liability company (Maritime, PMI, Maritime II, and PMI II sometimes collectively referred to as "Seller"), and DAVID PODROG ("Podrog"), sole owner of the selling entities.

## W I T N E S S E T H

WHEREAS, Maritime II leases the Severna Park Property from Sonpod, LLC by virtue of an unrecorded Lease, described below, and operates a car wash on said property:

(i) 8562 Veterans Highway, Millersville, Maryland 21108-2569 (the "Severna Park Property");

WHEREAS, Maritime leases the Edgewater Property from the Charles I. Gray Revocable Trust, and operates a car wash on said property:

(ii) 2473 Solomons Island Road, Edgewater, Maryland 21037-1002 (the "Leased Real Property" or "Edgewater Property"); and

WHEREAS, the properties are sometimes collectively referred to as the "Properties;" and

WHEREAS, PMI is a Florida limited liability company qualified to do business in the State of Maryland, which has been established as the successor entity to Maritime to facilitate the transfer of certain assets of Maritime to enable the establishment of a trust by David Podrog, the sole owner of Maritime and PMI; and

WHEREAS, PMI II is a Florida limited liability company qualified to do business in the State of Maryland, which has been established as the successor entity to Maritime II to facilitate the transfer of certain assets of Maritime II to enable the establishment of a trust by David Podrog, the sole owner of Maritime II and PMI II; and

WHEREAS, it is anticipated that the transfer of the assets of both business to PMI and PMI II will occur and that both PMI and PMI II will operate the businesses from that date until the Closing Date (as hereinafter defined), subject to certain management agreements between Maritime, Maritime II, and PMI and PMI II, respectively.

1

WHEREAS, subject to the terms hereof, Seller wishes to sell the business assets of the Seller to Buyer; and

WHEREAS, Maritime II has entered into an agreement with Sonpod, LLC, for the purchase of the Severna Park Property, which agreement has been assigned to PMI II, which entity shall convey the Severna Park Property to the Buyer or its assignee at Closing; and

WHEREAS, the Edgewater Property is currently under lease to Maritime by virtue of a Lease dated September 9, 2003 and a recorded Memorandum of Ground Lease dated October 29, 2009 and all amendments and modifications thereto (the "Lease"). Maritime has reached an agreement to purchase the Property from the owner, which agreement has been assigned to PMI and at closing PMI shall convey the Property to the Buyer or its assignee.

NOW, THEREFORE, in order to consummate said purchase and sale and in consideration of the mutual agreements set forth herein, the parties agree as follows:

SECTION 1.   PURCHASE AND SALE OF ASSETS.

1.1    Sale of Assets.  Subject to the provisions of this Agreement and except for the Excluded Assets (as hereinafter defined), Seller shall sell, transfer, convey or assign to Buyer or Buyer's assignee, and Buyer or Buyer's assignee will purchase from Seller, the assets, property and rights, including, without limitation, the Real Property hereinafter described and the rights of Seller used in operating the Edgewater and Severna Park car washes (collectively, the "Business"), including without limitation the entire right, title and interest of Seller in and to:

(a)     the Severna Park Real Property and the Edgewater Property, as hereinafter described in Section 2.20 hereof;

(b)     except as otherwise stated herein, all personal property used in connection with the operation of the Business, all of which is more specifically listed on Schedule 1.1(b), attached hereto;

(c)     all inventory used in connection with the operation of the Business, including without limitation all chemicals, cleaning supplies, automotive products, products for resale to customers, and other property of a similar nature (the "Inventory").  Inventory shall be no less than eighty percent (80%) of the inventory set forth on the June 30, 2014 Financial Statements;

(d)     all patents, copyrights, trade secrets, know how, computer software, licenses, trademarks, service marks except the "mermaid" trademark and/or logo, trade or product names, company names, logos, customer lists, mailing lists, sales and advertising material, engineering information, technology, development rights, drawings and designs, files and shop notes, customer specifications, supplier information, manufacturing or other processes, systems, data compilations, research results or other proprietary rights, all rights in content on internet websites and internet domain names presently used by Seller in the Business, including names of domain providers, login information and names under which all accounts are controlled

2

(collectively, "Intellectual Property") used in the Business as presently conducted or contemplated, including those items more specifically listed on Schedule 1.1(d) attached hereto;

      (e)    all contracts and agreements, including, but not limited to, agreements with customers set forth in Schedule 1.1(e), attached hereto (but not including any agreements whereby Seller is or may be liable for borrowed money or guarantees thereof nor any agreements whereby Seller is or may be liable for payments or benefits to employees of Seller) (the "Assumed Contracts"), all company records relating to customers, including without limitation billing and payment records, and all rights of Seller under any non-competition or similar covenants with present or former employees;

      (f)    all prepaid expenses, the benefit of which accrue to Buyer ("Prepaid Expenses"); and

      (g)    all goodwill of Seller as it relates to the Business as a going concern, including goodwill associated with trademarks, trade names and service marks ("Goodwill").

All of the above assets referred to in this Section 1.1 are hereinafter referred to as the "Subject Assets".

    1.2    Excluded Assets.  Buyer and Seller agree and acknowledge that notwithstanding anything to the contrary set forth in Section 1.1, Seller is not transferring to Buyer any cash or accounts receivable, nor any assets set forth in Schedule 1.2, attached hereto (hereinafter referred to as the "Excluded Assets").  Further, Seller grants Buyer a non-exclusive license for the period ending twelve (12) months after the Closing Date to use the "mermaid" trademark and/or logo for the purpose of transitioning the Business to Buyer.

    1.3    Assumption of Liabilities.  Except for (i) liabilities and obligations arising out of the operation of the Business after the Closing Date (as hereinafter defined), (ii) obligations for Coupons (as hereinafter defined), as specified in Section 1.4(a) hereof, and (iii) liabilities and obligations specifically assumed by Buyer pursuant to the terms of this Agreement, it is expressly understood and agreed that Buyer is not assuming or becoming liable for any liabilities of Seller (including, without limitation, any indebtedness of Seller) of any kind or nature at any time existing or asserted, whether known or unknown, fixed, contingent or otherwise.  The liabilities to be assumed by Buyer by an express provision of this Agreement are hereinafter sometimes referred to as the "Assumed Liabilities," and are listed on Schedule 1.3 attached hereto, and the liabilities which are not assumed by Buyer under this Agreement (that is, all liabilities of Seller other than Assumed Liabilities) are hereinafter sometimes referred to as the "Excluded Liabilities."  Seller hereby acknowledges and agrees that Buyer is not assuming or becoming liable for, and Seller shall remain exclusively liable for, all of the Excluded Liabilities. Buyer hereby acknowledges and agrees that as of the Closing Date hereinafter defined, Buyer shall assume and become exclusively liable for the Assumed Liabilities.  The assumption of liabilities by any party hereunder shall not enlarge any rights of third parties under contracts or arrangements with Buyer or Seller, and nothing herein shall prevent any party from contesting in good faith with any third party any of said liabilities.

681992.v13

1.4     Purchase Price and Payment.    The aggregate purchase price payable in consideration for the Subject Assets, including the assumption by Buyer of the Assumed Liabilities, and the satisfaction of all of the conditions contained herein, shall                   (the "Purchase Price").

On the Closing Date (as hereinafter defined), Buyer agrees to deliver to Seller the Purchase Price as follows:

(a)     The estimated retail value of the Coupons, hereinafter defined, and any other Assumed Liabilities listed on Schedule 1.3, attached hereto, shall be determined by agreement of the parties hereto at the Closing and documented in a Closing Memorandum and Agreement; and the estimated retail value of Coupons and any other Assumed Liabilities shall be assumed by Buyer as a partial payment on the Purchase Price;

(b)     Three Hundred Thousand Dollars ($300,000.00) (the "Escrow Amount") shall be held in escrow for a period of six (6) months following the Closing Date, as provided in Section 8.5;

(c)     To the extent any Inventory to be taken as of the Closing Date, and documented in a Closing Memorandum and Agreement, is less than Eighty (80%) Percent of the Inventory, determined as described in Section 1.1(c) hereof, the difference shall be applied against the Purchase Price as a partial payment of the Purchase Price;

(d)     The balance of the Purchase Price shall be payable in cash in the form of a bank check or wire transfer in immediately available funds to the account or accounts designated by Seller to Buyer.

1.5     Purchase Price Allocation.  The Purchase Price shall be allocated as set forth on Exhibit A, attached hereto.  Such allocation shall be binding upon Buyer and Seller for tax purposes.  Buyer and Seller shall file their respective federal income tax returns and their other tax returns reflecting such allocation, including Form 8594 and any other reports required by Section 1060 of the Internal Revenue Code of 1986, as amended.

1.6     Time and Place of Closing.  The closing of the purchase and sale of the Subject Assets (the "Closing"), shall be held at the offices of Felhaber, Larson, Fenlon and Vogt, P.A., 444 Cedar Street, Suite 2100, St. Paul, Minnesota 55101-2136 at 10:00 a.m. on January ____, 2015 (the "Closing Date"), or at such other place or an earlier or later date or time as may be mutually agreed on in writing by the parties.  The Closing shall be effective as of the end of business on the Closing Date.  The Seller disbursements, as directed by the Seller, shall be made by wire transfer on the date of Closing.  The parties shall exchange final documents electronically and/or delivery by mail, to avoid the need for in-person delivery of documents, to the extent practical, without prejudicing the interest of any party.

1.7     Transfer of Subject Assets.  On the Closing Date, Seller shall deliver or cause to be delivered to Buyer the following.

4

681992.v13

   (a) warranty bills of sale ("<u>Warranty Bills of Sale</u>") in the form set forth on <u>Exhibit B-1</u> and <u>Exhibit B-2</u>, attached hereto;

   (b) special warranty deeds or deeds ("<u>Special Warranty Deeds</u>" or "<u>Deeds</u>") from Seller for the Severna Park Property and for the Edgewater Property, in the forms set forth on <u>Exhibit C-1</u> and <u>Exhibit C-2</u>, attached hereto;

   (c) the assignment of any rights Seller may have in the Intellectual Property, Assumed Contracts and other Subject Assets not conveyed by the Warranty Bills of Sale, all such assignments to be in form and substance satisfactory to Buyer, and accompanied by such consents as may be required by Buyer based on any consent-to-assignment requirements in the Assumed Contracts or terms pursuant to which Seller holds and uses any Intellectual Property;

   (d) an escrow agreement ("<u>Escrow Agreement</u>") in the form set forth on <u>Exhibit K</u>, attached hereto;

   (e) an "<u>Opinion of Sellers' Counsel</u>" in the form set forth on <u>Exhibit D</u>, attached hereto;

   (f) such other instruments of transfer transferring to Buyer title to all of the Subject Assets as required by law; and

   (m) such other agreements, documents and certificates as Buyer, Buyer's counsel or the Title Company (as hereinafter defined) reasonably may request, including, but not limited to, any such other agreements or certificates as may be expressly identified or plainly contemplated by other provisions of this Agreement.

