# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| U.S. EQUAL EMPLOYMENT | * | |
| OPPORTUNITY COMMISSION, | | |
| | * | |
| **Plaintiff** | | |
| | * | |
| v. | | CIVIL NO. JKB-17-2463 |
| | * | |
| PHASE 2 INVESTMENTS INC., *et al.*, | | |
| | * | |
| **Defendants.** | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

The Equal Employment Opportunity Commission ("EEOC") brought this Title VII action against two corporations, Defendant Phase 2 Investments Inc. ("Phase 2"), and Defendant CWP West Corp. t/a Mister Car Wash ("Mister"), alleging that a previous corporation, Maritime Autowash, Inc. ("Maritime"), subjected a class of Hispanic employees to a hostile work environment and that both Defendants are liable. Both Defendants have moved to dismiss or in the alternative for summary judgment. (*See* Phase 2 Mot. Summ. J., ECF No. 15; Mister Mot. Summ. J., ECF No. 23). The EEOC has responded in opposition to both motions (ECF Nos. 19, 25) and both Defendants have replied (ECF Nos. 22, 41).[1] Therefore, both motions are ripe for review. No hearing is necessary to resolve either matter. *See* Local Rule 105.6 (D. Md. 2016). The Court construes both motions as, in part, motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) and as, in part, motions for summary judgment under Rule 56. For the reasons stated below the Court will deny Defendants' motions in their entirety.

---

[1] An earlier Order of this Court struck Mister's reply from the record and ordered that it refile its reply with certain omissions and redactions. (*See* Order, ECF No. 39.)

## I.    *Background*[2]

### a.   *The Charging Parties' employment, complaints of discrimination, and termination*

Maritime was a Maryland corporation that maintained two car washes, including one in Edgewater, Maryland.  (Am. Compl. ¶¶ 4, 6, ECF No. 5; Decl. Elmer Escalante ¶ 5, ECF No. 19-1.)  A number of Hispanic employees worked at the Maritime facility in Edgewater, including Elmer Escalante, Godofredo Esquivel Platero, Luis Serrano, Jose Luis Dominguez,[3] Gabriel Espinoza, Saul Herrera, Santos Villacorta, Eddy Cervantes, and Merced Espinoza Diaz ("the Charging Parties").  (Decls., ECF Nos. 19-1 through 19-9.)  The Charging Parties were subjected to harassment and discrimination while working at Maritime.  (*See* Charges of Discrimination, Decl. Rosemarie Rhodes Attachment C, ECF No. 19-10.)  They were required to work longer hours with shorter breaks than their non-Hispanic counterparts.  (*Id.*)  They were denied proper equipment for their jobs and paid less than their non-Hispanic colleagues as well.  (*Id.*)

On April 23, 2013, agents from United States Immigration and Customs Enforcement ("ICE") conducted an audit of Maritime.  (Aff. David Podrog ¶ 4, ECF No. 15-3.)  On May 7, 2013, ICE informed Maritime that thirty-nine of its employees were not authorized to work in the United States, including the nine Charging Parties.  (*Id.* ¶¶ 5-6.)  ICE further informed Maritime that, unless the thirty-nine employees could provide valid identification and employment eligibility documentation, Maritime would suffer civil, and perhaps even criminal, penalties if it continued to employ them.  (Notice of Suspect Documents 2, ECF No. 15-4.)

---

[2] As these motions are treated as factual challenges to subject matter jurisdiction as well as motions for summary judgment the facts recited here draw from the record as a whole, *see Khoury v. Meserve,* 268 F. Supp. 2d 600, 606 (D. Md. 2003), and insofar as they relate to the substantive arguments raised by the Defendants in support of their motions for summary judgment, these facts, and the inferences to be drawn from them, are taken (and largely set out here) in the light most favorable to the EEOC, who is the party opposing the motions.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

[3] The Complaint spells this employee's name as "Dominguez" (Am. Compl. ¶ 34), and his name on his Declaration is "Dominguez," (*see* ECF No. 19-4), but his name on his Charge of Discrimination is "Dominquez," (*see* ECF No. 15-9).  The Court will use the spelling "Dominguez."

According to the Charging Parties, after being informed of the employees' status, Maritime General Manager Kyle Decker "held a meeting with the Hispanic employees and told [them] that he and Owner [David] Podrog had made a decision to give those employees without proper documentation $150 so that they could obtain new papers and be re-hired . . . under new names." (*E.g.,* Escalante Decl. ¶ 11; Decl. Godofredo Esquivel ¶ 5, ECF No. 19-2.)

After being rehired, on July 27, 2013 the Charging parties and other Hispanic employees complained to David Podrog and Kyle Decker about the mistreatment they had been suffering. (*E.g.*, Escalante Decl. ¶ 19; Decl. Luis Serrano ¶ 10, ECF No. 19-3.) Decker "indicated" that the employees would only get a thirty minute lunch break that day, and if they did not report back to work at 1:00 pm, they would be fired. (*E.g.*, Escalante Decl. ¶ 19.) The Charging Parties and other Hispanic employees did not report back to work at 1:00 p.m., and Maritime fired them. (*E.g.,* Escalante Decl. ¶¶ 19-20; Esquivel Decl. ¶¶ 11-12.) (According to David Podrog, Maritime only fired seven of the Charging Parties, as well as other employees identified by ICE, and only because they were unable to provide documentation proving that they were eligible to work. (Podrog Aff. ¶ 12.))

### b. *EEOC's investigation*

On July 30, 2013 the Charging Parties submitted intake questionnaires to the EEOC. (Intake Questionnaires, Decl. Rosemarie Rhodes Attach. A, ECF No. 19-10.) On February 4, 2014, the Charging Parties signed formal Charges of Discrimination, and notice of these Charges was then sent to Maritime. (*See, e.g.*, Escalante Charge of Discrimination, ECF No. 15-6 (signed February 4, 2014); Escalante Notice of Charge of Discrimination, Decl. Rosemarie Rhodes Attach. D, ECF No. 19-10 (dated February 25, 2014).) The Charging Parties began their employment at Maritime at different times, and thus their Charges of Discrimination allege

different dates for the earliest date on which the alleged discrimination took place, but most of the Charges allege that the latest date on which discrimination took place was July 27, 2013 – the date on which the Charging Parties were fired. (*E.g.*, Escalante Charge of Discrimination; Dominguez Charge of Discrimination, ECF No. 15-9.)[4] After receiving the questionnaires and complaints from the Charging Parties, the EEOC began to investigate Maritime.

During the course of its investigation, the EEOC served Maritime with a subpoena, to which Maritime was not responsive. In 2015, the EEOC came to this court to enforce the subpoena. *See EEOC v. Maritime Autowash, Inc.*, Civ. No. GLR-15-869, 2015 WL 13158495 (D. Md. June 23, 2015). The EEOC, in its Application to Show Cause Why Administrative Subpoena Should Not Be Enforced, alleged that it was investigating unlawful practices arising out of Elmer Escalante's charges. *Id.* at *1. Maritime argued that because Escalante was not legally authorized to work in the United States, he could not seek relief under Title VII, and therefore the EEOC could not enforce its subpoena. *Id.* A judge of this court, in a very brief opinion, agreed, and denied the EEOC's Application for an order to show cause. *Id.* at *2. The EEOC appealed and on April 25, 2016, the Fourth Circuit reversed. *See EEOC v. Maritime Autowash, Inc.*, 820 F.3d 662. The Fourth Circuit's decision will be discussed in greater detail below, but essentially Judge Wilkinson, writing for the Court, explained that "[n]othing [in Title VII] explicitly bars undocumented workers from filing complaints," and that because the EEOC only needed to show an "arguable or plausible basis for its jurisdiction" at this "very early stage," the subpoena was enforceable. 820 F.3d at 663-66. The Court declined to specifically address the "particular issue that Maritime press[ed]—whether and to what extent Title VII covers undocumented aliens," noting that it was a "novel and complex problem." *Id.* at 667.

---

[4] One of the Charging Parties, Godofredo Platero alleged that the latest the discrimination took place was July 26, 2013, not July 27. (ECF No. 15-7.) Gabriel Espinosa's Charge of Discrimination does not provide dates for the earliest or latest times that discrimination allegedly took place. (ECF No. 15-10.)

### c. *Defendants' changes in ownership*

While the EEOC was working to enforce its investigatory powers, corporate changes were underway at Maritime. In 2014 Mister began the process of purchasing Maritime's assets. (*See* Decl. Casey Lindsay ¶ 3, ECF No. 23-2.) Both parties, Maritime and Mister, entered into a letter of intent which specified a purchase price "in excess of $15,000,000." (*Id.* ¶¶ 3-4.) After signing the letter, "the parties commenced the due diligence process and began negotiating the terms of an asset purchase agreement." (*Id.* ¶ 5.)

Mister did much to protect itself from any potential liability that Maritime might incur. The purchase was "intentionally structured as an asset acquisition to avoid assuming any existing liabilities of Maritime," (Lindsay Decl. ¶ 7), and the asset purchase agreement ("APA") explicitly provided that, except for any liabilities incurred after the closing date, and any liabilities specifically assumed by Mister, the "Buyer is not assuming or becoming liable for any liabilities of Seller." (APA § 1.3, ECF No. 23-5.) All liabilities that Mister expressly assumed were listed in a Schedule attached to the APA, and this Schedule made no mention of any employment discrimination liability. (*See* APA Schedule 1.3.) Maritime and Mr. Podrog agreed to indemnify and hold harmless Mister "from and against any damages [and] liabilities . . . of any kind or nature whatsoever . . . arising out of . . . any failure by [Maritime] to perform and fully discharge any of the Excluded Liabilities as set forth in this Agreement." (*Id.* § 8.2.)