Such instruments of transfer (i) shall be in the form and will contain the warranties, covenants and other provisions (not inconsistent with the provisions hereof) which are usual and customary for transferring the type of property involved under the laws of the jurisdictions applicable to such transfers, (ii) shall be in form and substance reasonably satisfactory to Buyer and its counsel, and (iii) shall effectively vest in Buyer good and marketable title to all the Subject Assets free and clear of all liabilities except as stated on Schedule 1.3, licenses, claims, liens, restrictions, encumbrances, mortgages and security interests whatsoever (collectively "<u>Liens</u>") with the exception of (A) any Assumed Liabilities as set forth on <u>Schedule 1.3</u> attached hereto, and (B) Permitted Encumbrances (as hereinafter defined). On the Closing Date, Seller shall also deliver or cause to be delivered to Buyer all of the Assumed Contracts and such assignments thereof and consents to assignment as are necessary to assure Buyer their full and useful benefit. In addition, Seller and Podrog acknowledge that (i) Section 10-912 of the Tax-General Article, Annotated Code of Maryland, provides for income tax withholding on sales or transfers of real property and associated tangible personal property in Maryland by nonresidents or nonresident entities, (ii) in a sale or transfer of real property and associated tangible personal property in Maryland owned by nonresidents or nonresident entities, the deed or other instrument of transfer may not be recorded with the clerk of the circuit court for the jurisdiction in which the land is located ("Clerk") or filed with the Department of Assessments and Taxation ("Department") unless payment is made to the Clerk or Department in an amount equal to the withholding required under such statute. Seller and Podrog hereby authorize such withholding as may be

681992.v13

required in order to comply with such requirements in order to effect recordation of the deed and any other instruments required to be recorded pursuant to this Agreement.

      1.8    <u>Proration or Apportionment</u>.

      (a)    <u>Utilities; Taxes</u>.  Notwithstanding anything herein to the contrary, the water, gas, electricity and other utilities, local business or other license fees or taxes, common area expenses (and any other amount), and other similar periodic charges, shall be apportioned as of the Closing Date such that Seller shall be liable for (and shall reimburse Buyer to the extent that Buyer shall pay) that portion of such of the foregoing relating to, or arising in respect to, periods on or prior to the close of business on the Closing Date and Buyer shall be liable for (and shall reimburse Seller to the extent Seller shall have paid) that portion of the foregoing relating to, or arising in respect to, periods after the Closing Date.  To the extent practicable, utility meter readings shall be determined as of the close of business on the Closing Date.

      (b)    <u>Personal Property and Ad Valorem Taxes</u>.  Notwithstanding anything herein to the contrary, any taxes (other than payroll taxes) not measured or measurable, in whole or in part, by net or gross income or receipts (including, but not limited to, personal property or ad valorem taxes, but not including real estate taxes and assessments which are governed by other provisions of this Agreement) imposed on the Subject Assets that relate to a tax period beginning before the close of business on the Closing Date and ending after the Closing Date, shall be apportioned as of the close of business on the Closing Date such that Seller shall be liable for (and shall reimburse Buyer to the extent that Buyer shall pay) that portion of such taxes relating to, or arising in respect to, periods prior to the close of business on the Closing Date, and Buyer shall be liable for (and shall reimburse Seller to the extent Seller shall have paid) that portion of such taxes relating to, or arising in respect to, periods after the Closing Date.

      (c)    <u>Payroll and Payroll Taxes</u>.  Notwithstanding anything herein to the contrary, that portion of Sellers' liability for payroll expenses and payroll taxes related to or arising in respect of the period on or prior to the close of business on the Closing Date, shall be paid by Seller.  Buyer shall be liable for such payroll expenses and payroll taxes relating to, or arising in respect to, periods after the Closing Date, but only as to employees that Buyer hires or contracts for on or after the Closing Date.

      (d)    <u>Transfer Taxes and Recording Fees</u>.  Seller shall pay for all transfer taxes, state and local deed taxes, documentary stamp taxes and recording fees with respect to the Special Warranty Deeds to be delivered by Seller pursuant to this Agreement.

      (e)    <u>Real Estate Taxes and Special Assessments</u>.  General real estate taxes payable in the calendar year in which the Closing occurs shall be prorated between Seller and Buyer through the Closing Date based upon a 365-day tax year commencing July 1 of such year, with Seller being responsible for the day of Closing.  Seller shall pay all real estate taxes payable in calendar years preceding the year in which the Closing occurs if any taxes are still outstanding, and Buyer shall pay all real estate taxes payable in the calendar years following the year in which the Closing occurs.  Seller shall pay all special assessments levied or pending against the Real Estate, including, but not limited to, any amount of special assessments, if any, payable with the real estate taxes payable in the calendar year in which the Closing occurs.

Should any amounts described in any of the preceding paragraphs of this Section not have been finally determined on the Closing Date, a mutually satisfactory estimate of such amounts made on the basis of Sellers' records, as reasonably agreed to by Buyer, shall be used as a basis for settlement at Closing, and the amount finally determined will be prorated as of the Closing Date as a final apportionment of such taxes and no re-proration shall occur after Closing.

1.9     Inventory.   Immediately prior to the Closing, Buyer and Seller shall together determine the aggregate value of the Inventory being sold to Buyer and at the Closing.  Buyer and Seller shall execute an instrument satisfactory to the parties confirming such value.  For all purposes of this Agreement, such value shall be final and binding on the parties.  In the event that the value of the Inventory determined pursuant to this Section 1.9 differs from the Inventory in the form set forth on Exhibit A, attached hereto, Exhibit A shall be amended to reflect the proper allocation of the Purchase Price.

1.10    Coupons.   The term "Coupons" shall mean gift certificates, pre-paid coupons or similar material issued or sold by Seller prior to the Closing Date which entitles the customer to receive services without paying any additional amount for said services.

## SECTION 2.   REPRESENTATIONS AND WARRANTIES OF SELLER AND PODROG.

As a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated hereby, Seller and Podrog each, jointly and severally, hereby make the representations and warranties contained in this Section 2.  For purposes of this Agreement, "Sellers' Knowledge" shall mean the actual knowledge of Seller, Podrog and all other officers, directors and managers of Seller and the Business after due inquiry of all such persons.  The representations and warranties of PMI and PMI II shall solely be limited to the period between its acquisition of the business assets and the sale and transfer of the assets to the Buyer.  PMI and PMI II are Florida LLCs, qualified to do business in Maryland, and hold the authority to transact business in Maryland.

2.1     Organization, Qualification and Capitalization.

(a)     Organization, Qualification and Capitalization of Maritime and Maritime II.  Maritime and Maritime II are each corporations duly organized, validly existing and in good standing under the laws of the State of Maryland, and each is qualified to do business in the State of Maryland, with full power and authority to own and lease its properties and to conduct its business in the manner and in the places where such properties are owned and leased or such business is currently conducted or proposed to be conducted.  Maritime and Maritime II are each duly qualified to do business in the state of its incorporation and as a foreign corporation in each other jurisdiction listed on Schedule 2.1, attached hereto.  Copies of the Articles of Incorporation of each of Maritime and Maritime II, as amended to date, certified by the Secretary of State of the State of Maryland, and of the Bylaws of each of Maritime and Maritime II, as amended to date, certified by the secretary of each of Maritime and Maritime II, will be delivered to Buyer prior to the Closing, all such copies will be complete and correct, and there will thereafter be no changes to either Maritime's or Maritime II's Articles of Incorporation or Bylaws prior to the Closing.

7

(b)     Organization, Qualification and Capitalization of PMI and PMI II.   PMI and PMI II are each limited liability companies duly organized, validly existing and in good standing under the laws of the State of Florida, and each is qualified to do business in the States of Florida and Maryland, with full power and authority to own and lease its properties and to conduct its business in the manner and in the places where such properties are owned and leased or such business is currently conducted or proposed to be conducted.  PMI and PMI II are each duly qualified to do business in the state of its organization and as a foreign entity in each other jurisdiction listed on Schedule 2.1, attached hereto.  Copies of the Articles of Organization of each of PMI and PMI II, as amended to date, certified by the Secretary of State of the State of Florida, and of the Operating Agreement of each of PMI and PMI II, as amended to date, certified by the secretary of each of PMI and PMI II, will be delivered to Buyer prior to the Closing, all such copies will be complete and correct, and there will thereafter be no changes to either PMI's or PMI II's Articles of Organization or Operating Agreement prior to the Closing.

2.2     Authority of Seller.  Seller has full right, authority and power to enter into this Agreement and each agreement, document and instrument to be executed and delivered by or on behalf of Seller or pursuant to this Agreement (the "Sellers' Documents") and to carry out the transactions contemplated hereby and thereby.  The execution, delivery and performance by Seller of this Agreement and the Sellers' Documents have been duly authorized by all necessary action of Seller and any other persons with any interests in any ownership interests of Seller, and no other action on the part of Seller is required in connection therewith. This Agreement and the Sellers' Documents executed and delivered by Seller pursuant to this Agreement constitute, or when executed and delivered will constitute, valid and binding obligations of such party enforceable in accordance with their respective terms.  Except as set forth on Schedule 2.2, attached hereto, the execution, delivery and performance by Seller of this Agreement and the Sellers' Documents, and the consummation of the transactions contemplated hereby or thereby:

(a)     do not and will not violate any provision of the Articles of Incorporation or Articles of Organization or Bylaws or Operating Agreement of Seller, as the case may be, in each case as amended to date;

(b)     do not and will not violate any laws of the United States, or any state or other jurisdiction applicable to Seller, or require Seller to obtain any approval, consent or waiver of, or make any filing with, any person or entity (governmental or otherwise) that has not been obtained or made; and

(c)     do not and will not result in a breach of, constitute a default under, accelerate any obligation under, or give rise to a right of termination of any indenture, loan or credit agreement or any other agreement, contract, instrument, mortgage, lien, lease, permit, authorization, order, writ, judgment, injunction, decree, determination or arbitration award to which Seller is a party or by which any of the property of Seller is bound or affected, or result in the creation or imposition of any Liens on any of the Subject Assets.