Mister also explored Maritime's potential liabilities as part of its due diligence process. (*See* Decl. Sarah Ross ¶¶ 3-4, ECF No. 23-3.) Mister asked Maritime "to disclose any and all pending lawsuits or claims by employees." (*Id.* ¶ 3.) Maritime responded in October 2014, by "forward[ing] position statements" its counsel had prepared in response to the Charges of Discrimination that the Charging Parties had filed in 2014. (*Id.* ¶ 4.) In addition to these

position statements, Maritime sent a letter from its counsel "stating that Maritime Autowash had an Employment Practices Liability Insurance policy with $1,000,000 in coverage and that [he] would be 'surprised' if the Claimants' damages would exceed $1,000,000." (*Id.*) According to Mister, it never received the actual Charges of Discrimination from Maritime. (*Id.* ¶ 5.) Mister requested from Maritime, and received, a census of Maritime's "then current employees." (*Id.* ¶ 6.) This request presumably came after the letter of intent in later 2014, well over a year since the Charging Parties had been terminated by Maritime, and, as one would expect, "[n]one of the due diligence documents provided by Maritime Autowash indicated that any of the nine [Charging Parties] were then current employees of Maritime Autowash." (*Id.*) According to Mister, Maritime never disclosed to Mister that the EEOC had sought a show cause order, the subject of which was later litigated in court (and discussed above). (*Id.* ¶ 7.) It is undisputed that the Charging Parties were never employed by Mister, and no employees have filed charges of discrimination naming Mister as a respondent.

On January 21, 2015, the parties closed the referenced deal, and Mister took ownership of Maritime's assets, including the Edgewater facility that had employed the Charging Parties. (*See* APA.) Even after its due diligence, Mister did not negotiate for a lower price, and paid over $15 million, "the largest amount Mister Car Wash had ever paid for two stores in the history of the company." (Mister Mot. Summ. J. Mem. Supp. 6, ECF No. 23-1; Decl. Lindsay ¶ 8.) As to branding, by the terms of the APA Mister had only purchased a limited license to use Maritime's trademark for twelve months after the closing date (*see* APA § 1.2), and Mister set about transitioning away from Maritime's public facing marketing materials, such as its signage and social media. (*See* Ross Decl. ¶¶ 9-11.) Mister did not change Maritime's website for several months after the sale, and continued to use Maritime's social media. (Rhodes Decl. ¶ 5 and

Attachs. B & C.)  But by October of 2015, Mister was no longer using Maritime's website or social media.  (Ross Decl. ¶ 11.)  As a result of an "unrelated trademark infringement claim over the name 'Mister Car Wash'" the outdoor signage continued to show "Maritime Autowash," but that has since been converted as well.  (*Id.* ¶ 12.)

Mister also made considerable internal changes, such as capital improvements worth roughly $600,000, changes to the car washing process in order to make the experience consistent with Mister's other facilities, and personnel changes.  (*See id.* ¶¶ 14-15, 21-24.)  Mister offered employment to all of Maritime's employees (not including the Charging Parties, who were not employees of Maritime at the time of the acquisition), but required all of the employees to provide valid documentation showing they were authorized to work in the United States.  (*Id.* ¶¶ 16-18.)  Mister was only able to hire 31% of Maritime's employees (*id.* ¶ 18), but still, as of June 2015, almost half of Mister's workforce were former Maritime employees (Rhodes Decl. ¶ 5).  Mister asserts that it had to hire many new "production-level employees" (those who physically clean the cars), and due to the inexperience of these new employees Mister had to "suspend its high-revenue detailing services at both stores, resulting in a significant decrease in the profits of each store."  (*Id.* ¶¶ 19-20.)  In other words, according to Mister, as a result of the differences between Maritime and Mister, it had to spend over $600,000 and lost revenue.

To complicate matters further, after Maritime sold its Maryland car wash facilities, it too experienced some corporate change.  On March 13, 2015, Phase 2 Investments ("Phase 2") was incorporated in Florida.  (Podrog Aff. ¶ 3.)  David Podrog, who was President of Maritime, is also the President of Phase 2.  (*Id.* ¶ 2.)  Subsequently, Maritime Autowash, as well as a third corporation of which Mr. Podrog was President, Maritime Autowash II, merged into Phase 2.  (*See id.* ¶ 3; Mister Mot. Summ. J. Mem. Supp. at 2 n.3.)  Under Florida law, when two

corporations merge into a third corporation, the surviving corporation (here, Phase 2) "shall thenceforth be responsible and liable for all liabilities and obligations of each corporation party to the merger." Fla. Stat. Ann. § 607.1106(1)(c).

### d. *The EEOC's claims and the current posture of the dispute*

After resolving the enforcement of the subpoena before the Fourth Circuit, after Maritime sold its assets to Mister, and after Maritime then merged with Maritime Autowash II to form Phase 2, the EEOC finally concluded its investigation and sent both Defendants a Letter of Determination. (*See* Letter of Determination, ECF No. 41-3.)[5] In the Letter, the EEOC stated that it had "determined that Respondent Maritime violated Title VII by discriminating against [the] Charging Parties and Hispanics as a class with regard to harassment, intimidation, unequal terms and conditions of employment, lower wages, denial of promotional opportunities, disparate discipline and discharge because of their national origin (Hispanic) and in retaliation for engaging in protected activity." (*Id.* at 2.) The EEOC also found that "Respondent Mister Car Wash is as [sic] a successor in interest for Title VII purposes," and invited both parties to engage in informal conciliation. (*Id.* at 2-3.) On June 14, 2017, the EEOC determined that conciliation had failed and notified the Defendants. (*See* Mem. 6, ECF No. 40.) It then filed the instant action on August 28, 2017, and thereafter amended its complaint. (*See* Compl., ECF No. 1; Am. Compl.)

The EEOC's amended complaint alleged that Hispanic employees at Maritime were "relegated" to lower paid positions, denied overtime, and denied their fair share of tips. (Am. Compl. ¶¶ 36-37; 42-43.) It alleged that Maritime would require the Charging Parties to perform additional tasks that it did not request of its non-Hispanic employees, such as cleaning

---

[5] The letter is addressed to Maritime and Mister. Phase 2 and Mister are the "Defendants" in this action. Considering that Phase 2 is, under Florida law, responsible for any liabilities of Maritime, and that Phase 2 has not challenged that fact, the Court will use the term "Defendant" to refer to both Maritime and Phase 2.

the "car tunnel and machinery, powerwash[ing] the property, perform[ing] landscaping duties," and performing tasks at Maritime's manager's homes, all without additional compensation. (*Id.* ¶¶ 46, 48-49.) Furthermore, the EEOC alleged that Maritime treated the Charging Parties and other Hispanic employees differently at work, forcing them to eat outside, "drink unfiltered water, and utilize an unlocked unisex bathroom which needed repair." (*Id.* ¶ 51.) It alleged that Maritime would not let them take full lunch breaks or take other work breaks, and that Maritime did not provide them with access to the indoor facilities or proper equipment to perform their work. (*Id.* ¶¶ 52-55.) The complaint described verbal harassment as well, alleging that Managers at Maritime would swear at the Charging Parties, "bark[] commands to them," and threaten to fire them. (*Id.* at ¶ 57.)

Phase 2 filed a motion to dismiss under Rule 12(b)(6) or for summary judgment on October 27, 2017 (ECF No. 15) and Mister filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6) or for summary judgment on November 27, 2017 (ECF No. 23). The EEOC also moved for attorney's fees under Rule 4(d)(2) after effecting alternative service on Phase 2, and moved to strike certain portions of Mister's reply in support of its motion to dismiss. Those motions have been disposed of in an earlier order. (ECF No. 39.) The EEOC has responded to both Phase 2 and Mister's motions to dismiss and both Defendants have replied. These motions are therefore ripe for review.

## II.    *Nature of the motions and their standards*

The motions submitted by Defendants are captioned as motions to dismiss under Rule 12(b)(6) (and, for Mister's motion, Rule 12(b)(1)) or "in the alternative" for summary judgment. As both Defendants make challenges to subject-matter jurisdiction, the Court considers each of Defendants' motions in part under Rule 12(b)(1). *See Neal v. Residential Credit Solutions, Inc.*,

Civ. No. JKB-11-3707, 2012 WL 1453597, at *1 (D. Md. Apr. 24, 2012) (considering a motion under Rule 12(b)(6) as if brought under Rule 12(b)(1)). The Court considers the remainder of Defendants' motions to be motions for summary judgment under Rule 56.[6] Under Rule 12(d) a Court may convert a motion to dismiss to one for summary judgment and consider matters outside the pleadings, but the parties must "be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When, however, "the movant expressly captions its motion 'in the alternative' as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court 'does not have an obligation to notify parties of the obvious.'" *Pevia v. Shearin*, Civ. No. ELH-13-2912, 2015 WL 629001, at *3 (D. Md. Feb. 10, 2015) (quoting *Laughlin v. Metro Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998)). The Defendants here captioned their motions as summary judgment motions "in the alternative," and the EEOC appears to have grasped "the obvious," as it has submitted material outside the pleadings. It is therefore appropriate to consider the remainder of Defendants' motions as motions for summary judgment.

The burden of proving subject-matter jurisdiction is on the plaintiff. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). The Defendants here have brought factual challenges to subject-matter jurisdiction, arguing that the facts supporting jurisdiction are not true, and not that the complaint fails to allege necessary jurisdictional facts. *See id.* Under a factual challenge, "the court may consider exhibits outside the pleadings . . . [and] is free to weigh the evidence and

---

[6] It would be inappropriate to consider Defendants' jurisdictional challenges under Rule 56, as summary judgment goes to the merits of a case. *See Coe v. Baltimore City Fire Dept.*, Civ. No. WDQ-11-1282, 2013 WL 657634, at *2 n.2 (D. Md. Feb. 21, 2013) (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (3d ed.)) (alterations omitted) ("In most circumstances, a Rule 56 motion for summary judgment is an inappropriate method for challenging the district court's subject matter jurisdiction.").

satisfy itself as to the existence of its power to hear the case." *Williams v. U.S.*, 50 F.3d 299, 304 (4th Cir. 1995) (internal quotation marks and citations omitted).

The Defendants have also brought motions to dismiss that the Court will construe as motions for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

### III.    *Analysis*

There is much overlap between the arguments presented by both Defendants. Therefore, the Court will not address each motion separately. Rather, it will first address fundamental

challenges brought by the Defendants – to the EEOC's standing and this Court's jurisdiction – and then proceed to the Defendants' substantive arguments.