The officers or agents of Seller who execute this Agreement and the Sellers' Documents contemplated hereby on behalf of Seller have and shall have all requisite power to do so in the name of and on behalf of Seller.

    2.3    <u>Absence of Restrictions</u>. Seller has not made any other agreement with any other party with respect to the sale or any other disposition or encumbrance of the Business or the Subject Assets.

    2.4    <u>Title to Assets; Liens; Condition of Assets</u>.

    (a)    Except as set forth on <u>Schedule 2.4(a)</u>, attached hereto, Seller has good and marketable title to all of the Subject Assets (other than the Real Property that is covered by other provisions of this Agreement), such assets referred to herein as the "<u>Non-Real Estate Assets</u>", free and clear of all Liens whatsoever. Upon the sale, assignment, transfer and delivery of the Non-Real Estate Assets to Buyer under this Agreement and the Seller Documents, there will be vested in Buyer good and marketable title to the Non-Real Estate Assets, free and clear of all Liens whatsoever.

    (b)    Except as set forth on <u>Schedule 2.4(b)</u>, attached hereto, and except with respect to the Real Property, the Non-Real Estate Assets:

    (i)    include all assets used or held for use by Seller to conduct the Business as currently conducted, and all such assets are located at the Business; and

    (ii)    are in good repair, have been well maintained, are in operating condition, are fit for continued use in the Business after the Closing Date without interruption and do not require any material modifications or repairs.

    (c)    Except as set forth on <u>Schedule 2.4(c)</u>, attached hereto, all of the Non-Real Estate Assets used in connection with the Business are owned by Seller.

    2.5    <u>Financial Statements</u>.

    (a)    Seller has delivered to Buyer the following financial statements of the Business (collectively, the "<u>Financial Statements</u>"):

    (i)    the balance sheets of the Business as of December 31, 2013 and for the trailing twelve (12) months ending on June 30, 2014 (the June 30, 2014 balance sheet hereinafter shall sometimes be referred to as the "<u>Base Balance Sheet</u>"), and the related statements of income for the two (2) years then ended, copies of which are attached hereto as <u>Schedule 2.5</u>, attached hereto.

    (ii)    The income tax returns filed by Seller for the years ending December 31, 2011, December 31, 2012 and December 31, 2013, copies of which have been delivered to Buyer.

9

Said Financial Statements are complete and correct, and present fairly the financial condition of the Business at the dates of said statements and the results of their operations for the periods covered thereby.

(b)     As of the date of the Base Balance Sheet and as of the Closing Date, the Business had no liabilities of any nature, whether accrued, absolute, contingent or otherwise, asserted or unasserted, known or unknown (including, without limitation, liabilities as guarantor or otherwise with respect to obligations of others, or liabilities for taxes due or then accrued or to become due or contingent or potential liabilities relating to activities of Seller or the conduct of the Business prior to the date of the Base Balance Sheet regardless of whether claims in respect thereof had been asserted as of such date), except liabilities (i) stated or adequately reserved against on the Base Balance Sheet, or (ii) reflected in Schedules furnished to Buyer hereunder as of the date hereof.

(c)     Since the date of the Base Balance Sheet, there has not been any material adverse change in the results of operations, financial condition or net worth of the Business or in the Subject Assets, whether or not in the ordinary course of business.

(d)     Since the date of the Base Balance Sheet, Seller has operated the Business in the ordinary course consistent with past practices.

2.6     Intellectual Property.

(a)     The Intellectual Property is freely transferable to Buyer and constitutes all of the technology, proprietary rights and intellectual property necessary in order for Buyer to operate the Business in the ordinary course as presently conducted and perform the Assumed Contracts in accordance with their terms. Seller has the right to use, free and clear of claims or rights of other persons, all of the Intellectual Property without payments to, or consents from, any other party.

(b)     All licenses or other agreements under which Seller is granted rights in any of the Intellectual Property are in full force and effect, and there is no default by any party thereto. To Sellers' Knowledge, the licensors under said licenses and other agreements have and had all requisite power and authority to grant the rights purported to be conferred thereby. True and complete copies of all such licenses or other agreements, and any amendments thereto, which are available to Seller have been provided to Buyer.

(c)     Seller does not have the use of any Intellectual Property that infringes any rights of any other person. With regard to the Business, Seller is not making unauthorized use of any confidential information or trade secrets of any person, including, but not limited to, any former employer of any past or present employee of Seller.

(d)     Schedule 2.6(d) contains a complete and accurate list and summary description of all internet domain names used in the operation of the Business ("Net Names"). All Net Names have been registered in the name of Seller or an affiliate of Seller and are in compliance with all formal legal requirements. No Net Name has been or is now involved in any dispute, opposition, invalidation or cancellation proceeding, and to Sellers' Knowledge, no such

681992.v13

action is threatened with respect to any Net Name. To Sellers' Knowledge, there is no domain name application pending of any other person which interferes with or infringes on any Net Name. To Sellers' Knowledge, no Net Name has infringed, or to Sellers' Knowledge, has been challenged, interfered with or threatened in any way. To Sellers' Knowledge, no Net Name infringes, interferes with or is alleged to interfere with or infringe a trademark, copyright or domain name of any other person or entity.

2.7     Assumed Contracts. Except as set forth on Schedule 2.7, attached hereto, all of the Assumed Contracts have been entered into in the ordinary course of business, are in full force and effect and have not been amended, extended or otherwise modified (whether orally or in writing). Seller is not in default under any Assumed Contract (a "default" being defined for purposes hereof as an actual default or any set of facts which would, upon receipt of notice or passage of time or both, constitute a default). Seller is not a party to or subject to any contract or agreement that will impose any obligations on Buyer (except for the obligations to be performed under the Assumed Contracts in the ordinary course of business) or otherwise impair the value of the Subject Assets after the Closing Date. All of the terms of each Assumed Contract are set forth in writing, and true and complete written copies of all of the Assumed Contracts have been provided to Buyer. The Buyer shall be responsible for all remaining payments and/or termination costs under any assumed contract.

2.8     No Litigation; Compliance With Applicable Laws.

(a)     There is no litigation or governmental or administrative proceeding or investigation pending or, to Sellers' Knowledge, threatened against Seller, or any affiliate of Seller, which may have an adverse effect on the Business or the Subject Assets, or which would prevent or hinder the consummation of the transactions contemplated by this Agreement.

(b)     Seller is in compliance with all applicable statutes, ordinances, laws, orders, rules and regulations promulgated by any federal, state, municipal or other governmental authority which apply to the conduct of the Business or the Subject Assets; and Seller has received no notice of any violation or alleged violation of any such statute, ordinance, order, rule or regulation.

2.9     Payment of Taxes. Within the times and in the manner prescribed by law, Seller has filed all federal, state, local, foreign and other tax returns required to be filed by Seller through the Closing Date, and all such returns correctly and accurately set forth the amount of any taxes relating to the applicable period. Seller has paid or caused to be paid any and all federal, state, local, foreign and other taxes, and all deficiencies, or other additions to tax, interest, fines and penalties owed by Seller through the Closing Date, whether disputed or not (collectively, "Taxes"). Seller has no knowledge of any unassessed tax deficiency proposed or threatened against Seller or the Business. None of the Subject Assets is or will be subject to any lien or encumbrance for Taxes which are past due or which became payable or accrued on or prior to the Closing Date.

2.10    Insurance. There is in full force and effect all liability, casualty and workers' compensation insurance policies necessary to properly insure the Subject Assets and the Business, all as set forth on Schedule 2.10, attached hereto. Said insurance is adequate and

11

681992.v13

customary for the business engaged in by Seller, is sufficient for compliance by Seller with all requirements of law and all agreements and leases to which Seller is a party, and there are no unpaid claims with respect to said insurance. All premiums due as of the date hereof have been paid in full and such policies will remain in effect through the Closing Date. All such policies have been issued by reputable insurance companies which are actively engaged in the insurance business and authorized to issue policies in Maryland. Sellers' liability insurance is an "occurrence" type of policy and shall be in full force and effect as of the Closing.

2.11   <u>Warranty or Other Claims</u>. There are no existing or threatened product liability, warranty or other similar claims or any facts on which a claim of such nature could be based, with respect to the Business or any Subject Asset for products or services which are defective or fail to meet any product or service warranties. No claim has been asserted with respect to the Business or any Subject Asset for re-negotiation or price re-determination of any sale of a product or service relating to the Business or the Subject Assets and there are no facts on which a material claim of such nature could be based.

2.12   <u>Employee Benefit Programs and Employees</u>.

(a)     Except as set forth on <u>Schedule 2.12</u>, attached hereto, Seller has no employment contracts, agreements containing severance or termination pay arrangements, deferred compensation agreements, pension or retirement plans, bonus or profit-sharing plans, stock option or purchase plans or other non-terminable (with or without penalty) arrangements, group insurance, group hospitalization or other employee benefit plans, in each case relating to their employees in the Business.

(b)     Seller employs over fifty (50) employees and generally enjoys good employer-employee relationships. Seller is responsible for and has paid, or will have paid, in accordance with all applicable laws and current policies of Seller all amounts due to Sellers' employees for any salary, bonus, wages, severance, vacation, sick leave, benefits or other accrued obligations due to Sellers' employees for service through the Closing Date. Seller agrees to terminate all of Sellers' employees effective as of the close of business on the Closing Date. Pursuant to the Management Agreements between Maritime, Maritime II, and PMI and PMI II, respectively, the employees shall remain employees of Maritime and Maritime II through the Closing Date.

(c)     The parties hereto agree that Buyer will not be required to hire any of the employees of Seller (provided that nothing herein shall be construed to limit Buyer's right to extend offers of employment to any of the employees of Seller). Upon termination of the employment of any of Sellers' employees, Buyer will not by reason of the transactions contemplated by this Agreement, or anything done prior to or on the Closing Date, be liable to any of said employees for so-called "severance pay" or any other payments. Seller will be responsible for any and all severance pay and notice obligations associated with any termination of employment of any employee by Seller that may occur before, contemporaneously with, or at any time following the acquisition transaction, including, but not necessarily limited to, any obligations that may arise under any individual employment or severance agreement.