### a. *Standing*

Mister never employed the Charging Parties, the discriminatory actions alleged in the Amended Complaint were not performed by Mister, and the EEOC only named Mister as a Defendant under a theory of "successor liability." Mister makes much of these facts. In addition to making substantive arguments that it would be inequitable to apply successor liability in this case, Mister makes additional preliminary challenges based on the fact that it never employed the Charging Parties: namely, that the EEOC lacks standing to assert claims against Mister, and that this Court does not have subject-matter jurisdiction over the claims against Mister. The Court will first address Mister's standing argument, and then turn to jurisdiction. The Court will address the substantive issue of whether it is equitable to hold Mister liable as a successor only after establishing the EEOC's standing and the Court's jurisdiction over the claims in this case.

Mister argues that because it never employed the Charging Parties "there is no fairly traceable connection between the Claimants' alleged injuries and Mister Car Wash," and therefore the EEOC lacks standing. (Mister Mot. Summ. J. Mem. Supp. at 17-18.) The "Claimants," by which Mister seems to mean the Charging Parties, did not bring this case. The EEOC did. And the EEOC has standing to bring it. The EEOC is bringing this case under the statutory authority granted to it by Title VII, to vindicate the public's interest. *See Gen. Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 326 (1980). "If it were true that . . . [the EEOC's] prayer for relief could be dictated by [the employee who filed the charge], [defendant's] analysis might be persuasive. But once a charge is filed, the exact opposite is true under the statute—the EEOC is in command of the process." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 291 (2002).

The EEOC has named Mister as a Defendant under the theory that it is a successor to Maritime for purposes of liability under Title VII, and thus the injury – Maritime's alleged violation of Title VII – is fairly traceable to Mister. *Cf. Deming v. First Franklin*, No. 09-5418RJB, 2010 WL 891009, at *3 (W.D. Wash. Mar. 9, 2010) (order vacated on reconsideration on other grounds) (finding that plaintiff's injuries were traceable to successor corporations and plaintiff had standing against them).

### b. *Jurisdiction*

Even if the fact that the Charging Parties were never employed by Mister does not defeat the EEOC's constitutional standing, Mister still argues that it does defeat the Court's subject-matter jurisdiction over the claims against it. Furthermore, both Defendants argue that the Court does not have jurisdiction over certain claims because the Charging Parties did not exhaust their administrative remedies.

### i. *"Successor jurisdiction"*

Mister clearly believes that because it never employed the Charging Parties this Court does not have jurisdiction over the claims against Mister. It is unclear why. Mister appears to argue that charging parties must be "employees" of a defendant in order for a court to have jurisdiction over Title VII claims against that defendant, and that the Charging Parties here were never "employees" of Mister. Whether an aggrieved person was an "employee" under Title VII, however, does not determine whether the Court has jurisdiction over the underlying claim. *See Donatello v. Cty. of Niagara*, 15-CV-39V, 2016 WL 3090552, at *6-*8 (W.D.N.Y. June 2, 2016).

The requirement that an administrative charge of discrimination must be filed against a defendant before suit in a Title VII case, however, *is* jurisdictional. *See Jones v. Calvert Grp.,*

*Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009). And it is undisputed that neither the Charging Parties nor the EEOC brought administrative charges against Mister. Therefore, the Court must determine whether it has jurisdiction over the claims against Mister even though the Charging Parties never brought charges of discrimination against Mister. The Court finds that it does have jurisdiction over Mister because Mister has been named as a successor to Maritime and sufficient jurisdictional facts exist to satisfy Title VII.

Title VII does not explicitly establish liability for successor entities, but many courts have imposed such liability nonetheless. *See Lipscomb v. Techs., Servs., & Information, Inc.*, Civ. No. DKC-09-3344, 2011 WL 691605, at *7 (D. Md. Feb. 18, 2011) (citing cases). The U.S. Court of Appeals for the Fourth Circuit is not among them – it has yet to speak on the issue. *See id.* However, several District Courts in the Fourth Circuit have. *See id.*; *Weintraub v. Bd. of Cty. Comm'rs for St. Mary's Cty.*, Civ. No. DKC-2008-2669, 2009 WL 10685453, at *4 (D. Md. May 26, 2009); *EEOC v. Ecurie Alford, Ltd.*, Civ. No. 91-113-NN, 1993 WL 389433, at *9 (E.D. Va. July 15, 1993); *EEOC v. Thurston Motor Lines, Inc.*, 124 F.R.D. 110, 113-14 (M.D.N.C. 1989). To the Court's knowledge, no court has found that the doctrine of successor liability does not apply to Title VII, and both the EEOC and Mister seem to agree that the doctrine has at least potential application to this lawsuit.[7] If successor liability applies to Title VII, it must create a jurisdictional exception; virtually by definition in a successor liability case no charge of discrimination will have been filed against the successor entity. At least one judge in this District has considered successor liability as an "exception" to the jurisdictional requirement that an employee first file charges of discrimination with the EEOC naming the defendant-employer. *See Lipscomb*, 2011 WL 691605, at *7-*10.

---

[7] Mister argues that it is not a successor to Maritime for purposes of Title VII liability, but nowhere argues that successor liability does not apply to Title VII.

The notion of successor liability as an exception to Title VII's jurisdictional requirements raises troubling issues. Courts have noted that "[s]uccessor liability [under Title VII] is an equitable determination," *Prince v. Kids Ark Learning Center, LLC*, 622 F.3d 992, 994 (8th Cir. 2010), generally requiring a court to balance a number of factors, *see Lipscomb*, 2011 WL 691605, at *8. Considerations of equity generally may not "apply to overcome a jurisdictional bar." *Harris v. Hutchinson*, 209 F.3d 325, 328 (4th Cir. 2000). So it is hard to see how a court could have jurisdiction over a Title VII claim against a defendant only after finding that, based on a variety of factors, the equities favor holding that defendant liable for the acts of its predecessor. To do so would seem to put the cart before the horse. But to apply successor liability to Title VII and *not* read the doctrine as providing a jurisdictional exception would also be to endorse an odd conclusion: successor corporations could be held liable for the actions of their predecessors, but courts would almost never have jurisdiction over these claims (because employees and the EEOC would rarely, if ever, name a potential successor corporation in their charges of discrimination). Or, the rule would be that after a successor corporation purchases a predecessor, the charging parties (or the EEOC) must refile additional charges of discrimination against that successor. Such a rule would prejudice plaintiffs who may not learn of a successor until after the statute of limitations has run, and at the very least would create unnecessary additional paperwork. *See EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1093 (6th Cir. 1974).

*MacMillan*, a leading case on successor liability in Title VII, provides a route around this odd result. In *MacMillan*, an employee filed charges with the EEOC against her employer, Flintkote Company. *Id.* at 1088. Later, MacMillan "took over operation of Flintkote's Cleveland facility" where the employee worked. *Id.* The EEOC then filed suit against

MacMillan, alleging that all jurisdictional requirements had been met, including that a charge had been properly filed with the EEOC against "Defendant Corporation." *Id.* MacMillan moved to dismiss the EEOC's complaint for lack of subject-matter jurisdiction and for summary judgment. *Id.* at 1088-89. The Sixth Circuit ultimately held that there were genuine issues of fact with regard to whether MacMillan could be held liable for Flintkote's alleged acts as a successor corporation. *Id.* at 1094. But the Sixth Circuit first had to address the jurisdictional problem: that the employee had never filed a charge against MacMillan with the EEOC. *See id.* at 1092-93.

The Sixth Circuit discussed the dual purpose behind the charging requirement. "First, it notifies the charged party of the asserted violation. Secondly, it brings the charged party before the EEOC and permits effectuation of the Act's primary goal, the securing of voluntary compliance with the law." *Id.* at 1092 (quoting *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 719 (7th Cir. 1969)). It then noted that, when read in light of Title VII's statute of limitations provision, "it is reasonable to assume, at least in the case of successor companies, that Congress only intended that a discriminatee be required to name those who were known to him and could have been charged within the period of limitations." *Id.* at 1092-93. It went further:

> The statutory mandate of informal settlement and conciliation is not served by requiring an aggrieved person to charge each new successor company. Such a requirement might encourage evasion through corporate transfers. Even in the case of bona fide transfers of ownership, the delays which would be involved in refiling charges might be substantial and result in prejudice to the discriminatee. Furthermore, serious questions would be presented as to whether a charge filed against a successor would be barred by the statute of limitations.

*Id.* at 1093. The Sixth Circuit then concluded that "[s]ince MacMillan had notice of the charge against Flintkote and had custody and control of all related documents, requiring a 'second 'filing' by the aggrieved party . . . would serve no purpose other than the creation of an

additional procedural technicality.'" *Id.* (omission in the original) (quoting *Love v. Pullman Co.*, 404 U.S. 522, 526-27 (1972)). So, *before* determining whether there were genuine issues of material fact regarding MacMillan's status as a successor corporation, the Sixth Circuit first held that because MacMillan had notice of the charge and "custody and control of all related documents," the jurisdictional requirement that charges of discrimination against the defendant be filed with the EEOC prior to commencement of a civil suit was met.