681992.v13

2.13    Environmental Matters.

(a)    (i) Seller has not generated, transported, used, stored, treated, disposed of, or managed any Hazardous Waste, hereinafter defined, other than in accordance with all applicable Environmental Laws (hereinafter defined); (ii) no Hazardous Material, hereinafter defined, has been or is threatened to be spilled, released, or disposed of at the sites of the Business, or has been located in the soil or groundwater at such sites; (iii) except in accordance with all applicable Environmental Laws, no Hazardous Material has been transported from such sites or used by Seller for treatment, storage, or disposal at any other place; and (iv) no Liens have been imposed by any governmental agency on such sites or any facility, machinery, or equipment owned, operated, leased, or used by Seller in the Business in connection with the presence of any Hazardous Material.

(b)    (i) Seller has no liability under any Environmental Laws, nor has Seller violated any Environmental Law; (ii) all of the Real Property owned, operated, leased, or used by Seller in the Business, including, without limitation, the Real Property (hereinafter defined), and any facilities and operations thereon are presently in compliance with all applicable Environmental Laws; (iii) Seller has not entered into or been subject to any judgment, consent decree, compliance order, or administrative order with respect to any environmental or health and safety matter or received any request for information, notice (including but not limited to notice from the Maryland Department of the Environment (the "MDE") or the United States Environmental Protection Agency (the "EPA")), demand letter, administrative inquiry, or formal or informal complaint or claim with respect to any environmental or health and safety matter or the enforcement of any applicable Environmental Law; and (iv) to Sellers' Knowledge, none of the items enumerated in this subsection will be forthcoming.

(c)    The sites of the Business do not contain any asbestos or asbestos-containing material, any polychlorinated biphenyls (PCBs) or equipment containing PCBs, or any urea formaldehyde foam insulation.

(d)    Seller has provided Buyer with copies of all documents, records, and information available to Seller concerning any environmental or health and safety matter relevant to the Business and the sites on which it is located, whether generated by Seller or others, including, without limitation, environmental audits, environmental risk assessments, site assessments, documentation regarding off-site disposal of Hazardous Materials, spill control plans, and reports, correspondence, permits, licenses, approvals, consents, and other authorizations related to environmental or health and safety matters issued by any governmental agency, all of which are identified on Schedule 2.13(d), attached hereto.

(e)    For purposes of this Section 2.13, (i) "Hazardous Material" shall mean and include any hazardous waste, hazardous material, hazardous substance, petroleum product, oil, toxic substance, pollutant, contaminant, or other substance which may pose a threat to the environment or to human health or safety, as defined or regulated under any Environmental Law; (ii) "Hazardous Waste" shall mean and include any hazardous waste as defined or regulated under any Environmental Law; (iii) "Environmental Law" shall mean any environmental or health and safety-related law, regulation, rule, ordinance, or by-law at the foreign, federal, state, or local level, whether existing as of the date hereof, previously enforced, or subsequently

13

enacted, including the any state or EPA underground storage tank regulations; and (iv) "Seller" shall include all affiliates of Seller, meaning all persons or entities controlled by, controlling or under common control with Seller.

(f)     All underground storage tanks ("UST" or "USTs"), if any, comply with EPA and MDE underground storage tank regulations, including, but not limited to, regulations regarding corrosion protection, spill and overfill protection, tank leak detection and line leak protection. All USTs removed from the Real Property by Seller were done in compliance with EPA and MDE underground storage tank removal rules and regulations.

2.14   Disclosure.   The representations, warranties and statements contained in this Agreement and in the certificates, exhibits and schedules delivered by Seller pursuant to this Agreement to Buyer do not contain any untrue statements of a material fact, and do not omit to state a material fact required to be stated therein or necessary in order to make such representations, warranties or statements not misleading in light of the circumstances under which they were made. To Sellers' Knowledge, there are no facts which presently or are likely in the future to have a material adverse effect on the business, properties, operations or condition of Seller or the Subject Assets which have not been specifically disclosed herein or in a schedule furnished herewith, other than general economic conditions affecting Sellers' industry.

2.15   Permits; Consents.

(a)     Seller has all permits, registrations, licenses, franchises, authorizations, certifications and other approvals (collectively, the "Approvals") that are necessary for the conduct of the Business. Seller has obtained all such Approvals, which are valid and in full force and effect, and the Business is operating in compliance therewith. Such Approvals include, but are not limited to, those required under federal, state or local statutes, ordinances, orders, requirements, rules, regulations, or laws pertaining to environmental protection, public health and safety, worker health and safety, buildings, highways, zoning and appropriate city water utility. Except as set forth on Schedule 2.15(a), attached hereto, all such Approvals will be available and assigned to Buyer and remain in full force and effect upon Buyer's purchase of the Subject Assets to the extent permitted by law. To Sellers' Knowledge, no further Approvals will be required in order for Buyer to conduct the Business subsequent to the Closing Date.

(b)     No approval, consent, authorization, notification or exemption from or filing with any person or entity not a party to this Agreement (collectively, the "Consents") is required to be obtained or made by Seller in connection with the execution and delivery of this Agreement, and the Seller Documents or the consummation of the transactions contemplated hereby and thereby, including, but not limited to, any Consent necessary to permit Buyer's continuation of the Business or any Consent necessary for Sellers' effective transfer of each of the Subject Assets, or assignment of each of the Assumed Contracts (without triggering a breach, default, termination or other modification in any such Assumed Contract), to Buyer; provided, however, the parties acknowledge that any consents required under the Assumed Contracts, are described on Schedule 2.15(b) attached hereto.

2.16   Transactions with Interested Persons.   Except as set forth on Schedule 2.16, attached hereto, neither Seller nor any officer, supervisory employee or director of Seller or, to

14

Sellers' Knowledge, any of their respective spouses or family members, owns, directly or indirectly, on an individual or joint basis, any material interest in, or serves as an officer or director or in another similar capacity of, any competitor or supplier of Seller, or any organization which has a material contract or arrangement with Seller in connection with the Business. Since the date of the Base Balance Sheet, Seller has not made any distributions, redemption payments, dividends or distributions in connection with ownership interests or any other payments to any manager, holder of any ownership interests, or any affiliate of Seller, or any of their respective spouses or family members, other than payments for salary, bonus and benefits to their employees in accordance with past practices.

2.17   Subsidiaries. Except as set forth on Schedule 2.17, attached hereto, Seller does not own or have any direct or indirect interest in or control over any corporation, partnership, joint venture or entity of any kind (each, a "Subsidiary").

2.18   Labor Matters. Seller is in compliance with all applicable laws and regulations respecting labor, employment, fair employment practices, work place safety and health, terms and conditions of employment, and wages and hours. There are no charges of employment discrimination or unfair labor practices, nor are there any strikes, slowdowns, stoppages of work, or any other concerted interference with normal operations existing, pending or threatened against or involving Seller. No question concerning representation exists respecting any group of employees of Seller. There are no grievances, complaints or charges that have been filed against Seller under any dispute resolution procedure (including, but not limited to, any proceedings under any dispute resolution procedure under any collective bargaining agreement) that might have an adverse effect on Seller or the conduct of the Business and no arbitration or similar proceeding is pending and no claim therefor has been asserted. No collective bargaining agreement is in effect or is currently being or is about to be negotiated by Seller. Seller has not received information to indicate that any employment policies or practices of Seller is currently being audited or investigated by any federal, state or local government agency. Seller is and has been, in compliance with the requirements of the Immigration Reform Control Act and any similar statutes, ordinances, laws, orders, rules and/or regulations promulgated by any federal, state, municipal or other governmental authority. Seller has properly classified current and past workers as employees or independent contractors for applicable federal and state tax, unemployment insurance and workers' compensation purposes.

2.19   Inventory. Schedule 2.19, attached hereto, is a list of the Inventory of the Business as of the Closing Date. The values of the Inventory stated in the Financial Statements reflect the normal Inventory valuation policies of Seller and were determined in accordance with generally accepted accounting principles, practices and methods consistently applied.

2.20   Real Property. All of the Severna Park Property and the Edgewater Property utilized in whole or in part in the Business is identified on Schedule 2.20, attached hereto (referred to herein as the "Real Property"). Seller and Podrog, jointly and severally, hereby make the following representations and warranties with respect to the Real Property:

(a)   Title and Description. Seller has good, clear, record and marketable fee simple title to the Severna Park Property and the Edgewater Property, free and clear of all mortgages, deeds of trust, ground leases, assessments, leases and tenancies, claims, covenants,

15

681992.v13

conditions, restrictions, easements, judgments or other encumbrances and free of encroachments which in any manner would prohibit the operation of a car wash onto or off of the Real Property, except for matters agreed to by Buyer and set forth on Schedule 2.20(a), attached hereto (the "Permitted Encumbrances") and each is located on a separately subdivided lot.

(b)     Security Interests.  All of the mortgages, deeds of trust, ground leases, security interests or similar encumbrances on the Real Property are set forth on Schedule 2.20(b), attached hereto (collectively, the "Mortgages").  The Properties shall be clear of all mortgage liens at the time of Closing.

(c)     Condition.  Except as set forth on Schedule 2.20(c), attached hereto, there are no material defects in the physical condition of any improvements constituting a part of the Real Property, including, without limitation, structural elements, mechanical systems, roofs or parking and loading areas, and all of such improvements are in good operating condition and repair, have been well maintained and are free from infestation by rodents or insects.  Except as set forth on Schedule 2.20(c), attached hereto, the Real Property is not subject to special flood or mudslide hazards or within the 100 year flood plain.  Schedule 2.20(c) attached hereto includes disclosures which are required by law to be made prior to or upon signing this Agreement, with respect to the status and location of known wells on the Real Property, how sewage generated at the Real Property is managed and any special assessment, special tax, fee or charge authorized under Title VIII of the Anne Arundel County Code, if any.

(d)     Utilities.  All water, sewer, gas, electric, telephone, drainage and other utility equipment, facilities and services required by law or necessary for the operation of the Real Property as it is now improved and operated are installed and connected pursuant to valid permits, are sufficient to service the Real Property and are in good operating condition.  If any such utilities are available to the Severna Park Property or the Edgewater Property through privately owned land, access to such utilities is provided through one or more valid and binding easement agreements, each of which is in full force and effect.  Neither the Severna Park Property nor the Edgewater Property is served by wells or a private septic system.