The Court finds the reasoning in *MacMillan* convincing. There is, in effect, a preliminary question of "successor jurisdiction," as well as a more substantive question of "successor liability." This first question does not require the Court to engage in a balancing of equities to make a determination. Rather, the question is whether jurisdictional requirements were met as against the predecessor corporation, and then whether the successor corporation had notice of the charge and an opportunity to voluntarily comply with the law. Put differently: A federal court has jurisdiction over a Title VII claim against a defendant-employer who was not named in an administrative charge of discrimination when the theory of liability rests on the actions of a different employer who *was* named in the charge of discrimination, and the defendant-employer had notice of the charge and an opportunity to voluntarily comply prior to the plaintiff bringing the claim in court.[8]

---

[8]It may be worth noting at this juncture that charges of discrimination were never technically filed against Phase 2, either. Only Maritime was named as a respondent in charges of discrimination in this case. Although Phase 2 does not challenge the Court's jurisdiction on this ground, the Court's reasoning as to why it has jurisdiction over the claims against Mister applies with equal force as to why the Court has jurisdiction over the claims against Phase 2 – i.e. that liability is premised on Maritime's actions for which Phase 2 is responsible (under Florida statutory law, as opposed to Federal common law) and Phase 2 had sufficient notice and an opportunity to conciliate. It is also worth noting that the Court's holding does not require the EEOC (or an individual Title VII plaintiff) to literally send notice of a charge of discrimination to a successor defendant, as the EEOC did here. (There may be a case where a successor and predecessor are so similar that the Plaintiff can carry its burden of proving subject-matter jurisdiction by alleging that the successor had notice and an opportunity to conciliate by way of the predecessor. In fact, *MacMillan* seems to be such a case; it does not appear that the EEOC ever sent MacMillan notice of the charge of discrimination. *See* 503 F.2d at 1088-89.)

Here, Mister may not have been named in the charges of discrimination, but it has been given ample notice of these charges prior to the initiation of this lawsuit, and was given an opportunity to conciliate. (*See, e.g.*, Notice of Charges of Discrimination, ECF No. 23-9 (notice of charges of discrimination sent to Mister on June 16, 2015).) Mister argues that it was unaware of the nature of the charges against Maritime when it purchased Maritime; but it nowhere argues that it was unaware of these charges prior to the initiation of this lawsuit. It is the later notice that goes to jurisdiction. Congress evinced a clear desire that employers would be given an opportunity to voluntarily comply with Title VII and settle disputes through informal means before being dragged to the courthouse. *See MacMillan*, 503 F.2d at 1093. Congress did not evince such a desire to create formalistic methods to frustrate and avoid the claims of unwary aggrieved employees. *Id.* (quoting *Love*, 404 U.S. at 527) ("Such technicalities are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process."). Here, requiring either the Charging Parties or the EEOC to file an additional, identical charge against Mister "would be simply a useless exercise in technical nicety." *EEOC v. Gen. Elec. Co.*, 532 F.2d 359, 366 (4th Cir. 1976). The Court will not require such an exercise, and finds that it has jurisdiction over the claims against Mister.

### ii. *Exhaustion*

Both Defendants argue that the scope of the Charging Parties' charges of discrimination limits the scope of the EEOC's action here because the Court does not have jurisdiction over claims not raised in the charges of discrimination. Essentially, the Defendants argue that because the charging documents do not assert a charge of "race" discrimination, and do not outline various specific practices, the EEOC did not exhaust a race discrimination claim, or any Title VII claims based on those specific practices. The Defendants are mistaken.

"The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996). "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Id.* at 963.

As far as determining what claims were stated in the initial charge, "courts construe [administrative charges] liberally." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005). "Lawyers do not typically complete the administrative charges," *id.*, and courts should not read the EEOC charge as "a common-law pleading that strictly cabins the investigation," *Gen. Elec. Co.*, 532 F.2d at 364. "[A]n unsophisticated Title VII litigant should not be limited to the precise wording found in his original charge of discrimination." *Hubbard v. Rubbermaid, Inc.*, 436 F. Supp. 1184, 1189 (D. Md. 1977). And even a sophisticated Title VII litigant can find the difference between "race" and "national origin" discrimination confusing. *See Deravin v. Kerik*, 335 F.3d 195, 201-202 (2d Cir. 2003). Perceived "racial categories may overlap significantly with nationality or ethnicity," and "the line between discrimination on account of race and discrimination on account of national origin may be so thin as to be indiscernible." *Id.* at 202 (quoting *Adames v. Mitsubishi Bank, Ltd.*, 751 F. Supp. 1548, 1559 (E.D.N.Y. 1990)).

Beyond claims explicitly stated in a charge or inferred on the basis of a liberal construction, a plaintiff may bring a claim that was absent from a charge of discrimination so long as it was "reasonably related to the original [charge]," *Evans*, 80 F.3d at 963, and/or "would naturally have arisen from an investigation thereof," *Dennis v. Cty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995). "Congress intended the exhaustion requirement to serve the primary purposes of

notice and conciliation." *Chacko*, 429 F.3d at 510. A court, therefore, does not need to peer into what was actually uncovered during an investigation; its focus is on the notice that was provided to the defendant. Accordingly, it must ask whether "a reasonable investigation of [the] administrative charge *would have uncovered* the factual allegations set forth in formal litigation," not whether the investigation actually did uncover such facts. *Chacko*, 429 F.3d at 512 (emphasis added).

In other words, a charge must contain sufficient information to let the defendant know that conduct that might have been uncovered in a later investigation was on the table from the beginning. Thus, if an individual plaintiff alleges only race discrimination, and in a manner that does not put the defendant employer on notice that the plaintiff may have experienced, for example, sex discrimination, that plaintiff may not later bring a claim of sex discrimination in court. *See Bryant v. Bell Atlantic Md., Inc.*, 288 F.3d 124, 132-33 (4th Cir. 2002); *see also Sloop v. Mem'l Mission Hosp., Inc.*, 198 F.3d 147, 148-49 (4th Cir. 1999) (EEOC charge only concerned age discrimination under the ADEA, claims alleging retaliation under Title VII were not exhausted). *But see Gen. Elec. Co.*, 532 F.2d at 368-70 (EEOC charge alleged racially discriminatory testing procedure, EEOC investigation uncovered that testing procedure was perhaps sexually discriminatory as well, and claim of sex discrimination was exhausted).

Similarly, if a plaintiff's EEOC charge details only "one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits," the claim may be barred. *Chacko*, 429 F.3d at 509. In *Chacko*, for example, the EEOC charge only outlined three discrete acts, but the plaintiff's later complaint alleged a twenty-year long pattern of discrimination, and the Fourth Circuit determined that the plaintiff had not exhausted his claims. *Id.* at 506-12; *see also Dennis v. Cty.*

*of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) (plaintiff's EEOC charge only concerned discriminatory discipline, but complaint alleged failure to hire, promote, or train and was not properly exhausted).

The Charging Parties' charges are mostly identical except for the name of the employee. (*See* Charges of Discrimination, ECF Nos. 15-6 through 15-14.) The Charging Parties selected "National Origin" and "Retaliation" as the bases of discrimination. The sections outlining the "particulars" of the discriminatory behavior vary only in the first sentence, which provides different dates for when the different employees began their employment, as well as their different positions. The rest of these sections are substantially the same for each:

I [. . .] From the beginning of my employment I was subjected to unequal terms and conditions of employment than my younger, non Hispanic coworkers by Management. However, in April 2012, when Kyle Decker became the General Manager it became more difficult at work. Examples include but not limited to working longer hours with shorter breaks, not having proper equipment, assigned additional duties, and paid less wages.

Furthermore, I was denied promotional opportunities. I trained new younger non Hispanic employees on the requirements of the job and shortly after they would be promoted.

I also was being subjected to harassment which created a hostile work environment. Anytime I attempted to complain to management, I was threatened with discharge and sent home. Management used profanity while speaking to me. They used words such as fuck you and called me mother fucker. This was not an uncommon occurrence. I have also been reprimanded for leaving at my scheduled time off and threatened with discharge. In January 2013, I complained to General Manager Kyle Decker, but he did not address my concerns. On July 27, 2013, I initially complained to Manager Chris Dogson, but he explained that he did not have the authority to do anything. Afterwards, I attempted to speak with Mr. Decker and owner David Podrog, but instead I was discharged.

II. Respondent did not address my concerns nor provided me with a reasonable explanation for the above action.

III. I believe I have been discriminated against because of my national origin, Hispanic when I was subjected to harassment, intimidation, and a hostile work environment, unequal terms and conditions, assignment, discipline, promotion,

wages and in retaliated for having engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended when discharged.

IV.  I believe that Hispanics as a class have been discriminated against with respect to harassment, intimidation, hostile work environment, unequal terms and conditions of employment, assignment, discipline, discharge, promotion, wages, and retaliation. [sic]

(*See, e.g.*, Escalante Charge of Discrimination, ECF No. 15-6.)

Read liberally, these charges assert a claim of race discrimination.  To be sure, in some instances the line between national origin discrimination and race discrimination will not be "so thin as to be indiscernible." *Adames*, 751 F. Supp. at 1559 (internal quotation marks omitted).  But here it is thin enough.  The Charging Parties allege that they were discriminated against as a class for being "Hispanic."  The term "Hispanic" does not describe a nation.  It is not even a clear geographical area.  Unlike say "European" which could perhaps refer to a perceived racial class or a continent of origin, "Hispanics," "[i]n the eyes of the Census Bureau [at least] . . . can be of any race, any ancestry, any country of origin."  Jeffrey S. Passel and Paul Taylor, *Who's Hispanic?*,  Pew  Research  Center  Hispanic  Trends  (May  28,  2009), http://www.pewhispanic.org/2009/05/28/whos-hispanic/.  By marking "national origin" as the type of discrimination, explaining that the "national origin" was "Hispanic," and briefly describing alleged discriminatory behavior that in no way implicated discriminatory animus against a particular national origin,[9] the Charging Parties stated a claim that, when construed liberally, put race discrimination on the table.

When given a liberal construction, these charges also encompass much of the behavior outlined in the EEOC's complaint, or at least those allegations are reasonably related to the original charges.  Furthermore, to the extent that there are allegations in the complaint that go

---

[9] In other words, the Charging Parties did not allege in their charges that Maritime's managerial staff singled them out for being from, say, Argentina, or El Salvador.

beyond the behavior in the charging documents, those allegations could reasonably have grown out of an investigation conducted by the EEOC. Many of the allegations that Phase 2 contends were not properly exhausted are simply more specific statements of the allegations in the charges. For example:

| Charge | Complaint |
|---|---|
| Alleged that the Charging Parties were "subjected to unequal terms and conditions of employment." | Alleges that the Charging Parties were required to "eat outside . . . drink unfiltered water, and utilize an unlocked unisex bathroom." |
| Alleged that the Charging Parties were forced to work "longer hours with shorter breaks, and paid less wages." | Alleges that the Charging Parties were denied overtime and full tips and forced to perform additional duties without compensation. |
| Alleged that the Charging Parties were "not [given] proper equipment." | Alleges that "Defendants provided higher quality collared shirts and warm jackets to the non-Hispanic employees," and "when [the Charging Parties were] cleaning the tunnel or the 12,000 gallon underground recycling tanks . . . Defendants provided them with used boots that had holes in them." |

(*See* Am. Compl. ¶¶ 41-55; *e.g.*, Escalante Charge of Discrimination.) In these, and other, instances the EEOC's complaint simply puts meat on the bones of the allegations put forth by the Charging Parties in their charges.