(e)     Compliance with Law; Government Approvals.  Seller has not received any notice from any governmental authority of any violation of any law, ordinance, regulation, license, permit or authorization issued with respect to the Real Property that has not been corrected heretofore, and no such violation exists which could have an adverse effect on the operation or value of the Real Property.  All improvements constituting part of the Real Property have been completed and are in compliance in all respects with all applicable laws, ordinances, regulations, licenses, permits and authorizations, and there are presently in effect all licenses, permits and authorizations required by law, ordinance, or regulation.  All building permits and occupancy certificates have been issued for the improvements on the Real Property, and a copy of the most recently issued building permits and occupancy certificates are set forth on Exhibit E, attached hereto.  There are no non-conforming permitted uses of the Real Property.  The conveyance or lease of the Real Property to Buyer shall include all rights to the use of any off-site facilities necessary to ensure compliance with all such laws, ordinances, codes and regulations.  There is at least the minimum access required by applicable subdivision or similar law to the Real Property. Conveyance or lease of the Real Property to Buyer will not result in the imposition of any deferred real estate taxes or assessments against the Real Property.

681992.v13

(f)    Zoning Letter.  As promptly as possible after the date of this Agreement, Seller shall deliver to Buyer a letter regarding each parcel of Real Property substantially in the form set forth on Exhibit F, attached hereto, dated within thirty (30) days prior to the Closing Date (each a "Zoning Letter"), from the governmental agency with jurisdiction.

(g)    Real Property Taxes.  Except as set forth in Schedule 2.20(g), attached hereto, Seller has not received any notice of any pending or threatened reassessment of all or any portion of the Real Property, any real estate tax deficiency or condemnation, and, to the best of Sellers' Knowledge, the transfer of the Real Property to Buyer will not result in any such reassessment or deficiency.  There are currently no contests filed with respect to any real estate tax previously paid or to be paid in connection with the Real Property.

(h)    Copies of Surveys and Appraisals.  As promptly as possible, Seller shall deliver to Buyer copies of all surveys and appraisals of the Real Property in Sellers' possession, whether obtained by Seller or others.

(i)    Certificates of Occupancy.  Seller shall deliver to Buyer a copy of the certificates of occupancy (the "Certificates of Occupancy") from applicable governmental agencies with jurisdiction.

2.21    Patriot Act Representations.  Neither Seller nor Podrog, to the knowledge of Seller or Podrog, any person or entity holding any legal or beneficial interest whatsoever in it (whether directly or indirectly), nor, to the knowledge of Seller and Podrog, any of Sellers' employees, agents or representatives, is (a) named on any list of persons issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") pursuant to Executive Order 13224 or the Annex thereto issued by the President of the United States, as amended and as in effect on the date of this Agreement, or any similar list issued by OFAC or any other department or agency of the United States of America (collectively, the "OFAC Lists"), or any other laws, policies, lists or other requirements of any governmental entity addressing or in any way related to terrorist acts or acts of war, including the Terrorism Sanctions Regulations (31 C.F.R. Part 595), the Terrorism List Governmental Sanctions Regulations (31 C.F.R. Part 596), the Foreign Terrorist Organizations Sanctions Regulations (31 C.F.R. Part 597) and the Foreign Narcotics Kingpin Sanctions Regulations (31 C.F.R. Part 598) (collectively, the "Anti-Terrorism Laws"), or (b) included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the persons referred to or described in any OFAC Lists, or (c) otherwise in violation of any Anti-Terrorism Laws.  None of the property or interests in property of Seller is subject to being "blocked" under any Anti-Terrorism Laws.  Neither the execution nor performance of this Agreement by Seller or Podrog is or will be in violation of any Anti-Terrorism Laws.

2.22    Maryland Bulk Transfers.  Seller and Podrog represent and warrant that closing the transaction described in this Agreement does not require compliance with the provisions of the Maryland Uniform Commercial Code-Bulk Transfers, Md. Ann. Code, Commercial Law Article § 6-101 et seq. (the "Act").

17

SECTION 3.   REPRESENTATIONS AND WARRANTIES OF BUYER.

As a material inducement to Seller to enter into this Agreement and consummate the transactions contemplated hereby, Buyer hereby makes the representations and warranties to Seller contained in this Section 3.

3.1   Organization of Buyer.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware with full corporate power to own or lease its properties and to conduct its business in the manner and in the places where such properties are owned or leased or such business is conducted.

3.2   Authority of Buyer.  Buyer has full right, authority and power to enter into this Agreement and each agreement, document and instrument to be executed and delivered by Buyer pursuant to this Agreement (the "Buyer Documents") and to carry out the transactions contemplated hereby and thereby.  The execution, delivery and performance by Buyer of this Agreement and the Buyer Documents will have been by the Closing Date duly authorized by all necessary corporate action of Buyer and no other action on the part of Buyer will be required in connection therewith.  This Agreement and the Buyer Documents executed and delivered by Buyer pursuant to this Agreement when executed and delivered will constitute valid and binding obligations of Buyer enforceable in accordance with their terms.  The execution, delivery and performance by Buyer of this Agreement and the Buyer Documents and the consummation of the transactions contemplated hereby or thereby:

(a)   do not and will not violate any provision of the Certificate of Incorporation or Bylaws of Buyer;

(b)   do not and will not violate any laws of the United States, or any state or other jurisdiction applicable to Buyer or require Buyer to obtain any approval, consent or waiver of, or make any filing with, any person or entity (governmental or otherwise) that has not been obtained or made; and

(c)   do not and will not result in a breach of, constitute a default under, accelerate any obligation under, or give rise to a right of termination of any indenture, loan, credit agreement or any other agreement, contract, instrument, mortgage, lien, lease, permit, authorization, order, writ, judgment, injunction, decree, determination or arbitration award to which Buyer is a party and which is material to the business and financial condition of Buyer.

The officers or agents who execute this Agreement and the Buyer Documents on behalf of Buyer have and shall have all requisite power to do so in the name of and on behalf of Buyer.

3.3   Broker's or Finder's Fees.  Buyer has no liability to pay fees or commissions to any broker, finder or agent with respect to the transaction contemplated by this Agreement for which Seller could become liable or obligated.

SECTION 4.   COVENANTS.

    4.1   <u>Prior to Closing</u>.   The parties hereto agree, during the period from October 10, 2014, the effective date of the Letter of Intent between Buyer and Seller, or as otherwise provided below, to the Closing Date, as follows:

        (a)   <u>Conduct of Business</u>.   Seller has since December 31, 2013 and will continue to operate the Business in the ordinary course in a manner consistent with past practices, and, in furtherance thereof, Seller agrees that:

            (i)   Seller has not and will not do or cause any act or thing which will have a material adverse effect on the Business or which will result in a breach of any representation or warranty of Seller hereunder, nor has or will Seller enter into any contract or transaction out of the ordinary course of business consistent with past practices;

            (ii)   Seller has performed and will continue to perform all Sellers' material obligations under contracts and has and will use its best efforts to keep the Business intact, to preserve for the benefit of Buyer all sources of supply available to Seller and all of the customers and goodwill for the benefit of Buyer;

            (iii)   Seller will not make any adverse change to Sellers' operations of the Business, including but not limited to, abnormal salary or compensation adjustments, new commission or bonus programs, or enter into any contract long-term in nature;

            (iv)   Seller will issue Coupons in no greater number than has been issued under past practices; and

            (v)   Seller will remove from the Real Property and properly dispose of all garbage, waste products, solid waste, empty barrels and containers, obsolete or junked equipment, and such other similar items not necessary for the operation of the Business, as is reasonably requested to be removed and disposed of by Buyer.

        (b)   <u>Access</u>.   Buyer will use its reasonable best efforts to conduct its due diligence in the manner which is least disruptive to Sellers' operations and employees.   Buyer and its authorized representatives shall have reasonable access, during normal business hours, to the Business and to all properties, books, records, contracts and documents of Seller relating to the Business for the purpose of studies, sampling and inspection, and Seller shall furnish or cause to be furnished to Buyer and its authorized representatives all information with respect to the Business as Buyer may reasonably request, including, without limitation, payroll records, and accounts receivable and payable records prepared or received by Seller.   Buyer may make tests or inspections at the Real Property, environmental or otherwise, provided Buyer restores the Real Property to its former condition existing immediately prior to such tests or inspections in all material respects after performing any such tests or inspections.

        (c)   <u>Non-Solicitation</u>.   Seller has not and will not enter into any agreements with respect to or enter into discussions concerning or provide to anyone any information with

respect to, or solicit or encourage (including the furnishing of any non-public information concerning Seller) any Acquisition Proposal hereinafter defined from or with any third party. The term "Acquisition Proposal" means any proposal with respect to any merger, consolidation or liquidation of Seller, the sale of a material portion of Sellers' assets relating to the Business or the purchase of any equity securities of Seller.

(d)   Prompt Action.   Subject to the terms and conditions of this Agreement, Seller agrees to use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done as promptly as practicable, all things necessary to satisfy the conditions set forth in Section 5 hereof, including without limitation obtaining Consents from any governmental entity or third party (including consents under the Assumed Contracts) required hereunder.

(e)   Change in Circumstances.   Seller and Buyer shall promptly advise the other party of any change in circumstances which would make any representation or warranty set forth in this Agreement untrue if such state of facts had existed on the date of execution of this Agreement.

4.2   Non-Competition Agreements.   At the Closing, Seller and Podrog shall enter into Non-Competition Agreements agreeing not to compete with Buyer substantially in the forms set forth on Exhibit G-1, Exhibit G-2, Exhibit G-3, Exhibit G-4 and Exhibit G-5 attached hereto (the "Non-Competition Agreements").

4.3   Confidentiality.   Each party agrees that, unless and until the Closing has been consummated, each of the parties and its officers, directors, agents and representatives will hold in strict confidence, and will not use any confidential or proprietary data or information obtained from the other party or parties with respect to its business or financial condition except for the purpose of evaluating, negotiating and completing the transaction contemplated hereby. Information generally known in an industry or which has been disclosed to the party by third parties who have a right to do so shall not be deemed confidential or proprietary information for purposes of this Agreement.   If the transaction contemplated by this Agreement is not consummated, each party will return to the other (or certify that it has destroyed) all copies of such data and information, including but not limited to financial information, customer lists, business and corporate records, worksheets, test reports, tax returns, lists, memoranda, and other documents prepared by or made available to such party in connection with the transaction. The confidentiality provisions contained in this Section 4.3 shall survive the termination of this Agreement.