What exactly the EEOC uncovered during its years-long investigation is not dispositive in this case. The issue here is one of notice: the charging documents must contain enough material that the Defendant would have been able to comprehend the accusation, investigate on its own, and either root out the problem or come to the conciliation table with eyes wide open. For example, in *General Electric*, two male charging parties alleged racial discrimination, and accused the defendant of discriminating via a biased testing procedure. 532 F.2d at 362. The Court held that a claim of sex discrimination (against women) was exhausted because the claim was that the same testing procedure discriminated on the basis of sex. *See id.* at 368-70. In other words, the charging document had sufficient information that the defendant could have

investigated the alleged bad practice and reasonably uncovered what was afoot. Such is the case here. The charging documents contain enough information to have provided Maritime with a blueprint, and the EEOC's later construction of a claim was faithful enough to that blueprint that the Court will not dismiss any claims on the ground that they were not exhausted.

Both Defendants additionally argue that any claims by a "class" of Hispanic employees are not exhausted because, beyond the Charging Parties, no members of this class filed charges of discrimination. This argument is without merit. The EEOC need not present a charge of discrimination filed by either an employee or the EEOC for each and every employee against whom the employer allegedly discriminated. *See Gen. Elec. Co.*, 532 F.2d 359 (EEOC was permitted to bring claims of discrimination against women when only two male employees filed charges of discrimination); *see also EEOC v. Hearst Corp.*, 553 F.2d 579 (9th Cir. 1977) (EEOC permitted to bring claims of discrimination against women and racial minorities when only one white male filed charge of discrimination); *EEOC v. Huttig Sash & Door Co.*, 511 F.2d 453 (5th Cir. 1975) (EEOC permitted to bring claims of discrimination against women when only male employee filed charge of discrimination). A charge is necessary for the EEOC to begin its investigative process. But once that charge is filed and investigation begun, anything reasonably growing out of that investigation can be brought against the defendants in a complaint, so long as there was notice and opportunity for conciliation. There was notice here, (*see* Letter of Determination ("I have determined Respondent Maritime violated Title VII by discriminating against Charging Parties *and Hispanics as a class . . . .*" (emphasis added))), Defendants were given an opportunity for conciliation, and the Court has jurisdiction over all of the EEOC's claims.[10]

---

[10] The Court will briefly note that the Defendants' arguments regarding exhaustion were based on the scope of the Charging Parties' charges of discrimination, not the scope of the Letter of Determination. (*See* Phase II Mot. Summ.

### c. *Substantive Issues*

Having determined that the EEOC has standing, the Court has jurisdiction over the claims against Mister, and the claims have been properly exhausted, the Court can now move to the Defendants' numerous substantive arguments as to why judgment should be granted in their favor on these claims. The Court will first discuss Mister's successor liability, then both Defendants' arguments regarding the statute of limitations, and finally the impact of the Charging Parties' immigration status on this case.

### i. *Successor Liability*

In addition to making the argument that the Court does not have jurisdiction over the claims against Mister because Mister never "employed" the Charging Parties, Mister has also made the substantive argument that it should not be treated as a successor for liability purposes under Title VII. Although the Fourth Circuit has not addressed successor liability under Title VII at all (either in the context of a "jurisdictional exception" or as an alternative basis for liability), the Court is on better traveled ground here as many other courts have addressed what factors should be considered in determining whether a successor corporation should be liable under Title VII for the actions of its predecessor.

To begin, successor liability under Title VII is a matter of federal common law. *See Reed v. Lawrence Chevrolet, Inc.*, 14 F. App'x 679, 687 (7th Cir. 2001). The cases that Mister and the EEOC cite explaining successor liability not in the context of Title VII, and under state law, are

---

J. Mem. Supp. at 15-18; Mister Mot. Summ. J. Mem. Supp. at 18-19.) Mister suggests that the Letter of Determination was deficient in some respects in its Reply, but does properly raise that argument. (*See* Mister Reply at 3; Mem. 17, ECF No. 40 (noting that Mister did not raise the argument that EEOC failed to conciliate claims but "[t]hen, in [its] reply it appeared to argue for the first time that the EEOC failed to conciliate.").) Regardless, the Letter of Determination is sufficient. It did not explicitly state that "race" discrimination was at issue, but for the reasons explained above that is not a troubling defect. Furthermore, it stated that the claims were on behalf of a class of aggrieved employees, and therefore the Defendants had an opportunity to conciliate such claims.

therefore, at best, persuasive. *See, e.g.*, *National Am. Ins. Co. v. Ruppert Landscaping Co.*, 25 F. App'x 116, 120 (4th Cir. 2001) (unpublished opinion) (discussing general corporate successor liability under Virginia law); *Hern v. Telsys Intern., Inc.*, 139 F.3d 889, 1998 WL 66620, at *3 (4th Cir. 1998) (unpublished table opinion) (discussing general corporate successor liability under Maryland law). Successor liability here is an equitable doctrine, borrowing from other statutory contexts, but addressing a particular problem of employment discrimination: "Failure to hold a successor employer liable for the discriminatory practices of its predecessor could emasculate the relief provisions of Title VII by leaving the discriminatee without a remedy or with an incomplete remedy." *MacMillan*, 503 F.2d at 1091. Broadly speaking, then, courts should balance the needs of discriminatees and the national policy against discrimination evinced by Title VII against the unfairness of holding an innocent purchaser liable for another's misdeed and the possible chilling of the corporate market. *See Nutt v. Kees*, 796 F.3d 988, 991 (8th Cir. 2015) ("Before imposing successor liability, a court must balance the plaintiff's interests, the defendant's interests, and federal policy."); *cf. National Am. Ins. Co.*, 25 F. App'x at 121 (noting, in a different context, that holding successor companies liable simply because they purchased the assets of a cash strapped business would "drastically chill future asset purchases.").

More specifically, courts often look to the nine equitable factors set forth in *MacMillan*:

> 1) whether the successor company had notice of the charge, 2) the ability of the predecessor to provide relief, 3) whether there has been a substantial continuity of business operations, 4) whether the new employer uses the same plant, 5) whether he uses the same or substantially the same work force, 6) whether he uses the same or substantially the same supervisory personnel, 7) whether the same jobs exist under substantially the same working conditions, 8) whether he uses the same machinery, equipment and methods of production and 9) whether he produces the same product."

503 F.2d at 1094. "The first two factors are critical," *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1236 (7th Cir. 1986) (internal quotation marks omitted), and this equitable test, then, really

comes down to three major factors: "whether a successor had notice, whether a predecessor had the ability to provide relief, and the continuity of the business," *Lipscomb*, 2011 WL 691605, at *8; *see also Wheeler*, 794 F.2d at 1236 (distilling *MacMillan* to three factors).

*Notice.* This is a different notice inquiry from notice for the purposes of "successor jurisdiction" as discussed above. There, the Court was concerned with whether the Defendant had notice of the charges prior to the EEOC bringing its complaint in this Court, and thus whether the Defendant had the benefit of the notice and conciliation requirements that undergird Title VII's exhaustion requirement. Now the Court considers whether Mister had notice of these charges *prior to purchasing Maritime's assets*. Such notice can be actual or constructive. *See Lipscomb*, 2011 WL 691605, at *8. Mister had both.

Mister admits that it had *some* notice of these charges prior to purchasing Maritime's assets. (*See* Mister Mot. Summ. J. Mem. Supp. at 28 (noting that Mister asked Maritime to "disclose any and all pending lawsuits and claims by employees," and that Maritime "provided position statements earlier prepared by its counsel responding to EEOC charges").) It is admittedly unclear of the extent of that notice – i.e. what exactly Mister knew about the EEOC charges and the status of that investigation prior to purchasing Maritime – but it knew that Maritime was facing potential employment discrimination liability. At the very least, Maritime had constructive notice. In *Lipscomb*, the plaintiff did not allege that the defendant had *any* notice of the charge. 2011 WL 691605, at *8. Nevertheless, the court noted that "[w]ith some due diligence, [the] [d]efendant would have been able to ascertain that [the] [p]laintiff had filed an EEOC charge." *Id.* Mister seems to be a fairly sophisticated consumer in this situation, and could have acted upon the red flags thrown up by Maritime's counsel. Courts look to notice in

this context to protect innocent purchasers that were themselves blindsided, not to reward purchasers that choose to enter deals blindly.

To be fair, Mister does not so much argue that it entered this deal blindly, but rather stresses the lengths it went through to protect itself from any liability Maritime might incur. Unfortunately for Mister, its evidence and argument demonstrating due diligence, careful contracting, and ironclad indemnification does not move the Court in the direction it had hoped. First, the APA is an agreement between Mister and Maritime. Should the EEOC prevail on liability in this case, and Mister suffer economic hardship as a result, then it may well look to the APA to seek recourse against Maritime (or Phase 2, or Mr. Podrog), but that does not help Mister *vis à vis* the EEOC. Second, the lengths to which Mister went to protect itself from liability, such as structuring the sale as an asset purchase, inquiring into Maritime's liabilities, listing the assumed liabilities in a schedule, and including an indemnification clause, actually demonstrate the fairness of holding Mister liable as a successor. *See Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985). "[I]t would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser when . . . the successor *did not* have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price." *Id.* (emphasis added); *see also Golden State Bottling Co., Inc. v. N.L.R.B.*, 414 U.S. 168, 171 n.2 (1973) (quoting *Perma Vinyl Corp.*, 164 N.L.R.B. 968, 969 (1967), *enforced sub nom.*, *United States Pipe & Foundry Co. v. N.L.R.B.*, 398 F.2d 544 (5th Cir. 1968)) ("The imposition of this responsibility upon even the bona fide purchaser does not work an unfair hardship upon him . . . . [H]is potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising

from the seller's unfair labor practices."). Mister had the opportunity to protect itself, and, it seems, did so.[11]

*The ability of the predecessor to provide relief.* This factor is easily decided in favor of holding Mister liable as a successor. The Court need not look deeply into the current solvency of Phase 2 or the continuing availability of Maritime's supposed $1 million employment discrimination liability insurance policy because "to the extent that injunctive relief is appropriate, it is axiomatic that the current, rather than the former, employer would be the appropriate party" to provide that relief. *Lipscomb*, 2011 WL 691605, at *8. The EEOC has requested injunctive relief. Precisely what relief the EEOC would be entitled to if it succeeds on liability is unclear at this early stage, but the EEOC is seeking such relief, and there is no question that Phase 2 is incapable of providing it.