## SECTION 5.   CONDITIONS TO THE OBLIGATIONS OF BUYER.

All obligations of Buyer under this Agreement are subject to fulfillment prior to or on the Closing Date of each of the following conditions:

5.1   Representations and Warranties; Covenants.   The representations and warranties of Seller contained in this Agreement and in any certificate, schedule, exhibit or other document delivered pursuant to this Agreement shall be true at and as of the Closing Date as though made on and as of such date, and Seller shall have performed and complied with all agreements,

20

covenants and conditions required by this Agreement to be performed or complied with by them prior to or at the Closing. If this Agreement is executed before the Closing, Seller shall have delivered to Buyer a certificate dated the Closing Date signed by Podrog and an authorized officer of Seller to the effect set forth in this <u>Section 5.1</u>.

     5.2    <u>Third Party Consents</u>. Buyer shall have received from Seller all consents, authorizations and approvals that are necessary or appropriate for the parties to consummate the transactions contemplated hereby, including with respect to all Assumed Contracts and including, without limitation, approvals and authorizations from each of the parties listed on <u>Schedule 5.2</u>, attached hereto.

     5.3    <u>Release of Liens</u>. All Liens encumbering any of the Subject Assets shall be duly released by the secured parties and other lien holders, and UCC-3 release or termination statements and other lien discharging documents shall have been properly recorded or the recording thereof duly provided for, except for the assumed obligations stated herein.

     5.4    <u>Approval of Proceedings; Documentation</u>. All instruments and legal and corporate proceedings in connection with the transactions contemplated by this Agreement, and the form and substance of all instruments, opinions, certificates, and other documents executed pursuant hereto, shall be sufficient to vest effectively in Buyer all of Sellers' right, title and interest in and to the Subject Assets free and clear of all liens, restrictions, leases, options, charges, easements, encumbrances and title objection of any kind, and shall be reasonably satisfactory in form and substance to Buyer and its counsel, including, without limitation:

     (a)    Assignment and Assumption of Contracts in the form set forth on <u>Exhibit H</u>, attached hereto, duly executed by Seller and Buyer;

     (b)    Assignment of Intellectual Property, duly executed by Seller;

     (c)    Warranty Bills of Sale, duly executed by Seller;

     (d)    Special Warranty Deeds for the Severna Park Property and the Edgewater Property, duly executed by Seller. The Seller shall also deliver for recordation Deeds from the current property owners to the Seller, which Deeds shall be recorded immediately prior to the Deeds from the Seller to Buyer;

     (e)    The Non-Competition Agreements, duly executed by the parties thereto;

     (f)    Escrow Agreement, duly executed by the parties thereto;

     (g)    Counsel Opinion, duly executed by Sellers' counsel;

     (h)    FIRPTA Affidavits, duly executed by Seller; and

     (i)    Articles of Sale and Transfer as to Maritime and Maritime II, if required.

21

5.5     Certificate of Good Standing.  Seller shall have applied for and delivered to Buyer a Certificate of Good Standing from the Secretary of State of the State of Maryland dated within the same calendar year as, and not earlier than ten (10) days prior to, the Closing Date.

5.6     Legal Opinion.  Buyer shall have received an opinion from Sellers' counsel in the form set forth on Exhibit D, attached hereto.

5.7     Employee Matters.  As of the close of business on the Closing Date, Seller will (i) terminate any employment contracts applicable to (and release from any noncompete obligations to Seller) those persons employed in the Business who are offered employment by Buyer upon the Closing, and (ii) terminate participation of all such employees of the Business in employee benefit plans maintained by Seller, such termination to be effected in accordance with the applicable provisions of the Internal Revenue Code of 1986, as amended, ERISA, and all other applicable laws, rules and regulations.  Seller agrees to settle all benefit obligations and cause Sellers' plans to make timely appropriate distributions, to the extent required, to such employees in accordance with and as required by such plans.  Buyer shall not have any responsibility or liability of any kind whatsoever which relates in any way to any services rendered to Seller on or prior to the Closing Date or to any person's status as an employee of Seller on or prior to the Closing Date.  In addition, Seller shall provide to Buyer such copies of documents and other information related to the termination of such employees' participation in Sellers' plans as Buyer may reasonably request.  Seller agrees to bear all costs and expenses, including, but not limited to, accrued vacation and sick pay obligations, severance obligations, health insurance costs, including COBRA coverage, pension and welfare plan obligations, with respect to such employees through the Closing Date.  To the extent required by Treasury Regulations Section 54.4980B-9 (Q&A 8(c)), Seller shall be responsible for providing COBRA coverage under its group health plans following the Closing Date to any M&A qualified beneficiaries (within the meaning of such regulation) with respect to the asset sale transaction contemplated hereunder.

5.8     Environmental Inspections.  The results of any environmental site assessment of the Real Property requested by Buyer shall be satisfactory to Buyer in its sole discretion.

5.9     No Adverse Change.  No event or series of events shall have occurred which has or may reasonably be expected to have a material adverse effect on the Business or the Subject Assets.  Seller shall have delivered to Buyer a certificate dated the Closing Date signed by an authorized officer of Seller to the effect set forth in this Section 5.9.

5.10    No Litigation.  No investigation, suit, action, administrative or other proceeding initiated by a governmental authority or other third party shall be pending or threatened which, in the opinion of Buyer's counsel, is reasonably likely to result in the restraint or prohibition in the performance of this Agreement or the consummation of the transactions contemplated hereby, or the obtaining of damages or other relief against Buyer, the Business or the Subject Assets in connection therewith.

5.11    Financing.  Buyer shall have received financing sufficient to consummate the transactions contemplated by this Agreement on terms satisfactory to Buyer, which may include, but not limited to, debt and/or equity financing.

681992.v13

5.12    Title Insurance.  Buyer shall have arranged for Buyer to receive as soon as practicable after the date hereof, at Sellers' expense, a commitment for an ALTA 2006 owner's policy of title insurance for the Severna Park Property and the Edgewater Property from First American Title Insurance Company (the "Title Company") insuring marketable and insurable title and including affirmative insurance including, but not limited to, an endorsement deleting the standard exceptions, a comprehensive lender's and owner's endorsement, an ALTA 3.1 zoning endorsement, contiguity endorsement, if applicable, and affirmative coverage for appurtenant easements and such other endorsements required by Buyer's lender.  The commitment shall include legible copies of all documents described in Schedule B of the commitment.  All "standard exceptions" and items listed on Schedule B shall be deleted from such commitment at Sellers' expense.  The policy shall provide for a coverage amount equal to the fair market value of the Real Property, as determined by Buyer in its reasonable discretion.  Seller shall pay the premium for the title insurance policy.  Closing fees charged by the Title Company for the purchase shall be paid one-half (1/2) by Buyer and one-half (1/2) by Seller.

5.13    Surveys.  Buyer shall obtain surveys of each parcel of the Real Property and improvements thereon (the "Surveys"), certified on or after the date of this Agreement by a registered land surveyor selected by Buyer and prepared in accordance with the ALTA/ACSM surveying standards.  The Surveys shall contain a certification in the form set forth on Exhibit J, attached hereto.  The Surveys shall be certified to Buyer, the Title Company, Buyer's lender and such other entities or persons as Buyer may reasonably require.  Buyer must be satisfied in its discretion with the Surveys.  The cost of the Surveys shall be paid one-half (1/2) by Buyer and one-half (1/2) by Seller.

5.14    Shareholder Approval.   The requisite majority of shareholders' interests or membership interests of Seller shall have approved of this Agreement and the transactions contemplated hereby.

5.15    Environmental Studies.  With respect to the Real Property, Buyer shall obtain four counterparts of a "Phase I Environmental Site Assessment" for each parcel of the Real Property that shall include a preliminary inspection for asbestos-containing materials ("ACM"), updates to prior assessments or environmental reports, as determined in Buyer's discretion, or environmental listing of the Real Property addressed to Buyer and any other party requested by Buyer, prepared by a company selected by Buyer and conforming to such standards as Buyer may specify (the "Environmental Studies").  Buyer must be satisfied in its discretion with the Phase I Environmental Site Assessments and any other Environmental Studies.  The costs of each Phase I Environmental Site Assessment shall be paid one-half (1/2) by Buyer and one-half (1/2) by Seller.

5.16    UCC and Lien Searches.  Buyer shall have arranged for and delivered to Buyer, at Sellers' sole cost and expense, all of the following:  (i) county and state Uniform Commercial Code searches for Seller, for all business locations of Seller, and comprehensive federal and state tax lien, judgment and bankruptcy searches with respect to Seller; (ii) certification, if available, from the State of Maryland, that all unemployment taxes of Seller have been paid (through the last date in which the same were due); and (iii) certifications, if available, from the State of Maryland and from such other governmental authorities as Buyer may request that taxes, fees or assessment due by Seller to each such authority have been paid (through the most recent date for

payment of the same).  All searches and certifications described in the preceding sentence are collectively termed "Searches." Seller shall cooperate with Buyer as necessary to obtain the Searches.  All such Searches shall be updated by Buyer at Sellers' sole cost and expense within three (3) business days preceding the Closing Date.  Such searches shall disclose no liens, encumbrances or claims against Seller or any of the Subject Assets, other than liens, encumbrances or claims disclosed in and permitted by this Agreement.

SECTION 6.  CONDITIONS TO THE OBLIGATIONS OF SELLER.

All obligations of Seller under this Agreement are subject to the fulfillment prior to or on the Closing Date of each of the following conditions:

6.1     Representations and Warranties.  The representations and warranties of Buyer contained in this Agreement and in any certificate, schedule, exhibit or other document delivered pursuant to this Agreement shall be true at and as of the Closing Date as though made of and as of such date, and Buyer shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied by it prior to or at the Closing.

6.2     Delivery of Purchase Price.  Buyer shall have delivered the Purchase Price to Seller as provided in Section 1.4.

SECTION 7.  RIGHTS AND OBLIGATIONS SUBSEQUENT TO CLOSING DATE.