*Continuity of business.* This final factor is the closest, but tips slightly in favor of finding Mister liable as a successor. To be sure, Mister has changed much at the Edgewater facility since its purchase, and the EEOC makes too much out of Mister's temporary use of Maritime's marketing materials during the transition. The Court is satisfied for these purposes that the transaction between Maritime and Mister was not a sham, entered into on paper only to escape liability—the legal equivalent of a new coat of paint. *See Ecurie Alford, Ltd.*, 1993 WL 389433, at *10 (finding a successor company liable when "[o]nly the form [was] different. One was a sole proprietorship and the other [was] a corporation.").

Looking to the *MacMillan* factors, however, Mister is running substantially the same business. Mister is using the same facility and much of the same workforce (although it seems

---

[11] The fact that Mister did not lower its purchase price, while perhaps unfortunate for Mister in hindsight, is immaterial here. What matters is that Mister had the opportunity to negotiate for a lower price, and the sophistication to uncover the possible need to do so. After all, Mister did have the forethought and sophistication to indemnify itself against both Maritime and Mr. Podrog. (APA § 8.2.)

little to none of the same supervisory personnel); roughly the same jobs exist under roughly the same conditions; and (although with substantive upgrades) Mister is using the "same machinery, equipment and methods of production."  *MacMillan*, 503 F.2d at 1094.  Perhaps most important is the final *MacMillan* factor: "whether he produces the same product."  *Id.*  Mister is still operating a car wash.  It is a car wash company that purchased Maritime's assets because Maritime ran car washes.[12]  Though Mister puts forth evidence that it had to expend resources as a result of Maritime's alleged poor business practices, when it stepped into the "place of the perpetrator of the unfair [employment] practices, [it] became [at least in part] the beneficiary of the unremedied unfair [employment] practices."  *Golden State Bottling Co.*, 414 U.S. at 171 n.2 (1973) (quoting *Perma Vinyl Corp.*, 164 N.L.R.B. at 969).  Making all inferences in the EEOC's favor, Maritime made the decision to hire undocumented workers and discriminate against them and this practice directly impacted the value of Maritime's business – the business that, in large part, Mister now owns and runs.

The Court finds that Mister had some actual notice as well as constructive notice of the pendency of the EEOC's charges against Maritime when Mister purchased Maritime's assets, that neither Maritime nor Phase 2 is capable of providing all of the relief that the EEOC has requested, and that Mister is running largely the same business as Maritime.  For these reasons, the Court finds it equitable to hold Mister jointly and severally liable for any liability that Maritime, i.e. Phase 2, may incur in this case.

---

[12] Mister argues in its reply that this case is very similar to *Prince v. Kids Ark Learning Center, LLC*, in which the Eighth Circuit upheld a district court's decision finding that a successor was not liable even though it maintained the same business on the same facility with roughly the same staff.  622 F.3d at 993-96.  This case *is* similar to *Prince*, and the Court agrees with the Eighth Circuit that in that case "several factors support[ed] the imposition of successor liability," including that the successor "had notice of the discrimination charge," that the predecessor was "unable to provide relief," that the successor "operat[ed] in the same location," and that the successor had some of the same employees.  *Id.* at 995.  However, the district court concluded that successor liability would not be equitable in that case because of circumstances that are not applicable here, and the Eighth Circuit ultimately concluded that given those circumstances the district court did not abuse its discretion.  *Id.* at 995-96.

### ii. *Statute of Limitations*

In addition to various jurisdictional and procedural hurdles, Title VII has its own statute of limitations. In Maryland, a Title VII claim is untimely unless a charge of discrimination is filed (by either an aggrieved employee or the EEOC) within 300 days of the unlawful employment action. *See Gilbert v. Freshbikes, LLC*, 32 F. Supp. 3d 594, 605 (citing 42 U.S.C. § 2000e-5(e)(1)). Under the continuing violation doctrine, so long as a charge of discrimination was filed within this time period, other acts that occurred outside the filing period "may be considered for purposes of liability" if those acts are "plausibly or sufficiently related to [the] act" that did occur inside the filing period. *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 411 (D. Md. 2015); *see National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116-121 (2002). A "charge" in this context does not necessarily mean a formal charge of discrimination. An intake questionnaire, for example, may constitute a charge for the purposes of Title VII's statute of limitations if it contains sufficient information about the employer and the alleged discrimination and is "reasonably construed as a request for the agency to take remedial action." *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 402 (2008); *see* 29 C.F.R. § 1601.12 (EEOC regulation setting forth what information a "charge" should contain); *Scott v. Maryland Dep't of Public Safety and Correctional Servs.*, Civ. No. CCB-14-3695, 2015 WL 5836917, at *4 (D. Md. Oct. 2, 2015) (applying *Holowecki* to Title VII).

Defendants argue that the "charges" for purposes of the statute of limitations were the Charging Parties' formal charges filed on February 4, 2014. They further argue that some of the actions alleged by the EEOC are "discrete acts" that cannot be considered as part of a hostile work environment claim, and to which the continuing violation doctrine does not apply. The sum of the Defendants' arguments is that the Court can only consider alleged non-discrete acts

that occurred after April 10, 2013 (300 days prior to February 4, 2014). Mister further argues that when the Court ignores all untimely acts and discrete acts, the remaining alleged acts are not sufficiently severe or pervasive so as to state a claim for hostile work environment. The Defendants are largely wrong. First, the Court can consider all alleged actions that occurred after *October 3, 2012*, not April 10, 2013. Second, it can consider discrete actions that occurred after October 3, 2012, and it can consider non-discrete actions that occurred prior to that date. Third, when the Court considers all of these actions, the EEOC has presented sufficient alleged acts to state a claim for hostile work environment. The Court will explain each conclusion in turn.

First, the Court has little trouble deciding that the operative date for filing "charges" was July 30, 2013, when the Charging Parties submitted intake questionnaires, and not February 4, 2014, when the Charging Parties filed formal charges. Making all factual inferences in the Plaintiff's favor, these questionnaires satisfy the *Holowecki* standard: they contain, at least, a "written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of," 29 C.F.R. 1601.12(b), and they request that the agency take remedial action, *see Holowecki*, 552 U.S. at 402 (2008). *See also Scott*, 2015 WL 5836917, at *4 (finding that an EEOC intake questionnaire "serve[d] as a charge for the purpose of establishing the limitations period because it satisfie[d] EEOC regulations and the additional *Holowecki* requirement.").[13] Because charges were filed on July 30, 2013, all conduct that occurred after October 3, 2012 (300 days prior) is within the filing period.

---

[13] Phase 2 argues that because the Intake Questionnaires are significantly redacted, including portions describing the discriminatory conduct, "we must assume that the EEOC is hiding critical information that refutes its argument." (Phase 2 Reply 7, ECF No. 22.) Given the posture of this motion, that is exactly wrong. The Court makes all inferences *in favor* of the Plaintiff, not against it. *See Scott v. Harris*, 550 U.S. at 378. Mister makes a similar analytical error. The Intake Questionnaires filled out by the Charging Parties are in Spanish, and the EEOC provided a blank intake questionnaire in English. Mister argues that because the Court has no translation of the actual Intake Questionnaires filled out by the Charging Parties, it has no evidence of what information those

Second, the continuing violation doctrine clearly applies to this case. The EEOC's complaint asserts, at bottom, one cause of action under Title VII: a hostile work environment. Although the EEOC labels Count I "Hostile Work Environment" and Count II "Inferior Economic Terms and Conditions of Employment," both counts allege that the same conduct violated the same statutory provisions. Thus, the Court will look past the formal (and hollow) statement of two claims and view the EEOC's complaint as alleging a single count of hostile work environment.[14] A hostile work environment is a single "unlawful employment practice" that can be comprised of a number of different actions. *See Morgan*, 536 U.S. at 116-17. Any of those actions constitutes part of the "unlawful employment practice," and therefore if any of those actions occurred within the filing period, then, generally speaking, all of the actions that constitute that unlawful practice can be considered for purposes of liability. *See id.*

The EEOC alleges that the Charging Parties were subjected to a hostile work environment comprised of actions that occurred "[s]ince at least April 1, 2006." (Am. Compl. ¶ 34.) The Charging Parties were fired on July 27, 2013. (*Id.* ¶¶ 61-62; *e.g.*, Escalante Decl. ¶ 19.) Thus, some of the actions comprising the hostile work environment were alleged to have occurred between October 3, 2012, and July 27, 2013, which is within the filing period. The EEOC's hostile work environment claim is therefore timely, and the Court can consider actions

---

Questionnaires contain. (*See* Mister Reply 17-18, ECF No. 41.) Again, given the standard for reviewing a motion for summary judgment, the Court finds that, given the EEOC's provided translation, the Intake Questionnaires contain sufficient information to constitute a charge under *Holowecki*.