7.1     Further Assurances.  Seller from time to time after the Closing Date at the request of Buyer and without further consideration shall execute and deliver further instruments of transfer and assignment and take such other action as Buyer may reasonably require to more effectively transfer and assign to, and vest in, Buyer each of the Subject Assets.  Nothing herein shall be deemed a waiver by Buyer of its right to receive on the Closing Date an effective assignment of each of the Assumed Contracts.

7.2     Collection of Assets.  Subsequent to the Closing Date, Buyer shall have the right and authority to collect all items and assets transferred and assigned to it by Seller hereunder and Seller shall endorse any checks payable to Seller that are received on account of such receivables or other items, and Seller agrees that they will promptly transfer or deliver to Buyer from time to time, any cash or other property that Seller may receive with respect to any claims, contracts, licenses, leases, commitments, sales orders, purchase orders, receivables of any character or any other items included in the Subject Assets.

7.3     Payment of Obligations.  Seller shall pay all of the Excluded Liabilities as they become due.  Without limiting the generality of the foregoing, Seller shall, in accordance with applicable law, (i) promptly prepare and file on or before the due date or any extension thereof all federal, state and local tax returns required to be filed by Seller with respect to taxable periods of Seller that include any period ending on or before the Closing Date, and (ii) pay all taxes of Seller attributable to periods ending on or before the Closing Date.

7.4     Access to Books and Records.  From time to time subsequent to the Closing Date, Seller shall afford to Buyer and its accountants, representatives and attorneys reasonable access

24

to all of Sellers' business records, tax returns, books and other data relating to the Business and shall permit Buyer at Buyer's expense to make extracts and copies therefrom.

SECTION 8.   INDEMNIFICATION.

    8.1    <u>Survival of Warranties</u>. Each of the representations, warranties, agreements, covenants and obligations herein or in any schedule, exhibit, certificate or financial statement delivered by any party to the other party incident to the transactions contemplated hereby are material, shall be deemed to have been relied upon by the other party and shall survive the Closing regardless of any investigation and shall not merge in the performance of any obligation by either party hereto.

    8.2    <u>Indemnification by Seller and Podrog</u>.

    (a)    Seller and Podrog (the "<u>Seller Indemnifying Parties</u>), with the indemnification of PMI and PMI II extending solely to their respective periods of ownership, jointly and severally, agree to indemnify and hold Buyer and its respective subsidiaries and affiliates and persons serving as officers, directors, partners or employees thereof or Buyer's assignees (individually, a "<u>Buyer Indemnified Party</u>" and, collectively, the "<u>Buyer Indemnified Parties</u>") harmless from and against any damages, liabilities, losses, taxes, fines, penalties, costs, and expenses (including, without limitation, reasonable fees of counsel) of any kind or nature whatsoever (whether or not arising out of third-party claims and including all amounts paid in investigation, defense or settlement of the foregoing) (collectively, "<u>Losses</u>")  which may be sustained or suffered by any of them arising out of or based upon any of the following matters:

    (i)    fraud, intentional misrepresentation or a deliberate or willful breach by Seller of any of its agreements, representations, warranties or covenants under this Agreement or in any certificate, schedule, financial statement or exhibit delivered pursuant hereto;

    (ii)    any other breach of any agreement, representation, warranty or covenant of Seller under this Agreement or in any certificate, schedule, financial statement or exhibit delivered pursuant hereto, or by reason of any claim, action or proceeding asserted or instituted growing out of any matter or thing constituting a breach or alleged breach of such agreements, representations, warranties or covenants;

    (iii)    any failure by Seller to perform and fully discharge any of the Excluded Liabilities as set forth in this Agreement;

    (iv)    any liability of Seller for Taxes; and

    (v)    any liability of Seller in connection with the Act for which Buyer becomes liable.

    Claims under clauses (i), (ii), (iii), (iv) or (v) of this <u>Section 8.2</u> are hereinafter collectively referred to as "<u>Buyer Indemnifiable Claims</u>."

681992.v13

(b)     The indemnification provided for in this <u>Section 8.2</u> will remain in full force and effect regardless of any assignment by Buyer, investigation made by or on behalf of Buyer Indemnified Parties or any officer, director, partner, employee, agent or controlling person of Buyer Indemnified Parties or any knowledge of Buyer Indemnified Parties or such individuals of any facts or circumstances contributing to such indemnification.

(c)     In furtherance of, and without limiting any right to indemnification with respect to any Buyer Indemnifiable Claim which any Buyer Indemnified Party may have against any Seller Indemnifying Party hereunder, Buyer shall have the right to recover the amount of such Buyer Indemnifiable Claim by (i) seeking recovery of the amount of such claim from any Seller Indemnifying Party or (ii) as provided in <u>Section 8.5</u> (or pursuant to the terms of any instrument provided under <u>Section 8.5</u>).

(d)     Except for authority of Seller as provided in Section 2.2 and for fraud, the indemnification by Podrog personally shall be limited to a total indemnity amount, regardless of the number of claims, of Two Million Dollars ($2,000,000.00) and, except as otherwise set forth above, shall expire, terminate and be of no further force and effect two (2) years from the Closing Date.  Except for authority of Seller as provided in Section 2.2 and for fraud, any claim noted after that date against Podrog individually shall be null and void under any and all circumstances.

8.3     <u>Indemnification by Buyer</u>.

(a)     Buyer agrees to indemnify and hold Seller and Podrog and its affiliates and persons serving as officers, directors or employees thereof (individually, a "<u>Seller Indemnified Party</u>" and, collectively, the "<u>Seller Indemnified Parties</u>") harmless from and against any damages, liabilities, losses and expenses (including, without limitation, reasonable fees of counsel) of any kind or nature whatsoever (whether or not arising out of third-party claims and including all amounts paid in investigation, defense or settlement of the foregoing) which may be sustained or suffered by any of them arising out of or based upon any of the following matters:

(i)     fraud, intentional misrepresentation or a deliberate or willful breach by Buyer of any of its agreements, representations, warranties or covenants under this Agreement or in any certificate, schedule or exhibit delivered pursuant hereto;

(ii)     any other breach of any agreement, representation, warranty or covenant made by Buyer in this Agreement or in any certificate delivered by Buyer hereunder, or by reason of any claim, action or proceeding asserted or instituted growing out of any matter or thing constituting such a breach; and

(iii)     any failure by Buyer to perform and discharge any of the Assumed Liabilities as set forth in this Agreement.

(b)     The indemnification provided for in this <u>Section 8.3</u> will remain in full force and effect regardless of any investigation made by or on behalf of the Seller Indemnified Parties or any officer, director, partner, employee, agent or controlling person of the Seller

Indemnified Parties or any knowledge of the Seller Indemnified Parties or such individuals of any facts or circumstances contributing to such indemnification.

8.4     Notice; Defense of Claims.     An indemnified party may make claims for indemnification hereunder by giving written notice thereof to the indemnifying party.     If indemnification is sought for a claim or liability asserted by a third party, the indemnified party shall also give written notice thereof to the indemnifying party promptly after it receives notice of the claim or liability being asserted, but the failure to do so shall not relieve the indemnifying party from any liability except to the extent that it is prejudiced by the failure or delay in giving such notice.  Such notice shall summarize the bases for the claim for indemnification and any claim or liability being asserted by a third party.  Within twenty (20) days after receiving such notice the indemnifying party shall give written notice to the indemnified party stating whether it disputes the claim for indemnification and whether it will defend against any third party claim or liability at its own cost and expense.  If the indemnifying party fails to give notice that it disputes an indemnification claim within twenty (20) days after receipt of notice thereof, it shall be deemed to have accepted and agreed to the claim, which shall become immediately due and payable.  The indemnifying party shall be entitled to direct the defense against a third party claim or liability with counsel selected by it (subject to the consent of the indemnified party, which consent shall not be unreasonably withheld) as long as the indemnifying party is conducting a good faith and diligent defense.  The indemnified party shall at all times have the right to fully participate in the defense of a third party claim or liability at its own expense directly or through counsel; provided, however, that if the named parties to the action or proceeding include both the indemnifying party and the indemnified party and the indemnified party is advised that representation of both parties by the same counsel would be inappropriate under applicable standards of professional conduct, the indemnified party may engage separate counsel at the expense of the indemnifying party.  If the indemnifying party assumes the defense of a claim, (i) it will be conclusively established for purposes of this Agreement that the claims made in such claim are within the scope of and subject to indemnification; (ii) no compromise or settlement of such claims may be effected by the indemnifying party without the indemnified party's consent unless (A) there is no finding or admission of any violation of law or any violation of the rights of any person and no effect on any other claims that may be made against the indemnified party, and (B) the sole relief provided is monetary damages that are paid in full by the indemnifying party; and (iii) the indemnified party will have no liability with respect to any compromise or settlement of such claims effected without its consent. If no such notice of intent to dispute and defend a third party claim or liability is given by the indemnifying party, or if such good faith and diligent defense is not being or ceases to be conducted by the indemnifying party, the indemnified party shall have the right, at the expense of the indemnifying party, to undertake the defense of such claim or liability (with counsel selected by the indemnified party), and to compromise or settle it, exercising reasonable business judgment.  If the third party claim or liability is one that by its nature cannot be defended solely by the indemnifying party, then the indemnified party shall make available such information and assistance as the indemnifying party may reasonably request and shall cooperate with the indemnifying party in such defense, at the expense of the indemnifying party.

8.5     Escrow.  The Escrow Amount shall be held in escrow for a period of six (6) months (the "Escrow Period") following the Closing Date and distributed therefrom pursuant to the Escrow Agreement.

681992.v13

SECTION 9.   MISCELLANEOUS.

9.1    Construction.  The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean including without limitation.  The parties intend that each representation, warranty and covenant contained herein shall have independent significance.  If any party has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the party has not breached shall not detract from or mitigate the fact that the party is in breach of the first representation, warranty or covenant.

9.2    Fees and Expenses.  Each of the parties will bear its own expenses in connection with the negotiation and the consummation of the transactions contemplated by this Agreement, including but not limited to fees for attorneys, accountants and other advisers, and including for Seller any costs or expenses for which Seller is responsible pursuant to Section 5 hereof.