[14] The EEOC engages in some very curious pleading practices, changing a handful of words in Count II but otherwise alleging the same conduct. The only real difference between Count I and II is that in Count II the EEOC alleges that "[t]he effect of the practices complained of above in Counts I and II has been to deprive [the] Charging Parties . . . and a class of aggrieved Hispanic employees of equal employment opportunities and otherwise adversely affect their status as employees because of race and national origin." (Am. Compl. ¶ 82.) As best as the Court can tell, this is simply a conclusory and formulaic restatement of the third element of a hostile work environment claim. *See Guessous v. Fairview Property Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016) ("To prevail on a hostile work environment claim, a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's [protected characteristic]; (3) which is sufficiently severe or pervasive *to alter the plaintiff's conditions of employment and to create an abusive work environment*; and (4) which is imputable to the employer." (alteration in the original) (internal quotation marks omitted) (emphasis added)).

that contributed to the hostile work environment but occurred prior to October 3, 2012, under the continuing violation doctrine.[15]

There is one final issue with regard to the statute of limitations: consideration of "discrete acts." Both Defendants correctly note that the continuing violation doctrine does not permit a plaintiff to rehabilitate claims of discrete acts of discrimination simply by alleging that they were part of a "hostile work environment." As the *Morgan* Court noted: "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." 536 U.S. at 113. What precisely delineates a "discrete" act from a single act that nonetheless is part of an ongoing hostile work environment can be difficult to discern. But "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify." *Id.* at 114. This Court has further identified denial of overtime as a discrete act. *See Camacho v. Colvin*, Civ. No. 13-cv-1303-JKB, 2014 WL 2772314, at *5 (D. Md. June 17, 2014). A "discrete act," however, can still comprise part of a hostile work environment claim, so long as it falls within the filing period. *See Guessous v. Fairview Property Invs., LLC*, 828 F.3d 208, 221-22 (4th Cir. 2016). Thus, when a plaintiff brings a hostile work environment claim, that claim is timely if any of the acts, discrete or otherwise, occurred within the filing period, but the court can reach back and include only acts that occurred prior to the filing period if those acts are not "discrete."

---

[15] The Court will briefly note that the applicability of the continuing violation doctrine to this case mitigates, somewhat, the impact of the Court's finding concerning the date of the charge. Regardless of whether the "charge," for the purposes of the statute of limitations, was filed on July 30, 2013 or February 4, 2014, *some* of the alleged conduct allegedly occurred within the filing period. The parties were employed at some point during either filing period (October 2, 2013 to July 30, 2013 or April 10, 2013 to February 4, 2014), and the conduct allegedly occurred during their entire employment.

The EEOC alleges that the Charging Parties were subjected to a number of discrete actions. However, the nature and posture of this case make this fact largely inconsequential, even if the parties expend a number of pages discussing it. The EEOC alleges that the acts constituting the hostile work environment, including the discrete acts, occurred since April 2006, and therefore occurred during the filing period. Accordingly, the Court finds that all of the acts alleged can be considered as part of the EEOC's timely hostile work environment claim. It is worth noting here that, despite the already lengthy history of this case, with a trip to the Fourth Circuit, a years-long investigation, multiple corporate transfers, and a sizeable memorandum and order already issued by this Court, this case nevertheless remains in relative infancy. Formal discovery has not yet begun. On the limited record before the Court, and granting all inferences in the Plaintiff's favor, then, the Court finds that instances of all the alleged actions occurred within the filing period.[16] Later, discovery and a different standard of review (and factfinder) may overcome that finding. But, given that finding, appropriately made at this early stage, the Court has no trouble determining that the alleged timely acts – including denial of overtime and tips, being forced to perform additional duties without pay, being forced to eat outside and use a separate toilet, being sworn at and threatened with termination (to name a few) – if proven at trial, would be sufficiently severe and pervasive so as to constitute a hostile work environment.

### i. *Title VII and Undocumented Aliens*

Finally, the Court will address the elephant in the room; this is the issue that "Maritime presse[d]" two years ago before the Fourth Circuit, and that Phase 2 hangs its hat on here: must this case be dismissed if the Charging Parties were undocumented aliens? *See Maritime*

---

[16] For example, the EEOC alleges that the Charging Parties and class of aggrieved employees were sworn at (a non-discrete act) and passed over for promotion (a discrete act) "since April 2006." Making all inferences in the EEOC's favor, the Court finds that some of the Charging Parties and/or members of the class were sworn at and passed over for promotion during the filing period.

*Autowash*, 820 F.3d at 667. Just as the Fourth Circuit did in 2016, this Court will "begin by emphasizing what [it] need *not* address in this case." *Id.* at 664. Whether or not undocumented aliens can bring Title VII suits is not before the Court. Phase 2 argues throughout its papers that undocumented aliens do not have a cause of action under Title VII, but that is not exactly the issue. Even if the Charging Parties themselves did not have a cause of action, that does not necessarily mean that these claims brought by the EEOC should be dismissed. *See EEOC v. Restaurant Co.*, 490 F. Supp. 2d 1039, 1046 n.1 (D. Minn. 2007) (*Restaurant II*) (finding, in a similar case, that "even if the Court were to conclude that [the undocumented alien plaintiff-intervenor] lack[ed] standing to pursue her federal civil rights claims, there is no question that the EEOC could still pursue the claims"). The question raised by Phase 2's argument, then, is more properly phrased thus: is discrimination against an undocumented alien an unlawful employment practice under Title VII? Despite seemingly contrary language in some Fourth Circuit cases, the Court answers that question in the affirmative. *See Chaudhry v. Mobil Oil Corp.*, 186 F.3d 502 (4th Cir. 1999); *Egbuna v. Time-Life Libraries, Inc.*, 153 F.3d 184 (4th Cir. 1998). To explain why, the Court will begin, as it must, with the statute.

Title VII of the Civil Rights Act was passed in 1964 "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30 (1971). The act authorized suits against employers for discrimination on the basis of race, color, national origin, religion or sex. It did not restrict the class of persons who could bring such suits by citizenship or immigration status. The relevant statutory text remains unchanged. *See* 42 U.S.C. § 2000e (defining, *inter alia*, "person" and "employee" without reference to immigration

status); *id.* § 2000e-2 (setting forth what constitutes an unlawful employment practice without reference to immigration status).

Three things, however, *have* changed since Title VII was passed. First, the Supreme Court decided the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In that case, the Court set forth a prima facie case for a disparate treatment claim under Title VII, and in doing so enshrined the concept of an employee's "qualification" in the fabric of employment discrimination litigation. Quoting *Griggs*, the Court noted that "Congress did not intend by Title VII . . . to guarantee a job to every person regardless of qualifications." 411 U.S. at 800. The Court went on to hold that a Title VII plaintiff can establish a prima facie case "by showing (i) that he belongs to a racial minority; (ii) that he applied *and was qualified for* a job for which the employer was seeking applicants; (iii) that, despite his *qualifications*, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons *of complainant's qualifications*." *Id.* at 802 (emphases added). After *McDonnell Douglas*, if a person believed she had not been hired on account of her race, color, religion, sex, or national origin, but did not have direct evidence to support that belief, she had to show that she was qualified for the position in order to present a prima facie case under Title VII.

The second relevant occurrence between the passage of Title VII and today was that Congress, in 1986, passed the Immigration Reform and Control Act, Pub. L. No. 99–603, 100 Stat. 3559 ("IRCA"). IRCA was enacted in part "to reduce the influx of illegal immigrants into the United States by eliminating the job magnet." *Egbuna*, 153 F.3d at 187. In furtherance of that goal, IRCA made it illegal to employ aliens who were not authorized to work in the United States. *See* 8 U.S.C. § 1324a. IRCA did not, at least explicitly, amend or impact in any

way then-existing employment discrimination statutes, such as Title VII. "To the contrary, the legislative history explicitly cautions that IRCA should *not* be interpreted as extinguishing an undocumented alien's rights under these statutes:

> [T]he committee does not intend that any provision of this Act would limit the powers of State or Federal labor standards agencies such as the . . . Equal Employment Opportunity Commission . . . to remedy unfair practices committed against undocumented employees for exercising their rights before such agencies or for engaging in activities protected by these agencies.

153 F.3d at 188 (Ervin, J. dissenting) (alteration in the original) (quoting House Comm. on Educ. and Labor, H. R. Rep. No. 99–682(II), at 8–9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5757, 5758).

Third, and finally, in 1998 the Fourth Circuit decided *Egbuna v. Time-Life Libraries, Inc*. In that case, a Nigerian plaintiff who was unauthorized to work in the United States brought a suit against his former employer alleging that the employer had not rehired him because he had participated in an EEOC matter. In 1989, the plaintiff had started working for Time-Life Libraries Inc. ("TLLI") on the authority of a student work visa. *Egbuna*, 153 F.3d at 185. While working at TLLI, the plaintiff had corroborated the account of a coworker who had claimed that he had been sexually harassed. *Id.* at 186. The plaintiff's visa expired in 1989, but he continued to work for TLLI until 1993, when he quit, thinking he would return to Nigeria. *Id.* at 185. The plaintiff then changed his mind and reapplied for work at TLLI, though at that time he was unauthorized to work in the United States. *Id.* at 186. The plaintiff was not rehired, and he ultimately sued under Title VII, alleging retaliation. *Id.* The district court granted summary judgment for TLLI in part on the ground that the plaintiff was not "qualified" for the position. *Id.* at 186. He appealed.

The Fourth Circuit noted that a Title VII plaintiff "may seek equitable remedies from the courts for the discriminatory employment practices of an employer," remedies such as "hiring of the applicant, reinstatement, back pay, and injunctions against further violations." *Id.* at 186. But, the court noted – without citation, but alluding to *McDonnell Douglas* – that "A plaintiff is entitled to the above remedies *only* upon a successful showing that the applicant was qualified for employment." *Id.* at 187 (emphasis in the original). Given the passage of IRCA, the Court reasoned, when an alien is unauthorized to work in the United States he is necessarily not "qualified" for any position. *Id.* The Court therefore concluded that it could not "reverse the district court's grant of summary judgment in favor of TLLI. To do so would sanction the formation of a statutorily declared illegal relationship, expose TLLI to civil and criminal penalties, and illogically create an entitlement simply because [the plaintiff] *applied* for a job despite his illegal presence in this country and despite his having been statutorily *disqualified* from employment in the United States." *Id.* at 188 (emphasis in the original).