9.3    Governing Law; Consent to Jurisdiction.   This Agreement and all disputes, whether equitable or legal in nature, that arise under this Agreement that relate in any way to the rights or duties of the parties hereto or thereto, shall be governed by the internal laws of the State of Maryland, without regard to the conflict or choice of laws provisions thereof. The parties to this Agreement consent to the exclusive jurisdiction of the courts of the State of Maryland, County of Anne Arundel, or the federal district court for the District of Maryland, with respect to any action or proceeding, whether equitable or legal in nature, that relates in any way to the rights or duties of the parties to this Agreement, and further consent in such circumstances, to venue in the courts of the State of Maryland, County of Anne Arundel, or the federal district court for the District of Maryland for any such action or proceeding.

9.4    Notices.  All notices, requests, demands, claims and other communications hereunder (collectively, "Notices") must be in writing. Any Notice will be duly given if (and be deemed received two (2) business days after) it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient as set forth below.

|  | |
|---|---|
| If to Buyer: | CWP West Corp. |
|  | 222 East Fifth Street |
|  | Tucson, Arizona 85705 |
|  | Attention:  John Lai |
|  | Telephone: (520) 615-4000 |
|  | Telefacsimile:  (520) 615-4001 |

and

Ronald R. Kirchoff, Esq.
325 Cedar Street
300 Degree of Honor Building
St. Paul, Minnesota 55101
Telephone:   (651) 221-4050
Telefacsimile:  (651) 221-4052

If to Seller:     Maritime Autowash, Inc.
                  Attention:  David Podrog
                  6619 S. Dixie Hwy
                  PMB 193
                  Miami, Florida 33143
                  Phone: (443) 254-7676
                  e-mail: dpodrog@maritimeautowash.com

          and

                  Maritime Autowash II, Inc.
                  Attention:  David Podrog
                  6619 S. Dixie Hwy
                  PMB 193
                  Miami, Florida 33143
                  Phone: (443) 254-7676
                  e-mail: dpodrog@maritimeautowash.com

          and

                  Podrog Maritime Investments, LLC
                  Attention:  David Podrog
                  6619 S. Dixie Hwy
                  PMB 193
                  Miami, Florida 33143
                  Phone: (443) 254-7676
                  e-mail: dpodrog@maritimeautowash.com

          and

                  Podrog Maritime Investments II, LLC
                  Attention:  David Podrog
                  6619 S. Dixie Hwy
                  PMB 193
                  Miami, Florida 33143
                  Phone: (443) 254-7676
                  e-mail: dpodrog@maritimeautowash.com

| with a copy to: | Alan W. Bernstein, Esquire |
| | Bernstein & Feldman, P.A. |
| | 900 Bestgate Road, Suite 200 |
| | Annapolis, Maryland 21401 |
| | Telephone: (410) 573-0017 |
| | Telefacsimile: (410) 573-0049 |

| If to Podrog: | David Podrog |
| | 6619 S. Dixie Hwy |
| | PMB 193 |
| | Miami, Florida 33143 |
| | Phone: (443) 254-7676 |
| | e-mail: dpodrog@maritimeautowash.com |

| with a copy to: | Alan W. Bernstein, Esquire |
| | Bernstein & Feldman, P.A. |
| | 900 Bestgate Road, Suite 200 |
| | Annapolis, Maryland 21401 |
| | Telephone: (410) 573-0017 |
| | Telefacsimile: (410) 573-0049 |

Any party may give any Notice using other means (including personal delivery, expedited courier, messenger service, telecopy, telefacsimile, ordinary mail, or electronic mail), but no such Notice shall be deemed to have been duly given unless and until it is actually received by the intended recipient. Any party may change the address to which Notices are to be delivered by giving the other parties Notice in the manner set forth above.

9.6    Entire Agreement; No Third Party Beneficiaries.   This Agreement is complete, reflects the entire agreement of the parties with respect to its subject matter, and supersedes all previous written or oral negotiations, commitments and writings; provided, however, this Agreement does not supersede, impair or in any way modify the Purchase Agreement, or any other instrument, agreement, document or certificate that is executed and delivered pursuant to or in furtherance of the Purchase Agreement.   No promises, representations, understandings, warranties and agreements have been made by either of the parties except as referred to in this Agreement and the Purchase Agreement.   No provision of this Agreement or any other agreement or instrument entered into or executed in connection herewith is intended to create any right of any party other than Buyer and Seller and their respective successors and assigns.

9.7    Assignability; Binding Effect.   This Agreement shall be assignable, in whole or in part, by Buyer upon written notice to Seller, provided that such assignment shall not release Buyer of its obligations hereunder prior to or after Closing.   This Agreement may not be assigned by Seller without the prior written consent of Buyer.   This Agreement shall be binding upon and enforceable by, and shall inure to the benefit of, the parties hereto and their respective successors and permitted assigns.   Without limiting the foregoing, Buyer may assign any or all of its rights and benefits under this Agreement to its source of financing for any part or all of the Purchase Price, and may direct that any one or more instruments of conveyance conveying title

30

to Buyer and/or such source(s) of financing, provided that such assignment shall not release Buyer of its obligations hereunder prior to Closing.

    9.8   <u>Captions and Gender</u>. The captions in this Agreement are for convenience only and shall not affect the construction or interpretation of any term or provision hereof. The use in this Agreement of the masculine pronoun in reference to a party hereto shall be deemed to include the feminine or neuter pronoun, as the context may require.

    9.9   <u>Execution in Counterparts</u>. This Agreement may be executed and delivered (including by facsimile or Portable Document Format (pdf) transmission) in one or more counterparts, all of which will be considered one and the same agreement and will become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties. Facsimile or pdf transmission of any signed original document or retransmission of any signed facsimile or pdf transmission will be deemed the same as delivery of an original. At the request of any party, the other parties will confirm facsimile or pdf transmission by signing a duplicate original document.

    9.10   <u>Amendments</u>. This Agreement may not be amended or modified, nor may compliance with any condition or covenant set forth herein be waived, except by a writing duly and validly executed by each party hereto, or in the case of a waiver, the party waiving compliance.

    9.11   <u>Publicity and Disclosures</u>. Except as required pursuant to applicable law, no press releases or public disclosure, either written or oral, of the transactions contemplated by this Agreement, shall be made by a party to this Agreement without the prior knowledge and written consent of Buyer and Seller. However, Buyer shall have the right to make such press release and announcement as it determines concerning this Agreement or the transactions contemplated hereby on or after the Closing Date.

    9.12   <u>Taxes</u>. Seller shall be responsible for any and all sales, transfer, recordation, excise or similar taxes payable on the transfer of the Subject Assets to be sold, assigned, transferred and delivered to Buyer hereunder, under any Seller Document or under any document related hereto and Seller agrees to make timely and full payment therefor. Seller shall provide evidence that such taxes have been paid as soon as reasonably practicable.

    9.13   <u>Cooperation</u>. The Buyer, at no expense or cost, shall cooperate with the Seller if Seller elects to participate in a §1031 exchange or establish a Charitable Remainder Trust or any similar business arrangement.

    9.14   <u>Severability</u>. In the event that any provision or any portion of any provision of this Agreement shall be held to be void or unenforceable, then the remaining provisions of this Agreement (and the remaining portion of any provision held to be void or unenforceable in part only) shall continue in full force and effect.

<em>[The remainder of this page was intentionally left blank.]</em>

681992.v13

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed as of the date set forth above by their duly authorized representatives.

BUYER:    CWP WEST CORP.

By:_____(SEAL)
Name: Ronald R. Kirchoff
Its:  Secretary

SELLER:    MARITIME AUTOWASH, INC.

By:_____(SEAL)
Name:_____
Its:_____

SELLER:    MARITIME AUTOWASH II, INC.

By:_____(SEAL)
Name:_____
Its:_____

SELLER:    PODROG MARITIME INVESTMENTS, LLC

By:_____(SEAL)
Name:_____
Its:_____

SELLER:    PODROG MARITIME INVESTMENTS II, LLC

By:_____(SEAL)
Name:_____
Its:_____

681992.v13

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed as of the date set forth above by their duly authorized representatives.

BUYER:    CWP WEST CORP.

By:_____(SEAL)
          Name: Ronald R. Kirchoff
          Its: Secretary

SELLER:   MARITIME AUTOWASH, INC.

By:_____(SEAL)
          Name: DAVID PODROG
          Its: PRESIDENT

SELLER:   MARITIME AUTOWASH II, INC.

By:_____(SEAL)
          Name: DAVID PODROG
          Its: PRESIDENT

SELLER:   PODROG MARITIME INVESTMENTS, LLC

By:_____(SEAL)
          Name: DAVID PODROG
          Its: MANAGING MEMBER

SELLER:   PODROG MARITIME INVESTMENTS II, LLC

By:_____(SEAL)
          Name: DAVID PODROG
          Its: MANAGING MEMBER

32

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed as of the date set forth above by their duly authorized representatives.

BUYER:    CWP WEST CORP.

By: _____ (SEAL)
    Name: Ronald R. Kirchoff
Its: Secretary

SELLER:    MARITIME AUTOWASH, INC.

By: _____ (SEAL)
    Name: _____
Its: _____

SELLER:    MARITIME AUTOWASH II, INC.

By: _____ (SEAL)
    Name: _____
Its: _____

SELLER:    PODROG MARITIME INVESTMENTS, LLC

By: _____ (SEAL)
    Name: _____
Its: _____

SELLER:    PODROG MARITIME INVESTMENTS II, LLC

By: _____ (SEAL)
    Name: _____
Its: _____

32

681992.v13

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed as of the date set forth above by their duly authorized representatives.

BUYER:     CWP WEST CORP.

By:_____(SEAL)
Name: Ronald R. Kirchoff
Its: Secretary


SELLER:    MARITIME AUTOWASH, INC.

By:_____(SEAL)
Name: DAVID PODROG
Its: PRESIDENT


SELLER:    MARITIME AUTOWASH II, INC.

By:_____(SEAL)
Name: DAVID PODROG
Its: President


SELLER:    PODROG MARITIME INVESTMENTS, LLC

By:_____(SEAL)
Name: DAVID PODROG
Its: Managing Member


SELLER:    PODROG MARITIME INVESTMENTS II, LLC

By:_____(SEAL)
Name: DAVID PODROG
Its: Managing Member


681992.v13

32

PODROG:

_____(SEAL)
David Podrog

33

681992.v13

**SCHEDULE 1.3**

**ASSUMED LIABILITIES**

1.     Liability for GMC Sierra truck lease

2.     Liability for GMC Yukon truck lease

3.     Liability for Commercial Trades LLC lease for camera security system