*Egbuna* remains the law in this Circuit and has not been revisited. A year after *Egbuna*, the Fourth Circuit was again confronted with similar facts: a foreign national unauthorized to work in the United States brought a Title VII suit after being denied a transfer to the United States. *See Chaudhry*, 186 F.3d 502. The Court, citing *Egbuna*, stated that "[t]o be eligible for Title VII protection, a plaintiff must show that he was qualified for employment." *Id.* at 504. The Court softened this blunt statement somewhat by way of explanation:

> This Court recently held in *Egbuna* that a foreign national who applies for a job in the United States is entitled to Title VII protection only upon a successful showing that the applicant was qualified for employment. A foreign national is qualified for employment if the applicant was an alien authorized for employment in the United States at the time in question.

*Id.* (internal quotation marks and citations omitted).

Considering the language in *Egbuna* and *Chaudhry*, it is perhaps understandable to surmise, as Phase 2 apparently has, that Title VII is fully inapplicable when the allegedly aggrieved employees are unauthorized to work in the United States, i.e. that discrimination against undocumented aliens is not, in fact, an unlawful employment practice under Title VII. Considering the history of Title VII, the import of an employee's "qualifications," the purpose behind the law, and the facts behind *Egbuna* and *Chaudhry*, however, that conclusion strikes this Court as wrong. Rather, *Egbuna* and *Chaudhry* stand for a more specific, and obvious, proposition: that an undocumented alien alleging (at least) a discriminatory failure to hire cannot present a prima facie case under *McDonnell Douglas* because IRCA makes that person legally unqualified for the position.[17] These cases do not preclude the EEOC from bringing this case,[18] and they do not require its dismissal. That *Egbuna* and *Chaudhry*'s holdings are so limited is demonstrated both by common sense and precedent.

On the common sense front, a plaintiff's "qualifications" for a position do not appear in every Title VII prima facie case. Where, as here, the plaintiff alleges a hostile work environment, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's [protected characteristic]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *See Guessous*, 828 F.3d at 221 (alteration in the original) (internal quotation marks omitted). Whether or not the plaintiff was "qualified" for the position

---

[17] *Egbuna* itself suggests that its scope is cabined to the hiring/firing context. The court distinguished the case from *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883 (1984), in part because *Sure-Tan* was "not a case in which the alleged discrimination occur[ed] during the hiring process." *Egbuna*, 153 F.3d at 187; *see also Maritime Autowash, Inc.*, 820 F.3d at 670 (Niemeyer, J., concurring) ("[T]he scope of *Egbuna* has not been fully delineated where an unauthorized alien is actually working for an employer covered by Title VII.").

[18] It perhaps bears repeating that the EEOC is the party that has brought this case. It was not brought by any of the Charging Parties themselves, and none of the Charging Parties (or any employee of Maritime) is an intervenor in this action.

is understandably missing from the essential elements of the claim. An employer is not entitled to harass an employee with, say, racial epithets and demeaning behavior on the ground that the employee was not very good at her job. The same logic suggests that an employer cannot harass an employee and escape Title VII liability because of the employee's immigration status. In fact, "the immigration status of the plaintiff is usually not relevant to the issue of whether the employer discriminated against the plaintiff in violation of Title VII." *EEOC v. Restaurant Co.*, 448 F. Supp. 2d 1085, 1087 (D. Minn. 2006) (*Restaurant I*) (noting that when an employer puts forth an employee's immigration status as a legitimate non-discriminatory reason for the employer's otherwise unlawful employment practice, the dispositive issue is whether the employer really believed that the employee was unauthorized to work, not the employee's actual immigration status).[19]

As for precedent, the Court finds the Supreme Court's decisions regarding the coverage of labor laws persuasive, as well as the Fourth Circuit's earlier brief consideration of this issue in this case. In *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883 (1984), a pre-IRCA case, the Supreme Court held that the National Labor Relations Act ("NLRA") covered undocumented aliens. The Court reasoned that the definition of "employee" was carefully defined by the statutory text and interpretations of it by the National Labor Relations Board ("NLRB"), and that text nowhere exempted undocumented aliens. 467 U.S. at 891-92. The Court then reasoned that enforcement of the NLRA against employers of undocumented aliens did not conflict with a different immigration law, the Immigration and Nationality Act ("INA"). *See id.* at 892. Although the INA, unlike IRCA, "evince[d] at best evidence of a peripheral concern with employment of

---

[19] The immigration status of the Charging Parties was apparently not particularly relevant here either, at least initially. In other words, even if in the eyes of *Egbuna* (and IRCA) the Charging Parties were "unqualified" for their positions as a matter of law, it certainly seems that in the eyes of Maritime they were "qualified" for their positions. It hired them.

illegal entrants," *id.* at 892 (internal quotation marks omitted), after the passage of IRCA the Court has continued to find that the NLRA covers conduct towards undocumented aliens. *See Hoffman Plastic Compounds, Inc. v. N.L.R.B.*, 535 U.S. 137, 152 (2002) (holding that the NLRB may enforce "significant sanctions" against an employer of undocumented aliens). Much like the NLRA, there is nothing in the text of Title VII that precludes application to discrimination against undocumented aliens, and enforcement of the statute in that context does not necessarily undermine the Congressional policy evinced in IRCA. Beyond the persuasive logic of these cases, the Court notes that the NLRA and Title VII share much in common. *See MacMillan*, 503 F.2d at 1091 (relying on NLRA cases in determining that successor liability applies to Title VII and noting that "Title VII was molded, to a large degree, after the Labor Act").

Although the Fourth Circuit has not addressed this issue, and explicitly refused to reach its merits two years ago in this case, it expressed understandable reservations about the position advanced by Phase 2 here. "The employer," the Fourth Circuit noted, "is asking the court for carte blanche to both hire illegal immigrants and then unlawfully discriminate against those it unlawfully hired. Maritime would privilege employers who break the law above those who follow the law." *Maritime Autowash*, 820 F.3d at 668. Punishing an employer for firing an undocumented alien in compliance with an order from ICE, or requiring reinstatement, would certainly create conflict between Title VII and IRCA, and would, as the Court in *Egbuna* noted, "sanction the formation of a statutorily declared illegal relationship." 153 F.3d at 188. But so would the holding sought by Phase 2. Taking the EEOC's allegations as true but applying Phase 2's legal theory, Maritime received a sizeable benefit by hiring the Charging Parties – it was able to pay them less, make them work longer hours, and make them perform additional duties without compensation, all without violating Title VII. Even if Maritime was unaware of the

Charging Parties' immigration status when it hired them, if the Court were to "sanction the formation of [that] statutorily declared illegal relationship" by shielding Maritime (and its successors) from Title VII scrutiny, other employers may well find an incentive to look the other way when potential employees are unable to provide proper documentation. Enforcing Title VII in this context does not, therefore, eviscerate IRCA. It strengthens it. *See Restaurant II*, 490 F. Supp. 2d at 1047 ("The Court also considers the need to reduce employer incentives to hire undocumented workers because of their inability to enforce their rights.").

So, discrimination against an employee on the basis of his race, national origin, or participation in EEOC investigations is an unlawful employment practice under Title VII even if that employee is an undocumented alien, and the EEOC may therefore pursue its claim here. But that does not entirely end the matter. *Egbuna* and *Chaudhry* may not require dismissal, but they, and *Hoffman Plastic*, do cabin the nature of the relief that the EEOC may seek in this case. *See Restaurant II*, 490 F. Supp. 2d at 1047 ("It is possible that *Hoffman Plastic* precludes undocumented employees from pursuing certain remedies in discrimination cases."); *see also Egbuna*, 153 F.3d at 187. The Court could not, for example, require Mister to rehire the Charging Parties. Nor could it require the Defendants to pay the Charging Parties backpay. *Hoffman Plastic*, 535 U.S. at 151 ("We therefore conclude that allowing the Board to award backpay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA."). This does not mean, however, that Maritime (and thus Phase 2 and Mister) will get off "scot-free" if it is proven that Maritime discriminated against the Charging Parties with regard to pay. *See id.* at 152.[20] The EEOC has requested "such further relief as the Court deems necessary and proper in the public interest,"

---

[20] Nor does it seem to have any bearing on the possibility of recovery for non-economic damages, such as emotional pain and suffering, related to other alleged unequal treatment beyond pay. *See* 42 U.S.C. § 1981a.

(Am. Compl. p. 17), and Title VII provides Courts a wide berth to craft appropriate remedies, *see* 42 U.S.C. § 2000e-5(g); *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 582 n.15 (1984) (quoting 118 Cong. Rec. at 7168) ("The provisions of this subsection are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible."). Although the Court cannot award backpay to the undocumented aliens, if Defendants are found liable, the public interest would be best served by enforcing *some* monetary penalty. Otherwise, employers would have an incentive to hire undocumented immigrants: they could pay such employees less than their colleagues with the knowledge that they will be able to pocket the difference, even if they may be required to implement some injunctive relief. But it would be premature to draw the contours of a remedy at this time (including the determination of who or what institution might be the recipient of such monetary payment). At this stage, the Court will only deny summary judgment for the Defendants. Liability and, perhaps, remedies will be decided at some later date.

### IV. *Conclusion*

The EEOC has standing to bring this claim and the Court has jurisdiction over all of the claims against both Defendants. The Court will therefore deny the Defendants' motions to dismiss in part, as they are in part construed as motions to dismiss under Rule 12(b)(1). Making all factual inferences in the EEOC's favor, the Court finds it is not inappropriate to hold Mister liable as a successor, that the claims against Mister and Phase 2 are timely, and that the alleged discrimination against undocumented aliens in this case constitutes an unlawful employment practice. For these reasons, the Court will deny both Defendants' motions to dismiss, construed in part as motions for summary judgment. An order shall issue accompanying this memorandum and setting forth this disposition.

DATED this 17th day of April, 2018.

BY THE COURT:

_____/s/_____
James K. Bredar
Chief Judge